PATTERSON, Retired Appellate Judge.
The Houston County grand jury indicted the appellant, Jerry Jerome Smith, on February 20, 1997, for the capital offense of “[mjurder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct,” Alabama Code 1975, § 13A-5-40(a)(10).[1] At arraignment, he entered pleas of not guilty and of not guilty by reason of mental disease or defect. He withdrew this latter plea before his case was submitted to the jury. When withdrawing the plea, his counsel stated, “Nobody’s saying he’s insane. We’re just saying he’s retarded.” (R. 1229.) The appellant was found guilty by a jury on February 24, 1998, of the capital offense charged in the indictment. A sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, and the jury recommended, by a vote of 11 to 1, that the appellant be sentenced to death. The trial court held another sentencing hearing as required by §§ 13A-5-47 through -52, and, after considering all the evidence, after weighing the aggravating and mitigating circumstances, and after considering the presentence report and the jury’s recommendation, sentenced the appellant to death.
The prosecution’s evidence showed that the appellant, a drug dealer, went to the residence of Willie Flournoy in Dothan, around 8:30 p.m., on October 19, 1996, to collect $1,500 Flournoy owed him for crack cocaine Flournoy had purchased. Flour-noy told the appellant that he did not have the money at that time, but that he would have it later that night. After smoking crack cocaine with Flournoy, the appellant left. Later that night, the appellant, accompanied by his girlfriend, Lekina Smith, returned to Flournoy’s residence. He carried a sawed-off .22 caliber rifle concealed *125 under his shirt. The appellant again asked Flournoy for the money, and Flour-noy said he did not have it. The appellant told his girlfriend, Lekina, to get out of the way, and then he pointed his rifle at Flour-noy and said, “Flint [Flournoy], I have something for you.” He shot Flournoy, who was unarmed, in the chest as Flour-noy begged him not to shoot. Flournoy attempted to escape, but fell in the yard of his residence and later died from a bullet wound in his chest. After shooting Flour-noy, the appellant turned on the other occupants of the home, none of whom was armed. He shot Theresa Helms six times as she tried to flee; she died at the scene from several gunshot wounds to her chest. He shot David Bennett as Bennett sat in a chair in one of the bedrooms of the residence; Bennett died at the scene from a gunshot wound to his head. The appellant attempted to shoot Derrick Gross, but his rifle jammed. As Gross and the appellant wrestled over the gun, the appellant tried to get a knife from his girlfriend so he could stab Gross. Gross escaped. After the shootings, the appellant, accompanied by his girlfriend, fled the scene; he made arrangements for an acquaintance to hide the rifle, changed clothing, and attempted to hide from the police. He was apprehended by the police at approximately 2:00 a.m. the following morning, when he was discovered hiding in his father’s house. After being advised of his rights, he confessed to the shootings. The prosecution’s evidence also tended to show that the appellant had bragged to other inmates in the county jail that he would beat the capital charge because of his mental condition. It further indicated that the appellant had made statements that the shootings were the result of a drug deal and that he intended to shoot all persons in the residence in order to eliminate all witnesses to the shootings.
At trial, the appellant admitted shooting and killing the three victims, but he contended that he did not intend to kill them. He claimed that he was not “in his right mind” at the time of the shootings and that he just “snapped,” for three reasons: (1) he had been on a binge, smoking crack cocaine and drinking alcohol; (2) he was under duress because he owed $27,000 to his narcotics supplier, a person he could only identify as a Jamaican named “Tony,” who lived in Florida and who, he claimed, carried an Uzi automatic weapon and had threatened to kill the appellant’s mother if he did not get his money; and (3) he was angry because Flournoy had called his girlfriend a “whore” and “bitch.” He also urged the jury to consider the facts that he had had an alcohol and drug problem since he was eight years old and that he was mentally retarded. In his closing summation, his counsel argued:
“He should get punished only for what he did and had an intent to do. We are not asking you to let him off for killing someone, absolutely not. He’s admitted that. But he didn’t intend to kill those people. The drugs and alcohol in his system, the threat of force, and then the final little thing, the straw that broke the camel’s back, Flint standing there and called his [girlfriend] a whore and a slut and stuff, the man snaps.”
(R. 1780.)
The evidence presented by the prosecution was largely direct evidence, and the appellant does not question on appeal the sufficiency of the prosecution’s evidence to support the jury’s verdict. Nevertheless, we have reviewed the record in reference to the question of the sufficiency of the evidence, as we are required to do in a death-penalty case, and we find that the evidence presented by the prosecution was sufficient for the jury to find the appellant guilty beyond a reasonable doubt of the *126 capital offense charged in the indictment. In fact, we find the evidence of guilt of the capital offense to be strong and convincing.
I.
The appellant first contends that the trial court erred in granting the prosecution’s challenges for cause, over his objection, of veniremembers M.M., L.Y., and L.W. The attorney general responds that the trial court’s grant of the challenges for cause was proper; the challenge was based upon the inability of the three venire-members to be impartial, which, he argues, could reasonably be inferred from their alleged failure to answer truthfully certain questions diming the voir dire examination,
“To justify a challenge of a juror for cause there must be a statutory ground (Ala.Code Section 12-16-150 (1975)), or some matter which imports absolute bias or favor, and leaves nothing to the discretion of the trial court.” Nettles v. State, 435 So.2d 146, 149 (Ala.Crim.App.), aff'd, 435 So.2d 151 (Ala.1983). Section 12-16-150 sets out the grounds for removal of veniremembers for cause in criminal cases; however, the attorney general asserts none of these statutory grounds and we find none applicable here.
However, in addition to the statutory grounds, there are other grounds in the common law for challenging venire-members for cause where those grounds are not inconsistent with the statute. Kinder v. State, 515 So.2d 55, 60 (Ala. Crim.App.1986). Ultimately, the test to be applied is whether the veniremember can set aside his or her opinions, prejudices, or biases, and try the case fairly and impartially, according to the law and the evidence. Knop v. McCain, 561 So.2d 229 (Ala.1989). This determination of a veniremember’s absolute bias or favor is based on the veniremember’s answers and demeanor and is within the discretion of the trial judge; however, that discretion is not unlimited. See Rule 18.4(e), Ala. R.Crim.P. Even proof that a venire-member has a bias or fixed opinion is insufficient to support a challenge for cause. A prospective juror should not be disqualified for prejudices or biases if it appears from his or her answers and demeanor that the influence of those prejudices and biases can be eliminated and that, if chosen as a juror, he or she would render a verdict rendered according to the law and the evidence. Mann v. State, 581 So.2d 22, 25 (Ala.Crim.App.1991); Minshew v. State, 542 So.2d 307 (Ala.Crim. App.1988), overruled on other ground, Ex parte Gentry, 689 So.2d 916 (Ala.1996).
In regard to the prosecutor’s claim that M.M., L.Y., and L.W. were untruthful in addressing the questions put to them during voir dire, we acknowledge that voir dire examination is critical in ensuring juror impartiality. It enables the parties to probe potential jurors for prejudice and bias, both known and unknown. Demonstrated bias in the responses to questions on voir dire may result in a potential juror’s being excused for cause. While demonstrated bias can result in a venire-member’s removal, hints of bias, not sufficient to warrant a challenge for cause, assist the parties in exercising their peremptory strikes. If the process is to serve its purpose, veniremembers must give truthful answers. McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); Dyer v. Calderon, 151 F.3d 970 (9th Cir.1998).
“Nevertheless, we must be tolerant, as jurors may forget incidents long buried in their minds, misunderstand a question or bend the truth a bit to avoid embarrassment. The Supreme Court has held that an honest yet mistaken answer to a voir dire question rarely amounts to a *127 constitutional violation; even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality. See McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 668 (1984).”
Dyer v. Calderon, 151 F.3d at 973; see also United States v. Langford, 990 F.2d 65 (2nd Cir.1993). “Few voir dires are impeccable and most irregularities can be shrugged off as immaterial to the fairness of the trial.” Dyer v. Calderon, 151 F.3d at 984.
“A court confronted with a color-able claim of juror bias must undertake an investigation of the relevant facts and circumstances.” Id. at 974. See also Hagood v. State, 111 So.2d 162 (Ala.Crim. App.1998). Thus, we turn to the relevant facts and circumstances regarding the removal of M.M., L.Y., and L.W. to discover if any of these veniremembers held absolute bias to warrant removal. The voir dire began with the trial court asking the assembled venire general preliminary questions directed toward their qualification to serve as jurors, and then counsel for the parties asked general questions of the entire venire. The assembled venire was asked, among the questions, if anyone was related by blood or marriage to the defendant, if anyone knew anything about the facts of the case, if anyone had discussed the case, or if anyone had said or had heard anyone say that the victims got what they deserved because of where they were and what they were doing when they were killed. Although several members of the venire responded to a number of the inquiries, M.M., L.Y., and L.W. did not respond to any of them. (Any venire-member who wished to answer any question privately was invited to do so at the bench.) Then counsel were permitted to question individually any veniremember. The prosecutor individually questioned M.M., L.Y., and L.W.
We first note that M.M., L.Y., and L.W. were challenged, in part, because they denied having made or having heard statements about the victims’ getting what they deserved; it should be remembered, however, that they were under oath, and no evidence has been introduced to contradict them in this regard. Although the prosecutor stated that he had been told by members of one of the victim’s family that the three veniremembers had made these statements or had been present when such statements were made, such assertion by the prosecutor was inadmissible hearsay. He stated to the trial court that he was willing to put on witnesses to prove that the three had made such statements or that they had been present when such statements were made, but he did not do so. “A prosecutor cannot simply presume, without further questioning to ‘dispel any doubt,’ that a veniremember, who is under oath, did not answer a question truthfully merely because the prosecutor has hearsay evidence to the contrary.” Walker v. State, 611 So.2d 1133, 1140 (Ala.Crim.App. 1992).
The prosecutor also challenged M.M. on the ground that she was untruthful because she did not respond when the venire was asked if anyone knew any of the victims or their family members. When questioned individually, M.M. testified that, when the venire was first asked if any member knew any of the victims, it did not “dawn” on her that the victim, David Bennett, could be the same David Bennett she had gone to school with 25 years before. She testified that she had also been in school with Bennett’s sister. She also testified that she had not seen or heard from Bennett or his sister in over 25 years. From her testimony, it is quite clear that, when questioned individually, *128 she still expressed uncertainty that the person she knew in school was in fact the victim, David Bennett. She stated that she had no bias against Bennett, but she was never asked if she harbored any bias or prejudice against the prosecution or the defendant or if she could sit on the jury and decide the case according to the law and the evidence. The trial court granted the prosecution’s challenge and excused M.M. without comment.
M.M.’s explanation as to why she did not initially disclose that she had known a person named David Bennett 25 years before was credible and uncontradicted. The evidence is insufficient to support a conclusion that she deliberately withheld information or that she failed to truthfully answer questions regarding any acquaintance with or knowledge of the victims and regarding comments about the victims’ deserving their fate. The evidence fails to show that M.M. was in any way biased or prejudiced against the prosecution. It certainly fails to show absolute bias.
The prosecution also challenged L.Y. for cause on the ground that she was untruthful because she did not respond initially when the venire was asked if anyone knew the defendant or any of his family. L.Y. also did not respond when the venire was asked if anyone was related by blood or marriage to the defendant. When questioned individually, she explained that she had been married to a “distant” cousin of the defendant. She stated that she did not respond to the question initially because she and her husband were separated. The degree of relationship between her husband and the defendant was never specified. L.Y. could very well have believed that because she was separated from her husband, any relation to the defendant was severed and she, therefore, was not required to answer the question affirmatively. She could very well have failed to respond initially because she was embarrassed. It is apparent that there was no close relationship between her and the defendant. We note that the trial court should have questioned L.Y. further to flesh out the relevant facts and circumstances. She was never asked specifically whether she had any bias against the prosecution or whether she could serve on the jury and decide the case impartially on the evidence presented. We find that the evidence is insufficient to warrant a conclusion that L.Y. was biased against the prosecution. To find absolute bias here, one would have to resort to pure speculation. Even if there were a hint of bias, we would agree with the defense counsel’s assessment: it would not be ground for a challenge for cause, but would more properly be a reason for a peremptory challenge.
The prosecutor also challenged L.W. on the ground that she had not been truthful in her answers. When L.W. was questioned individually by the prosecutor, she stated that she had heard on television and from a neighbor that someone named David Bennett had been killed. She elaborated that she did not know any of the people involved, had not discussed the case with anyone or heard any other discussions about the case, and had no knowledge of the case. Neither the trial court nor the prosecutor asked any question relating to the possibility of bias or prejudice on the part of this veniremember. In response to a question from defense counsel, L.W. stated that she had no bias against the prosecution and that she could sit on the jury and render a verdict based solely on the evidence.
We find that the evidence is insufficient to warrant a conclusion that L.W. was biased against the prosecution. The facts behind her removal for cause were insufficient to trigger her removal from the veni- *129 re. They do not support a conclusion that she deliberately withheld information or that she lied. A more likely explanation for her failure to respond initially during the general questioning of the venire was the confusing nature of the question, i.e., the stringing together of several separate questions into one.
As we explained supra, because no statutory ground existed to excuse the venire-members in question for cause, some absolute bias on their part must have been shown. Howevei’, the evidence of the voir dire examination falls short of proving any bias on the part of the veniremembers in question, much less an absolute bias that would have prevented them from rendering a fair and impartial verdict. Further questioning was required before the trial court could determine, first, whether the three potential jurors harbored prejudice or bias against the prosecution (or the defense for that matter) and second, assuming such prejudice or bias existed, whether they could lay it aside, follow the court’s instructions, and render an impartial verdict. We find that, under the circumstances here, the trial court abused its discretion in granting the prosecution’s challenges for cause of these venire-members.
However, the improper removal of a prospective juror for cause is subject to a harmless error analysis. See Evans v. State, 794 So.2d 411 (Ala.2000), and Rule 45, Ala.R.App.P. A party arguing on appeal that the trial court improperly removed a prospective juror for cause, must prove not only that the trial court erred, but also that the error probably injuriously affected the party’s substantial rights. In addressing the identical issue in the recent case of Evans v. State, 794 So.2d at 414, the Alabama Supreme Court stated:
“Evans argues that the trial court’s error in excusing E.F.W. violated his right to a trial by an impartial jury, a right guaranteed by Amendments 6 and 14 of the United States Constitution and § 6 of the Alabama Constitution. However, the United States Supreme Court has held that a defendant’s federal right to an impartial jury was not automatically violated merely by an erroneous ruling on a challenge for cause. Ross v. Oklahoma, 487 U.S. 81, 87-88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); see also United States v. Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000). As long as the jury that heard the case was impartial, the right guaranteed by the United States Constitution was not violated. See Ross, 487 U.S. at 87-88, 108 S.Ct. 2273. This rule would also apply to § 6 of the Alabama Constitution, which gives the defendant the right to a trial ‘by an impartial jury of the county or district in which the offense was committed.’ The plain meaning of this language is that the defendant is entitled only to an impartial jury and that unless the defendant can show that a trial court’s erroneous ruling during jury selection prevented the jury from being impartial, there is no violation of § 6.”
The appellant, although alleging generally that he was denied his right to an impartial jury, has made no showing that his rights were probably injuriously affected by the trial court’s excusing M.M., L.Y., and L.W. After reviewing the record, we conclude that the trial court’s error in excusing M.M., L.Y., and L.W. was harmless, and thus not reversible, because, even with the error, the appellant was accorded a trial by an impartial jury.
II.
The appellant contends that the prosecutor’s selection of five black veniremembers *130 for individual voir dire was racially motivated, and that it violated his and the veniremembers’ statutory and constitutional rights. After extensive voir dire examination of the entire venire by the trial court and the parties, the trial court allowed each party to select certain venire-members for individual voir dire. The trial court selected three veniremembers for further voir dire, the appellant selected one, and the prosecutor selected five. The five selected by the prosecutor were black. The appellant is black, as were the victims.
We find that the record does not support the appellant’s contention. There is nothing in the record to indicate that, or to support a reasonable inference that, the veniremembers selected by the prosecutor for further voir dire were selected for racial reasons. On the contrary, the record shows that the prosecutor had legitimate concerns that justified the additional voir dire of the five potential jurors and that those concerns were not racial. There was no evidence of disparate treatment between black veniremembers and white veniremembers.
The appellant also contends that he was denied his right to a jury chosen from a fair cross-section of the community. He does not now raise on appeal any impropriety in, and he did not object at trial to, the method of selecting jury pools in Houston County. Instead, he argues that the prosecutor’s focus on the black venire-members for individual voir dire and the ultimate removal of some of them for cause resulted in a pool from which to select a jury in which blacks were underrepresented. There is no merit in this contention. The appellant failed to meet the burden required to establish a denial of the fair cross-section standard. See Pierce v. State, 576 So.2d 236, 241-42 (Ala.Crim.App.1990) (citing Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)), which sets out the burden that must be met to establish a denial of the fair cross-section requirement.
III.
The appellant contends that the trial court committed reversible error in overruling his motion made pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), in which he claimed that the prosecution exercised two peremptory jury strikes in a racially discriminatory manner. In overruling this motion, the trial court found that the appellant had failed to establish a prima facie case of racial discrimination.
The prosecution has the burden of articulating nondiscriminatory reasons for challenged strikes only after the defendant has met his burden of establishing a prima facie case of discrimination. Batson. And, until that burden is met, the prosecution is under no obligation to offer explanations for its peremptory strikes. Edwards v. State, 628 So.2d 1021 (Ala.Crim.App.1993). In determining whether a prima facie case of racial discrimination has been established, the trial court is to consider all relevant circumstances that could lead to an inference of discrimination. Its determination on whether a pri-ma facie case of racial discrimination has been established is to be accorded great deference on appeal. Ex parte Branch, 526 So.2d 609 (Ala.1987); Boyd v. State, 715 So.2d 825 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.1998). Its finding that a defendant did not present a prima facie case of discrimination under Batson is reviewed under a “clearly erroneous” standard. Ex parte Branch, 526 So.2d at 625; Wilson v. State, 690 So.2d 449 (Ala.Crim. App.1995), aff'd in pertinent part, 690 So.2d 477 (Ala.1997).
*131 The record shows that, after the challenges for cause, three blacks remained on the venire; that the prosecution used its second strike to remove W.D., a black male, and its fourth strike to remove L.S., a black female; and, thus, one black, H.S., sat on the jury. The only discussion pertinent to the defense’s attempt at satisfying its burden of establishing a prima facie case of discrimination is as follows:
“MR. MEREDITH [defense counsel]: ... With regards to answers that [W.D.] gave during voir dire and during the conferences in here, I don’t have anything in my notes that would indicate a reason, a race-neutral reason, that [W.D.] responded to that would cause the state to strike him. Also, the same response I have with regards to [L.S.]. She is number 68.
[[Image here]]
“MR. BRANTLEY [defense counsel]: .... [T]hat’s my Batson motion.
“THE COURT: What says the State?
“MR. MAXWELL [chief assistant district attorney]: ... We submit that you have heard for six hours various answers from these particular [potential] jurors, and I believe that their answers in the earlier conferences and before the court show the court that [the defense has] not made a prima facie case.
“THE COURT: Okay. And—
“MR. BRANTLEY: Judge, I say we have, particularly, on [W.DJ. The only objection the State could have is that he didn’t recollect knowing one of the victims. And—
“THE COURT: Well, generally, this court is very conservative as far as making the State show their reasons if there is any hint of any type of prima facie case being shown. But in this case, I don’t think one has been shown. So, I’m going to deny your motion.”
(R. 466-70.)
The appellant argues that the prosecutor struck the two black venire-members solely because of their race, but he offers nothing to support his argument other than defense counsel’s assertion that he found nothing in his notes that would indicate a race-neutral reason for the strikes. However, the record shows that the prosecutor examined the two venire-members extensively in regard to matters of legitimate concern to the prosecution; those matters were unrelated to their race. In the case of W.D., the voir dire disclosed a possible bias against the prosecution’s case because of his expressed disapproval of the sexual preference or lifestyle of one of the victims. In the case of L.S., the prosecutor was concerned that her views on the death penalty might be influenced by her husband, who was known to be strongly opposed to the death penalty.
After reviewing the record, we find that the appellant failed to meet his burden of proving a prima facie case of racial discrimination in the prosecution’s exercise of its peremptory strikes. Thus, the trial court’s ruling that defense counsel failed to establish a prima facie case of racial discrimination in the prosecution’s peremptory strikes was not clearly erroneous.
IV.
The appellant contends that the trial court erred in denying his motions challenging veniremembers C.S. and K.L. for cause, and in granting the prosecution’s motion challenging veniremember J.D. for cause. All three veniremembers were questioned extensively on voir dire.
In regard to the trial court’s denial of his challenge for cause of C.S., the appellant argues that the voir dire examination of C.S. revealed that he was biased against *132 the defense, and further revealed that, because of ties with the prosecution, he was unable to be impartial. In reference to C.S., the record shows the following:
“MR. BRANTLEY [defense counsel]: [Y]ou’ve worked for years with the Federal Bureau of Investigation as an agent?
“[C.S.]: Twenty-five and one-half years. And I worked with Gary Maxwell’s [chief assistant district attorney’s] father for 14 years in the FBI office.
“MR. BRANTLEY: And you, also, practiced criminal defense as an attorney after you retired from the FBI?
“[C.S.]: On a limited basis, I practiced law over the years.
“MR. VALESKA [district attorney]: ... [C.S.], you know me, also, [we are] personal friends.
“[C.S.] I would say that about you and Gary.
“MR. VALESKA: You practiced criminal law. In fact, we tried cases against you. In fact, you whipped me in court; correct?
“[C.S.]: Onetime.
“MR. VALESKA: ... [W]hen I ran for district attorney, you supported me and you supported me with donations, putting up signs, served on the Boys’ Club, Hawke Houston Boys’ Club with you and your wife. We are all personal friends. Grew up with your sons....
“THE COURT: Okay, any questions?
“[C.S.]: I better be honest with you. I’m law-enforcement oriented because my major profession was being a FBI agent, and I would be pro-law enforcement, unless it was one of my clients that I am defending. Then, I wouldn’t be pro-law at that point.
“MR. BRANTLEY: ... I’m glad that you offered that, that you might be neutral, having practiced criminal defense .... [D]o you feel that sitting on the jury, that all of your years of being law enforcement might have some affect on you with regards to the decision you would make about the defendant’s guilt or innocence?
“[C.S.]: No, I wouldn’t be predisposed to say, ‘Hey, he’s automatically guilty,’ no.
“MR. BRANTLEY: Do you think that in all of your years with the FBI that you may have gained some experience in being able to read between the lines, so to speak, and to figure out things about this case that wouldn’t be in evidence? In other words, you’ve got some street-smarts about figuring defendants out. You’ve been in law enforcement and you’ve been a criminal defense attorney. Do you feel that you would use your street-smarts, so to speak, through the FBI training in helping you reach a decision today?
“[C.S.]: It may be in evaluating witnesses and seeing how they react on the stand.
“MR. BRANTLEY: And even if the judge instructed you that you couldn’t use that, that you had to base your decision solely on the evidence you heard and saw, it would be hard for you to keep that FBI training for the law enforcement aside, wouldn’t it?
“[C.S.]: I don’t think so.”
(R. 180-85.)
“MR. BRANTLEY: ... The fact that you worked on Mr. Valeska’s campaign, or, at least, you supported him in his reelection, what did you do for his campaign?
“MR. VALESKA: Just for the record, he made donations, put up signs and helped me out. He did all those things. “[C.S.]: Donations. And when I talked to my friends, I’d say, ‘Support Doug.’
*133 “MR. BRANTLEY: And how recent ago? His most recent campaign?
“[C.S.]: The last one.
“MR. BRANTLEY: About four or five years ago?
“[C.S.]: ... [I]n '92,1 think.
“MR. BRANTLEY: Would that fact interfere with your ability to return a verdict in this case based solely on the evidence?
“[C.S.] No.
“MR. BRANTLEY: What about the fact that you used to work with Mr. Maxwell’s dad in the FBI? ...
“[C.S.] Ray Maxwell. Fourteen years in this office.
“MR. BRANTLEY: Would that fact interfere with your ability to return a verdict based solely on the evidence? “[C.S.]: No.
[[Image here]]
“MR. VALESKA: ... I’m up for reelection now, but I’ve not asked you for any support at this time, have I?
“[C.S.]: No, and I might not give any, because you didn’t have any opposition last time, and you got a lot of money.
“MR. VALESKA: ... [Y]ou brought a book to the office and left with Sue Locke about baseball for Mr. Maxwell. You didn’t talk to me. And I was in there.
“[C.S.]: I just waved at you.
“MR. VALESKA: [W]e didn’t talk about the case. We didn’t talk about your being on jury duty. You just left a book on Rickwood baseball, Birmingham.”
(R. 189-92.)
In addition, during the general voir dire, defense counsel asked the venire if any of the members would hold it against the defendant if he did not testify. C.S. responded, “I know what the law is, but I don’t like the law. I would be more comfortable if a guy came up and said, T didn’t do it, let me tell you what happened.’” (R. 368.) Because of this ■ response, the trial court later further questioned C.S. individually. The record shows the following:
“THE COURT: ... The reason I had [C.S.] come back in, he made a comment to the extent that he thought that the matter of someone not testifying in his own behalf was bad law, and we need to [delve into] that just á little bit. Any questions?
“MR. BRANTLEY: .'.The fact that you believe that it’s a bad law, does that mean—
“[C.S.]: That won’t' change my—I wouldn’t be thinking in advance he’s guilty. No, I just think in some countries they do require them to, and I’m in agreement with that.
“MR. BRANTLEY: Okay. If Mr. Smith . doesn’t testify, will you hold that against him?
“[C.S.]: I will not.
“MR. BRANTLEY: Will you make some inferences from that?
“[C.S.]: (Negative response.) -
“MR. BRANTLEY: And you won’t discuss that in front of the other jurors.
“[C.S.]: No.”
(R. 381-83.)
The record shoves that C.S. could set aside his opinions and try the appellant’s case fairly and impartially and in accordance with the" law and evidence. Likewise, the record shows that C-.S.’s duty and responsibilities as a juror would not be affected by his lengthy experience as a law-enforcement officer or by his personal relationships with the prosecuting attorneys.
*134 As we stated in our discussion of the law in Part I of this opinion, to justify a challenge for cause, there must be a statutory ground or some matter that imports absolute bias or favor. Even proof that a veniremember is biased or has a fixed opinion is insufficient. The test to be applied is whether the veniremember can set aside his biases, prejudices, or opinions and try the case fairly and impartially, based upon the evidence. The evidence here fails to show that C.S. was biased against the appellant, and certainly fails to show absolute bias. We find that the trial court did not abuse its discretion in denying the appellant’s challenge for cause of C.S.
In regard to the trial court’s denial of his challenge for cause of KL., the appellant argues that the voir dire examination of KL. revealed that she was biased against him. In response to a question the trial court asked the venire—whether anyone knew any facts about the case—KL. responded that she did. She was then examined individually. The record shows the following:
“THE COURT: Okay. [K.L.], you stated you knew something about the case and we are just trying to determine what you do you know [sic],
“[KL.]: I just saw it on the news.
“THE COURT: And when did you see the news?
“[KL.]: This morning.
“THE COURT: And what did you see ...?
“[KL.]: They were showing pictures of the house and the bodies and different things like that, is what I saw.
“THE COURT: Because you saw those pictures and heard the news accounts, does that give you any preconceived idea about this case or—
“[KL.]: No, I think I could—I would listen to the evidence.
[[Image here]]
“MR. BRANTLEY: Would you describe the bodies you saw?
“[KL.]: Well, they showed them covered up in the edge of the bushes and covered with sheets or whatever they cover them with.
“MR. BRANTLEY: And you are saying that has no effect on you one way or the other.
“[KL.]: I would do my best to listen to the evidence.
“MR. BRANTLEY: But it would be hard, wouldn’t it?
“[KL.]: No, I don’t think so.
[[Image here]]
“MR. MEREDITH [defense counsel]: ... Did the news account ... indicate how they had been killed?
“[KL.]: They did, but I don’t remember what they said.
“MR. MEREDITH: Did they use anyone’s name?
“[KL.]: I didn’t pay that much attention. I really didn’t. Like I said, I glanced at the TV, and I saw what I described, and that is really what I heard and what I saw.
“MR. MEREDITH: You don’t recall anyone saying, ‘Here are the victims killed by Jerry Jerome Smith?’
“[KL.]: They may have—I’m sure they said that, but the name didn’t ring a bell when you called out the guy’s name this morning, so, I didn’t know him by name. “MR. MEREDITH: At this point in time, do you have any preconceived idea who killed those people?
“[KL.]: No.”
(R. 204-08.)
The record shows that KL. harbored no bias against the appellant, and *135 that she indicated that she would not let what she had seen on television affect her ability to give the appellant a fair and impartial trial, based upon the evidence. The trial court’s denial of the appellant’s challenge of K.L. for cause was proper.
In regard to the trial court’s granting the prosecution’s motion challenging veniremember J.D. for cause, the appellant contends that the prosecution failed to show that J.D. was absolutely biased against the prosecution or that a statutory ground existed for the challenge. The trial court asked the venire whether any member was related to defense counsel. J.D. responded that he was a nephew of the appellant’s cocounsel, Meredith. J.D. was then questioned individually, and the record shows the following:
“THE COURT: ... The fact that you are [Mr. Meredith’s] nephew, would that tend to make you listen to the defendant’s case more than it would the State’s case or does that association bias or prejudice you in [any] manner?
“[J.D.]: Well, I don’t know. I’m, also, going to help out with his campaign. So, there is a lot going on with it. I would rather be straight up front. I just as soon—I’ve sat on a jury before. I’m not opposed to that by no means, but I’d rather not be sitting on a jury with him defending.
[[Image here]]
“MR. BRANTLEY: If you were instructed you had to base your verdict, your decision, solely on the evidence in this case, you could do that, couldn’t you?
“[J.D.]: Yeah, I’m an honest person. Yeah, I could do that.
“MR. VALESKA: ... [I]f Mr. Meredith wasn’t representing him and it was just Mr. Brantley, then, it would make no difference of any kind, correct?
“[J.DJ: Correct.
“MR. VALESKA: ... [Because of the relationship and working on his campaign, would it [be] that you would listen to their side more, or give more credence, because of that relationship.?
“[J.D.]: I would try not to sway that way, but I don’t know. I’d say it probably wouldn’t. I mean, I’d try to be honest.
“MR. VALESKA: Could it affect you? “[J.D.]: It could affect me. I’m human.
[[Image here]]
MR. BRANTLEY: But it couldn’t affect you?
“[J.D.]: I would, probably, knowing Ben and being my uncle and everything, I imagine if he—I would have a tendency to probably hear him a little bit more than I would anybody else.”
(R. 152-56).
After expressing some doubt or reservation as to whether the fact that his uncle, with whom he had a close relationship, was one of defense counsel in the case would cause him to favor the defendant’s case over the prosecution’s, J.D. testified that he would rather not serve on the jury. He then testified that, if instructed to do so, he would base his verdict solely on the evidence presented; however, he subsequently testified that the relationship could and probably would affect him in his deliberations, and probably would cause him to favor the defense. As he put it, “I imagine ... I would have a tendency to probably hear him a little bit more than I would anybody else.”
After reviewing J.D.’s testimony on voir dire in its entirety, we conclude that it was sufficient to support a reasonable conclusion by the trial court that J.D., if selected to serve on the jury, would have an absolute bias in favor of the defense because of his relationship with defense co- *136 counsel, who was his uncle. The granting of the prosecution’s motion to challenge J.D. for cause was within the discretion of the trial court. We find no disparate treatment in the trial court’s rulings as to veniremembers J.D. and C.S. as the appellant suggests. J.D.’s case was clearly distinguishable from that of C.S.
V.
The appellant contends that the trial court erred in excusing venire-members who are illiterate. He argues that because he cannot read or write, the removal of the illiterate veniremembers prevented him from being tried by jurors who would be able to empathize with his illiteracy. He contends that the excusal of these veniremembers for this reason denied him his constitutional right to a fair trial by an impartial jury. We find no merit in these contentions.
Alabama law provides that to qualify to serve on a jury a prospective juror must be able to read. Section 12-16—60(a)(2), in pertinent part, provides:
“A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also ... [i]s able to read, speak, understand and follow instructions given by a judge in the English language.... ”
This statutory provision is mandatory; the trial court is not give any discretion in this area. McBride v. Sheppard, 624 So.2d 1069, 1071 (Ala.1993); Smith v. State, 482 So.2d 1312, 1313 (Ala.Crim.App.1985). Thus, the trial court properly excused the veniremembers who stated that they were illiterate.
VI.
The appellant contends that the admission into evidence of an extrajudicial and incriminating statement made by him to Sgt. David Jay and Sgt. Jon Beeson of the Dothan Police Department shortly after the shootings constitutes reversible error. He asserts that the prosecution failed to prove that he voluntarily, knowingly, and intelligently waived his Fifth Amendment rights enumerated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and failed to lay a proper predicate to show the voluntariness of the statement.
The evidence presented at the pretrial suppression hearing disclosed the following. Based on information they had received, Jay and Beeson began looking for the appellant. When they found him at around 2:15 a.m., October 20, 1996, at his father’s house, they told him they wanted to talk with him and asked him to accompany them to the police station. At the station, Beeson advised the appellant of his Miranda rights; he read them aloud to the appellant from a police department form. After each right had been read aloud, Beeson asked if he understood it, and he responded that he did. After he had been read his rights, Beeson read a waiver of those rights from the same form.[2] The appellant acknowledged that he understood the waiver; he then waived his rights and agreed to talk with the officers. He signed the waiver form around 4:45 a.m., and wrote under his signature that he had an eighth-grade education. He was then questioned by Jay and Beeson, and he gave a detailed statement implicating himself in the crime. The questioning began shortly after 4:45 *137 a.m. and ended around 5:30 a.m. The statement was tape-recorded. The appellant was subsequently booked into the county jail around 7:00 a.m. The booking proceeding was videotaped, and the videotape was introduced into evidence at trial and is a part of the record.
Jay testified at the suppression hearing that he had had considerable experience with persons who were under the influence of drugs and alcohol, and that the appellant did not appear to be under the influence of drugs or alcohol when he was picked up at his father’s home and during the time he was questioned and gave the statement. Jay testified that the appellant told him that he had smoked a “stem” of crack cocaine around 8:30 p.m. the previous evening, but he did not indicate that he had used any drugs or alcohol after that time. Jay further testified that the appellant, when read his Miranda rights and the waiver, indicated that he understood each and every right as it was read to him, as well as the waiver, and that he signed the waiver and agreed to give a statement. Jay testified that the appellant did not indicate at any time that he did not understand what was taking place, that no threats or promises were made to induce him to make a statement, that he did not indicate that he had any mental problems (and he did not appear to have any), that he appeared to be alert and his speech was not slurred, that he was articulate and did not hesitate to answer questions, and that he described the killings and his involvement in them in considerable detail.
At the suppression hearing, the prosecution introduced the appellant’s school records, which showed that the appellant had completed his reading courses satisfactorily from grades one through eight, that he had satisfactorily completed the eighth grade, and that his average grade in reading was a “C” and, on occasion, he made “As” and “Bs.”
At the suppression hearing, Dr. Donald Crook, Jr., a professional counselor, testified for the appellant. He testified that he had interviewed the appellant on three occasions and that he had administered various tests to him. He testified that the appellant had a full scale IQ of 72, a verbal IQ of 76, and performance intelligence of 69. His diagnosis of the appellant’s mental'ability was that he was in the upper level of “mild mental retardation.” He concluded that the appellant had a reading level of a child in kindergarten or in the first grade, and that he could not have read the waiver of his rights, but would have understood it if it had been explained to him. He stated, “He may have had some difficulties with just the word usage.” He further stated, however, that he was not saying that the appellant did not understand the waiver and its implications. He also admitted that some of his conclusions could be wrong and that the appellant could have manipulated his answers. He testified that, in his opinion, the appellant knew the difference between right and wrong and that he was capable of assisting in his defense. He testified that the appellant had a low frustration tolerance, displayed aggressiveness, and had poor impulse control, but had a basic level of awareness regarding the nature and quality of his actions. His diagnosis of the appellant’s mental ability was disputed by Dr. Michael D’Enrico, a forensic psychologist, who testified for the. prosecution. D’Enrico diagnosed the appellant’s mental ability as being “mild mentally deficient.”
The appellant did not testify at the hearing. He offered no evidence to explain the incriminating statement, and presented only one witness, Crook, in an effort to cast doubt on the prosecution’s evidence that his waiver was knowing, voluntary, *138 and intelligent, and that the inculpatory statement voluntary. After the hearing, the trial court ruled that the appellant’s statement was admissible, and it was subsequently admitted into evidence at the trial.
The evidence at trial indicated that the appellant was “street smart,” that he was engaged in an illegal interstate drug enterprise involving large sums of money, and that he was familiar with the workings of the criminal justice system, having had four prior felony convictions for serious crimes. Miranda was certainly not new or unknown to him, and he did not appear to be the type of person who could easily be overwhelmed or intimidated by police officers. We note also that the statement and waiver of rights were tape-recorded, and the tape was available for the trial court to hear. We have listened to the recording; the answers to the officers’ questions were clear, detailed, concise, and given without hesitation. They indicate that the appellant was in control of his faculties and that he knew what was going on. They support the conclusion that the appellant was not under the influence of alcohol or drugs at the time he was questioned.
A confession or extrajudicial inculpatory statement is prima facie involuntary, and the prosecution must show voluntariness and a Miranda predicate to have it admitted. Thomas v. State, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Lewis v. State, 295 Ala. 350, 329 So.2d 599 (1976). Whether a waiver is voluntary, knowing, and intelligent depends upon the particular facts and circumstances of each case, including the background, experience, and conduct of the accused—the totality of the circumstances. Thomas v. State; Wright v. State, 340 So.2d 74 (Ala.1976); Chandler v. State, 426 So.2d 477 (Ala.Crim.App.1982) (citing Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); Myers v. State, 401 So.2d 288 (Ala.Crim.App.1981), and cases cited therein. Whether a confession was voluntary is initially a question of law, to be determined by the trial court. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984); Myers v. State. The trial court’s determination on that question will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State; Minor v. State, 437 So.2d 651 (Ala.Crim.App.1983); Balentine v. State, 339 So.2d 1063 (Ala.Crim.App.1976). The trial court need only be convinced by a preponderance of the evidence that a confession or inculpato-ry statement was voluntarily made. Harris v. State, 420 So.2d 812 (Ala.Crim.App.1982); Myers v. State. “ ‘[A]ny conflicts in the testimony or credibility of witnesses during a suppression hearing is a matter for resolution by the trial court. Absent a gross abuse of discretion, a trial court’s resolution of this conflict should not be reversed on appeal.’” Johnson v. State, 680 So.2d 1005, 1007 (Ala.Crim.App.1996) (quoting Sheely v. State, 629 So.2d 23, 29 (Ala.Crim.App.1993)).
“ ‘ “In reviewing the correctness of the tidal court’s ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court.’” Kennedy v. State, 640 So.2d 22, 26 (Ala.Cr.App.1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Cr.App.1985), aff'd, 494 So.2d 772 (Ala.1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987), A trial court’s ruling on a motion to suppress will not be disturbed unless it is ‘palpably contrary to the great weight of the evidence.’ Parker v. State, 587 So.2d 1072, 1088 (Ala.Cr.App.1991).”
*139 Rutledge v. State, 680 So.2d 997, 1002 (Ala.Crim.App.1996).
After reviewing the totality of the circumstances surrounding the taking of the appellant’s inculpatory statement, we conclude that the trial court’s finding that the statement was given voluntarily after proper Miranda warnings is not contrary to the great weight of the evidence or manifestly wrong. Clearly, the preponderance of the evidence supports the trial court’s conclusion that the statement was voluntarily made after an intelligent, knowing, and voluntary waiver by the appellant of his Miranda rights. Any conflicts in the evidence and questions of the credibility of witnesses were for the trial court to resolve. After considering all the facts and circumstances, we hold that the trial court correctly admitted the statement into evidence.[3]
VII.
The appellant contends that the trial court’s failure to hold a hearing to determine his competency to stand trial was reversible error. He argues that his low IQ and diminished mental ability and condition mandated such a hearing.
A conviction obtained while the defendant is incompetent to stand trial violates due process. Anderson v. State, 510 So.2d 578 (Ala.Crim.App.1987). The test for determining competency to stand trial is whether the defendant “has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.” Id. at 579 (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). See also Ex parte La Flore, 445 So.2d 932 (Ala.1983).
“Section 15-16-21, Code of Alabama 1975, states:
“ ‘If any person charged with any felony is held in confinement under indictment and the trial court shall have reasonable ground to doubt his sanity, the trial of such person for such offense shall be suspended until the jury shall inquire into the fact of such sanity...
“(Emphasis added.)
“This section places the initial burden on the trial court to determine whether there are ‘reasonable grounds’ to doubt the accused’s sanity. ‘The trial court is, thus, the “screening agent” for mental examination requests.’ Reese v. State, 549 So.2d 148, 150 (Ala.Cr.App.1989). ‘ “It is left to the discretion of the trial court as to whether there is a reasonable or bona fide doubt as to sanity, and thus, whether a further examination is required.”’ 549 So.2d at 150. The trial court makes a preliminary determination “without the aid of a jury as to whether reasonable grounds exist[] to doubt the defendant’s competency.’ Rule 11.3, A.R.Crim.P., Committee Comments.”
Daniels v. State, 621 So.2d 335, 337 (Ala.Crim.App.1992).
Before trial, the appellant moved for the appointment of a psychiatrist to conduct a psychiatric evaluation to determine his *140 competency to stand trial. The trial court granted the motion and ordered the Alabama Department of Mental Health and Mental Retardation to appoint a qualified mental health professional to conduct the evaluation and to make a report to the court. At the same time, on motion of the appellant, the trial court authorized funds for the appellant to employ his own expert to perform a psychological evaluation and to assist him at trial. Dr. D’Enrico performed the competency evaluation and filed his report with the court as instructed. Dr. Crook performed the evaluation as the appellant’s expert. In a pretrial hearing on motions, the matter of the appellant’s competency came up. At the hearing, the appellant requested that the trial court review Crook’s report, in chambers, in camera, and keep it under seal. The prosecutor objected, contending that he was entitled to see the report. When the trial court indicated that the prosecution had a right to see the report, the appellant withdrew his motion for a psychological evaluation by his own expert. The prosecutor asked the trial court to accept D’Enrico’s report, which was in the court file, in lieu of his testifying. The trial court then asked the appellant if he had anything to present pertinent to his competency or to rebut D’Enrico’s report, and he responded that he did not. The trial court, noting the withdrawal of the appellant’s motion, then found the appellant competent to stand trial. The appellant did not object to the trial court’s ruling; thus, we review this issue under the plain-error standard. Rule 45A, Ala. R.App.P.
After reviewing the record, we find that it fully supports the trial court’s ruling that the appellant was competent to stand trial. The evidence does not support a conclusion that there was a reasonable and bona fide doubt of competency such as to require further investigation pursuant to § 16-16-21. On the contrary, the evidence shows that the appellant was fully competent to cooperate with and to assist his lawyers in his defense, and to understand the charges and proceedings against him. Neither D’Enrico nor Crook found that the appellant was incompetent to stand trial. D’Enrico testified that the appellant knew right from wrong and could assist his lawyers in his defense. The appellant’s pretrial statement and his testimony at the guilt and sentencing phases of his trial show without question that he had control of his faculties, that he was aware of the consequences of the proceedings, and that he was capable of cooperating with his counsel in presenting his defense. We also note that, in withdrawing his plea of “not guilty by reason of mental disease or defect” before the case was submitted to the jury, his counsel stated, “Nobody is saying he’s insane. We’re just saying he’s retarded.” (R. 1229.) Even the question whether he was mentally retarded, and if so, to what extent, was sharply disputed by the mental health experts. We hold that the trial court did not abuse its discretion in ruling that the appellant was competent to stand trial. Under the circumstances, the trial court was not required to pursue the inquiry further. There was no reasonable ground on which to doubt the appellant’s competency. There was no error in the trial court’s ruling and certainly there was no plain error.
VIII.
The appellant contends that the trial court erred in denying his motion seeking access to the records of the grand jury proceedings. He argues that the motion should have been granted “so that he might be prepared to challenge the state’s case and, if necessary, impeach the state’s witness.” (Appellant’s brief, p. 30.)
*141 “In Arthur v. State, 711 So.2d 1031, 1078-79 (Ala.Crim.App.1996), this Court stated:
“ ‘ “Before a defendant is allowed to inspect a transcript of a State’s witness who testified before the grand jury or before a trial judge should conduct an in camera inspection of such testimony ... the defendant should at least and at a very minimum make some offer of proof (1) that the matters contained in the witness’ grand jury testimony were relevant to the subject matter of the prosecution; (2) and that there exists an inconsistency between grand jury testimony and trial testimony. Unless defense counsel is merely going on a fishing expedition, he will have some information as to the particular inconsistency in the [witness’s] testimony. In this case no such showing was made and the existence of any inconsistency between the witness’ trial and grand jury testimony was never even alleged .... Also, there was no showing that the witness’ grand jury testimony, if available, was ‘of such nature that without it the defendant’s trial would be fundamentally unfair.’
[[Image here]]
“‘Millican v. State, 423 So.2d 268, 270-71 (Ala.Cr.App.1982).’
“See Mims v. State, 591 So.2d 120, 126 (Ala.Cr.App.1991). ‘While it is true that broader discovery is to be allowed in cases involving capital murder because of the possible imposition of the death penalty, Ex parte Monk, 557 So.2d 832, 836-37 (Ala.1989), a defendant must make a preliminary showing of particularized need before a court can balance this need against the policy favoring grand jury secrecy.’ Arthur v. State, 711 So.2d at 1078.”
Mitchell v. State, 706 So.2d 787, 806 (Ala.Crim.App.1997).
The appellant failed to make a preliminary showing of a particularized need for the grand jury information. The trial court properly denied his motion. (In his brief to this court, he does not advance any specific facts to support his argument.)
IX.
The appellant contends that, in the sentencing hearing, the trial court denied him his right to present, in mitigation, evidence of his “family circumstances,” violating, he argues, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and the Fifth, Sixth, Eighth, and Fourteenth Amendments. He asserts that the purpose of this evidence was to show that he “grew up in a markedly dysfunctional family.” (Appellant’s brief, p. 34.) He further argues that, by disallowing evidence of his family circumstances, the trial court diminished the magnitude of his deficiencies, and by doing so, he argues, thwarted an individualized assessment of the appropriateness of the punishment. It follows, he argues, that the trial court further erred in disallowing argument and instruction on this excluded evidence.
It appears from his argument in brief that the appellant claims that the trial court allegedly erred in precluding evidence indicating the following: that his mother and sister were alcoholics; that his father was “a convict”; that his parents were “unable to protect their children from predators or to provide them with a healthy home environment” (appellant’s brief, p. 32); that his six siblings were unable to offer him “the sustenance that a sibling can sometimes provide to assist a failing youngster” because they also suffered from neglect and “other ills” (appellant’s brief, p. 32); that he could not bond with some of his siblings because they *142 were incarcerated or in mental institutions; that a brother is mentally retarded (which fact, he argues, would have lent more credence to his expert’s finding that he is mentally retarded, on the theory that “mental retardation is a hereditary factor” (R.1924), and would have thus discredited the prosecution’s assertion that he is not mentally retarded but merely of borderline intelligence); that two siblings have attempted suicide (which fact, he argues, would have supported his assertion that his suicide attempt was genuine); and that neither of his parents visited him while he was in jail awaiting trial.
During the charge conference, which occurred before the sentencing phase, the prosecutor vehemently argued that any evidence pertaining to any family member was inadmissible, because, he argued, it was irrelevant to any mitigating circumstance. The trial court noted during the ensuing discussion, “The problem is this, if y’all still had your plea of insanity in the case, I think it probably is relevant, whether or not a family member committed suicide or had a mental problem. But the thing is, y’all withdrew that.” (R.1924.) The court subsequently ruled that it was excluding “anything that happened to anybody other than the defendant,” (R.1935.)
The appellant is correct that the sentencer in a capital case should be provided with “the fullest information possible concerning the defendant’s life and characteristics,” Lockett v. Ohio, 438 U.S. 586, 603, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In regard to the sentencing determination, the Supreme Court has “emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination.” Buchanan v. Angelone, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). As the Supreme Court has explained:
“If a sentencer is to make an individualized assessment of the appropriateness of the death penalty, ‘evidence about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.’ ”
Penny v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (quoting California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)).
Consistent with this constitutional mandate, Alabama’s capital punishment act provides:
“In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.”
§ 13A-5-52. See also § 13A-5-45(c) (“[a]t the sentencing hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances”); and § 13A-5-45(d) (“[a]ny evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements”). “ ‘[Sjubject only to the loose evi-dentiary requirement of relevance, capital defendants have a right to offer any evi *143 dence they choose on character or record or circumstances of the offense.’ ” Clisby v. State, 456 So.2d 99, 101 (Ala.Crim.App.1988) (quoting Stanley v. Zant, 697 F.2d 955, 960 (11th Cir.1983)). “It is readily apparent, therefore, that Alabama’s sentencing scheme broadly allows the accused to present evidence of mitigating circumstances .... ” Jacobs v. State, 361 So.2d 640, 652-53 (Ala.1978).
In arguing to the trial court that evidence pertaining to any of the appellant’s family members was inadmissible, the prosecutor cited Knotts v. State, 686 So.2d 431 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996). In Knotts, this court found that the trial court did not abuse its discretion in refusing to admit into evidence, for sentencing purposes, various court, hospital, social-service, and mental-health records mostly concerning and/or stemming from two assaults on the appellant’s sister by the appellant’s father.[4] The court, rejecting the appellant’s argument that “these records supply crucial mitigating evidence about the appellant’s ‘abusive and deprived’ family background,” 686 So.2d at 443, stated:
“A sentencer in a capital case may not refuse to consider or be ‘precluded from considering mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). The capital defendant generally must be allowed to introduce any relevant mitigating evidence regarding the defendant’s character or record or any of the circumstances of the offense, and consideration of such evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987).
“The records in question were offered in evidence by the appellant to show his home life and the fact that he was a product of a dysfunctional family. The state objected to the evidence on grounds of relevancy. The trial court sustained the state’s objections and stated that all the records pertaining to the appellant would be admitted, but that the records pertaining to persons other than the appellant would not. The determination of the relevancy of evidence lies within the sound discretion of the trial court. Borden v. State, 522 So.2d 333 (Ala.Cr.App.1988); C. Gamble, McElroy’s Alabama Evidence, § 21.01(6) (4th ed.1991). Here, the trial court was required to admit all relevant mitigating evidence of the appellant’s character or record and any circumstances pertaining to the offenses. The question before us is whether the trial court abused its discretion in refusing to admit evidence pertaining to members of the appellant’s family. We find that al *144 though the offered evidence may have had some slight probative value, the trial court did not abuse its discretion in refusing to allow its admission under the facts and circumstances existing here. The trial court admitted all records offered for purposes of mitigation pertaining specifically to the appellant.
“Furthermore, even if the trial court’s ruling was erroneous, we do not believe the error injuriously affected the substantial rights of this appellant. Matters in the excluded records pertaining to the appellant’s home and family were admitted in evidence through other records and through the testimony of numerous witnesses, thus making the evidence in the excluded records cumulative. The appellant’s sister testified at the sentencing hearing about the home and family life of the appellant. Thus, if error occurred, at all, it was harmless. See Ala.R.App.P. 45; McMahon v. State, 560 So.2d 1094 (Ala.Cr.App.1989).”
686 So.2d at 444.
Contrary to the prosecutor’s argument, Knotts is not authority for excluding any and all evidence relating to an immediate family member of a capital defendant. The ruling in Knotts was clearly limited: the court in that case found that “the trial court did not abuse its discretion in refusing to allow [the] admission [of the records] under the facts and circumstances existing here.” 686 So.2d at 444 (emphasis added). Evidence relating to another person and not directly to the defendant may be relevant to show a capital defendant’s disadvantaged background or his emotional or mental problems. See, e.g., Price v. State, 725 So.2d 1003, 1062 (Ala.Crim.App.1997) (the trial court correctly found the existence of the nonstatu-tory mitigating circumstance that the defendant’s father was murdered when the defendant was a small child), aff'd, 725 So.2d 1063 (Ala.1998); Guthrie v. State, 689 So.2d 948, 950 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.1997) (the trial court found and considered, as nonstatuto-ry mitigation, that one of the defendant’s siblings had died from a gunshot wound and another had been killed in an automobile accident). See also Abdur’Rahman v. Bell, 999 F.Supp. 1073, 1098 (M.D.Tenn.1998) (in discussing mitigation evidence, the court noted: “Petitioner also had a family history of serious mental conditions. Petitioner’s sister ... attempted suicide on multiple occasions and was institutionalized several times for mental health problems .... Petitioner’s brother ... committed suicide while this case was pending .... ”), vacated on other ground, 226 F.3d 696 (6th Cir.2000). Cf. Roberts v. State, 735 So.2d 1244 (Ala.Crim.App.1997) (remanded for a new sentencing hearing, in part, because of the trial court’s exclusion, on the basis of irrelevancy, of evidence regarding the personality of a person the appellant argued had substantial domination over him), aff'd, 735 So.2d 1270 (Ala.1999). Furthermore, what makes evidence of incidents involving people other than the defendant relevant to mitigation of the defendant’s crime is the effect each incident had upon the defendant’s life, see State v. Simpson, 341 N.C. 316, 462 S.E.2d 191 (1995), not necessarily who was involved. See, e.g., Doyle v. State, 460 So.2d 353 (Fla.1984) (the defendant was allowed to present evidence that he had suffered emotional disturbance as the result of the death of his brother in his arms after a hunting accident the previous year); State v. Richardson, 346 N.C. 520, 488 S.E.2d 148 (1997) (the jury found as mitigating evidence that, at an important stage in the defendant’s development, the defendant’s brother had been murdered, and that event resulted in significant changes in his personality and behavior). Succinctly, the *145 relevancy of proposed evidence of mitigating circumstances cannot be determined merely by whether the evidence involved only the defendant; such a litmus test would be unconstitutional.
Clearly, the above principles cast serious doubt on the propriety of the trial court’s blanket ruling that evidence relating “anything that happened to anybody other than the defendant” be excluded. However, we disagree with the appellant’s assertions that the trial court “basically restricted the mitigation case to evidence of appellant’s deficiencies” (appellant’s brief, p. 33), and disallowed evidence that he “grew up 'in a markedly dysfunctional family” (appellant’s brief, p. 34).
Turning to the appellant’s allegations of excluded facts, we make the following observations from the evidence at the guilt and sentencing phases:
1. Alcoholism of the appellant’s mother and a sister: Clearly, the evidence established that the appellant’s mother was an alcoholic and that she was rarely sober. The evidence also strongly indicated that one or more siblings abused alcohol and drugs: the appellant was drinking alcohol and using drugs with his siblings when 8 years old and; at 14, lived with his oldest sister, who was using drugs and alcohol. (The evidence established - that the appellant’s father was also an alcoholic.)
2. Incarceration/conviction of the appellant’s father: The appellant testified that he had no relationship with his father, an alcoholic, who “stayed in jail most of the time and basically couldn’t hold a job down.” (R.2016.)
3. Inability of the appellant’s parents to protect and to provide a healthy home environment for the appellant and his siblings: The evidence was abundant in this regard. We note, as examples, the testimony that his mother was an alcoholic, has a fourth-grade education, and was the only parent in the household; that he had no relationship with his father, who was also an alcoholic, was frequently incarcerated, could never come around the appellant because his mother would not allow it, and could not hold down a job; that his grandmother, who was ill, looked after him; that he had no one to discipline him; that he was sexually abused by an older cousin when he was 12; that his oldest brother had also been molested; that his sister became pregnant at 13; that he witnessed physically violent altercations between his parents during which they would cut each other; that the abuse of alcohol and drugs by him and his siblings started when he was 8 years old; that his cousins in New Jersey supplied him with drugs, starting when he was 12; and that, when he was 15, he lived with his oldest sister who was abusing drugs and alcohol.
4.Inability of the appellant’s siblings to offer him sustenance because they also suffered from neglect and “other ills”: Obviously, the appellant’s siblings also suffered from the dysfunctional home environment noted above. Moreover, evidence of the siblings’ own handicaps was strong. For example, evidence was introduced of his siblings’ abuse of alcohol and drugs; of a brother’s serious mental illness; of a sister’s pregnancy when she was 13 years old; of siblings’ incarcerations; of a sister’s mental retardation; and of his oldest brother’s mental retardation.[5]
*146 5. Mental retardation of a brother: The appellant testified that his oldest brother was mentally retarded. (Dr. D’Enrico also testified that the appellant’s brother J.S. had informed him that one of their sisters suffered from mental retardation for which she received Social Security disability income.) In specific regard to the appellant’s assertion that the fact of his brother’s mental retardation would have lent more credence to the defense expert’s finding that the appellant is mentally retarded on the theory that mental retardation is a hereditary factor, we note that, before any discussion on excluding evidence about the appellant’s siblings, defense counsel informed the court that the appellant was to be the only witness on his behalf. Without testimony from an expert witness as to a genetic link for mental retardation, counsel could not have made any arguments regarding the hereditary nature of mental retardation.
6. Siblings’ incarceration: The appellant testified that his oldest brother had been incarcerated. (The prosecutor’s objection to this evidence was sustained, but the appellant’s answer was not excluded.) In addition, Probation Officer Buchannan read the following from the presentence report for the appellant’s assault conviction: “There has been no discipline at home. Some of [his siblings] have been on probation, some are presently on probation, and some are in prison.” (R.1987.)
7.Failure of the appellant’s parents to visit him during his incarceration for this crime: During the guilt phase, the appellant testified that neither parent had been to see him while in jail. (We question the relevance of this fact in mitigation of the offense.)
Thus, we find that the trial court allowed evidence as to all the alleged facts argued in brief except (1) any sibling’s commitment to a mental institution, and (2) the attempted suicide of two siblings. Although the testimony did not include evidence of any sibling’s commitment to a mental institution, D’Enrico testified that the appellant’s brother J.S. had informed him that their brother D.S. took psychotropic medication and that he had been diagnosed as a schizophrenic. In regard to the absence of testimony regarding any sibling’s commitment, we first note that the appellant made no offer of proof.[6] Furthermore, the appellant’s stated purpose for introducing the alleged evidence of any sibling’s commitment was to show its effect of preventing the appellant from bonding with that sibling. Evidence of the enormous obstacles to the appellant’s bonding with at least some of his siblings was strong. Therefore, any error in the exclusion of proposed evidence regarding any sibling’s commitment would have been harmless.
*147 The appellant contends that testimony of suicide attempts by two siblings, which was not allowed, would have supported the genuineness of his attempted suicide. Without any offer of proof as to the catalysts of these attempted suicides or their effect, if any, on the appellant, we cannot conclude that this evidence would have been relevant. It was not offered that these attempts manifested an inherited mental disorder (which the appellant possibly shared) or some dysfunction arising from experiences in the home they once shared with the appellant. Moreover, we agree with the attorney general that the genuineness of the appellant’s suicide attempt was not questioned. Thus, the trial court’s exclusion of alleged evidence of siblings’ suicide attempts did not prejudice the appellant. (We note that, curiously, the trial court instructed the jury that a circumstance it could consider as mitigating was that the appellant’s older sister, D., “has an alcohol problem and has attempted suicide.” (R. 2136.))
Although the appellant does not raise this question on appeal, we have noted it in our plain-error review—-whether the trial court committed reversible error in excluding evidence indicating that the appellant’s sister was raped when he was 12 years old. The list of proposed nonstatutory mitigating circumstances that the appellant wanted read to the jury in the tidal court’s oral charge included the following: “At age twelve (12) client, [D.], [M.] and [W.] were at home, [E.L.M.] came in and raped [M.], hit [W.] in the head with a frying pan. Mr. Smith was angry about the incident.” (C.R.232.) Evidence of this incident alone is not necessarily relevant: what makes the incident relevant is the effect this incident had upon the appellant’s life. See State v. Simpson. The mere assertion that this incident angered the appellant gives no indication of how that anger impacted his life 13 years later. Moreover, the incident’s relevance to the showing of the marked dysfunction of the appellant’s family life is of little significance, because that dysfunction was established by overwhelming evidence. Thus, the exclusion of evidence of the rape of his sister was without prejudicial effect. Even if this evidence should have been admitted as relevant, we find that the evidence before the jury gave a full and accurate description of the appellant’s childhood in a severely dysfunctional family.
In regard to the appellant’s assertion that he was prevented from commenting on the evidence he alleges was excluded, we find no adverse ruling excluding argument on these areas of proposed mitigation. In fact, in opening comments, defense counsel argued:
“Did [the appellant] have a choice? I don’t believe he did. I believe when he was eight years old and started sniffing gas pipes and drinking home brew, he was kind of put in that rut. No father around. No one to guide him. The only example he had was bad. Brothers in jail. Sisters in jail. Mother in jail. Father in jail....
[[Image here]]
“If you even determine that he had a chance, he could have stopped somewhere along the way, even without a mom, dad, brother, sister, family support group, he could have done something somewhere.”
(R.1974-76.)
In regard to the appellant’s contention that the trial court erred in refusing to instruct the jury on the alleged circumstances of his life, we reiterate, “ ‘This Court has held that the trial court does not have to instruct the jury from a list of specific nonstatutory mitigating circumstances provided by the defendant.’” Hagood v. State, 77 So.2d 162, 198 (Ala. *148 Crim.App.1998) (quoting Brown v. State, 686 So.2d 386, 403 (Ala.Crim.App.1996), aff'd, 686 So.2d 409 (Ala.1996)). Although the trial court read to the jury its charge many of the appellant’s offered nonstatuto-ry mitigating circumstances, it was not required to charge specifically on any at all. See Hagood v. State. It follows that the trial court committed no error in reading some and not others.
On the above rationale, we reject the appellant’s request that this cause be remanded for another sentencing hearing. However, we agree with the appellant that the trial court’s comments in the charge conference strongly indicate that the court excluded from its consideration of appropriate punishment relevant evidence that happened to also include something regarding one of the appellant’s family members and, thus, failed to consider how the appellant’s life had been affected by his experiences with and deficiencies of his family members. Therefore, because we find it necessary to remand this case for other sentencing deficiencies, which we discuss infra, we direct the trial court on remand to review or reconsider the appropriate punishment for the appéllant, taking into consideration these factors.
X.
The appellant contends that his death sentence should be reversed because, he argues, the trial court erroneously construed § 13A-5-51(6), the statutory mitigating circumstance that “[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.” He bases this argument on two grounds. He first asserts that the trial court’s finding that this circumstance was not present was based, not on the court’s consideration of the evidence, but on its mistaken reasoning that this circumstance is not present unless the evidence proves the existence of a mental disease or defect. He argues that such a burden cannot be met, as a matter of law, in a case where the defendant did not assert the defense of mental disease or defect in the guilt phase. The appellant also asserts that the trial court erroneously narrowed this circumstance by its notion that the presence of an intent to kill negates application of this circumstance.
In support of these two contentions, the appellant directs us to the comments of the trial court and the prosecutor during a charge conference just before the sentencing phase and also to the findings in the trial court’s sentencing order in reference to the statutory mitigating circumstance listed at § 13A-5-51(6). The prosecutor vigorously, but erroneously, argued that the defense “gave up” this mitigating circumstance when it withdrew the defense of mental disease or defect at the guilt phase and that to be considered in mitigation, a substantially impaired capacity must rise to the level of a mental disease or defect. The defense countered this argument by correctly asserting that substantially impaired capacity can be less than a mental disease or defect that would rise to the level of a defense and that, in this case, the evidence of the appellant’s mental retardation, his intoxication at the time of the crime, and duress presented a jury question. In response to this discussion, the trial court initially denied the appellant’s request to submit § 13A-5-51(6) to the jury, stating, “Number Six is put there specifically for the defense of mental disease or defect.” (R.1921-22.) However, after a discussion on whether the appellant could introduce evidence concerning his immediate family members (see Part IX, supra), the following occurred:
“THE COURT: Okay. This is what I’m going .to- do. I don’t really think it’s *149 admissible to a certain extent, again, since the plea of mental disease or defect has been withdrawn. But to make very sure about it, I’m going to let you put it in.
“[DEFENSE COUNSEL]: ... Subsection Six?
“THE COURT: (Positive response.)”
(R.1927.)
Although the trial court indicated that it would submit the mitigating circumstance to the jury for its consideration, it did not do so. No objection was raised by defense counsel. Although the trial court did not instruct the jury on this circumstance, its sentencing order addressed § 13A-5-51(6), as follows: “The capacity of Mr. Smith to appreciate the criminality of his conduct. No evidence supports this contention. In fact, the evidence shows just the opposite, i.e., that the Defendant intended to kill the three victims.” (C.R. 264.)
In a capital case, the sentencer may not, as a matter of law, preclude or refuse to consider any relevant mitigating factor offered by a defendant. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 621, 98 S.Ct. 2981, 57 L.Ed.2d 1000 (1978); Clisby v. State, 456 So.2d 99 (Ala.Crim.App.1983). The trial court may determine the weight to be given mitigating evidence, but may not exclude it from consideration. Eddings v. Oklahoma.
The proposed mitigating facts that the appellant claimed were supported by the evidence and pertinent to § 13A-5-51(6) are that he is mildly mentally retarded; that he has a full scale IQ of 72, a verbal IQ of 76, and a performance IQ of 69; that he has a low frustration tolerance and poor impulse control; that he has the learning capacity of a child in third grade; that he came from a dysfunctional home; that he had habitually used alcohol and drugs, beginning at an early age; that he was highly intoxicated, at the time of the commission of the offense, as a result of ingesting alcohol and drugs; that he was under duress at the time of the offense because of threats against his mother; and that he acted as a 12 year old with regard to the capacity to form the intent to commit the crime charged.
We cannot ascertain from the trial court’s order whether the court disregarded all evidence relevant to § 13A-5-51(6), and if it did so, whether it dismissed the evidence either (1) in the erroneous belief that, as a matter of law, § 13A-5-51(6) could be considered only if the defendant had pleaded at the guilt phase not guilty because of mental disease or defect, or (2) in the erroneous belief that the necessary proof for a finding of the mitigating circumstance at § 13-5-51(6) must present a mental disease or defect of such magnitude as to constitute a defense to the offense. Although the following authority discusses the interplay between the defense of intoxication and § 13A-5-51(6), we find it persuasive here, not only as to the appellant’s assertion of intoxication, but also as to his assertion of substantially impaired capacity:
“A mitigating circumstance should not rise to the level of a defense to the crime. If the evidence does show intoxication sufficient to constitute a defense [under § 13A-3-2(e)], a guilty verdict should not be rendered. Although evidence of incapacity may be insufficient to establish a defense to a particular crime, it may be sufficient to constitute a mitigating circumstance to be considered in determining the appropriate penalty. Arizona has a comparable provision that clarifies this point by listing a mitigating circumstance that ‘defendant’s capacity to appreciate the wrong *150 fulness of his conduct or to conform his conduct to the requirement of law was significantly impaired, but not so impaired as to constitute a defense to prosecution.’ ”
Joseph A. Colquitt, “The Death Penalty Laws of Alabama,” 33 Ala.L.Rev. 213, 305 (1982) (footnotes omitted). The court in Ivory v. State, 686 So.2d 495, 503 (Ala.Crim.App.1996), addressed § 13A-5-51(6) specifically, as follows:
“During the sentencing phase of a capital proceeding, a defendant’s burden of proof regarding the mitigating circumstance found in § 13A—5—51(6) is substantially less than his burden during the guilt phase, of proving the defense of not guilty by reason of mental disease or defect. See Lewis v. State, 380 So.2d 970, 977 (Ala.Cr.App.1979) (‘the extent of sub-normal mental capacity [shown in support of this mitigating factor] does not have to measure up to the applicable test necessary to show ... insanity that makes one incapable of committing a crime’), cert. denied, 370 So.2d 1106 (Ala.1979); Whisenhant v. State, 370 So.2d 1080, 1095-96 (Ala.Cr.App.) cert. denied, 370 So.2d 1106 (1979) (a finding that a diminished capacity mitigating circumstance exists ‘may be based on evidence of a lesser standard that is necessary to find insanity’).”
We further find, in addition to its erroneous interpretation of the interplay between the defense of mental disease or defect and § 13A-5-51(6), that the trial court improperly rejected § 13A-5-51(6) as a mitigating circumstance solely on its finding that the appellant intended to kill the victims. The converse to the trial court’s exclusion of § 13A-5-51(6) on its finding of an intent to kill is that the mitigating circumstance is present only if the intent to kill is absent; if that were so, the defendant would be entitled to an acquittal because he did not have the intent to kill. A capital murderer can have the intent to kill, but still have substantial impairment of his capacity to appreciate the criminality of his actions or to conform his conduct to the requirements of the law. The two—intent to kill and substantially impaired capacity—are not mutually exclusive.
Because of the ambiguity of the trial court’s interpretation of § 13A-5-51(6), the trial court, in reviewing or reconsidering the appropriate punishment for the appellant on remand, is to consider all evidence relevant to that mitigating circumstance. It is to do so without operation of any incorrect belief that such evidence cannot be considered unless the appellant pleaded not guilty by reason of a mental disease or defect, that the evidence of substantially impaired capacity must rise to the level of a mental disease or defect, or that the circumstance is negated solely by evidence of intent to kill.
In our plain-error review, we have considered the issue whether the trial court committed plain error in failing to instruct the jury on the mitigating circumstance set out in § 13A-5-51(6), as it said it would. A capital defendant is entitled to jury instructions on mitigating circumstances “ ‘which would not be misleading, which correctly state the law ..., and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.’ ” Ex parte Wood, 715 So.2d 819, 822 (Ala.1998) (quoting Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978)). Under the facts here, the trial court had a duty to instruct the jury on the following statutory mitigating circumstances, because there was some evidence relevant to each: § 13A—5—51 (6); § 13A-5-51(2) (“[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance”); and *151 § 13A-5-51(5) (“[t]he defendant acted under extreme duress or under the substantial domination of another person”). It instructed on the latter two, but failed to instruct on § 13A-5-51(6). As we have previously noted, the trial court agreed, upon request of the appellant, to instruct the jury that it could consider the substantially-impaired-capacity statutory mitigating circumstance. However, the trial court inadvertently failed to so instruct the jury.
The appellant did not object, and he thus failed to preserve the issue whether the trial court erred in failing to instruct on § 13A-5-51(6). See Phillips v. State, 726 So.2d 292, 293-94 (Ala.Crim.App.1998); Ala.R.Crim.Proc. 21.3. He also failed to raise this issue on appeal. Nevertheless, we deem the issue sufficiently important to notice it pursuant to the requirement that we search the record for plain error in a capital case, whether or not brought to our attention. Ala.R.App.P. 45A.
In considering what constitutes plain error in a capital case, we have adhered to the interpretation of “plain error” adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Ex parte Harrell, 470 So.2d 1309 (Ala.1985); Ex parte Womack, 435 So.2d 766 (Ala.1983). See also Hooks v. State, 534 So.2d 329 (Ala.Crim.App.1987), aff'd, 534 So.2d 371 (Ala.1988). Plain error is error that has or probably has adversely affected a substantial right of the appellant, Ala.R.App.P. 45A, or error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Wom-ack. For an error to affect substantial rights, it must have been prejudicial and it must have affected the outcome of the proceeding. United States v. Olano, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). To determine whether an error affects the substantial rights of a defendant, a court must analyze the alleged error in the context of the entire record. United States v. Young, 475 U.S. 1, 16, 106 S.Ct. 903, 89 L.Ed.2d 1 (1986). The failure to object at trial weighs against any claim of prejudice an appellant may make. Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
While the court should have instructed the jury on the substantially-impaired-capacity statutory mitigating circumstance, the instructions given to the jury for its consideration of mitigating circumstances required the jury to consider all evidence relevant to mitigation, including any evidence relevant to impaired capacity, and to give effect to such evidence in recommending a sentence. Moreover, the court made clear to the jury that the enumerated proposed circumstances were merely examples of mitigation and that it could consider any other matter in mitigation. The trial court instructed the jury as follows:
“Alabama law lists some of the mitigating circumstances you may consider, but that list isn’t a complete list of those mitigating circumstances which you may consider. Although this list isn’t complete, I will read you some of the mitigating circumstances for your consideration: That the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance; another mitigating circumstance, that the defendant acted under extreme duress or under the substantial domination of another person. Again, these are two I’ve listed for you. This list isn’t complete.
‘You can consider other mitigating circumstances not included in the list I’ve just given you, and such other circumstances shall include any aspect of the defendant’s character or record or *152 any circumstance of the offense as a basis for a sentence of life imprisonment without parole instead of death ..., and you can consider mitigating circumstances not included in the two that I gave you. You must only consider mitigating circumstances which arise from the evidence. When the State disputes the existence of a mitigating circumstance, it has the burden of disproving the existence of that circumstance by a preponderance of the evidence. This means that you are to consider that the mitigating circumstances exist unless taking the evidence as a whole [it] is more likely than not that the circumstance doesn’t exist.”
(R. 2107-11.)
“A mitigating circumstance is anything about Mr. Smith or the crime which in fairness and mercy should be taken into account in deciding punishment, even when there is no excuse or justification from the bare facts of the crime. Therefore, a mitigating circumstance may stem from any of the diverse frailties of humankind. Mitigating circumstances or any facts relating to Mr. Smith’s age, character, education, environment, mentality, life and background, or any aspect of the crime itself, which may be considered extenuating or reducing his moral culpability or making him less deserving of the extreme punishment of death. And you may consider as a mitigating circumstance any circumstance that tends to justify the penalty of life imprisonment. You may consider all the evidence of mitigation and the weight which you give to a particular mitigating circumstance as a matter for your moral, factual, and legal judgment. However, you may not refuse to consider any evidence of mitigation, and, thereby, give it no weight.”
(R. 2127-29; emphasis added.)
“The Court charged you that you must consider the mitigating circumstances offered by the defendant. [T]he list of mitigating circumstances, proper, can’t limit your deliberations, since you are free to consider any aspect of the crime or of the character of the defendant as mitigating in your sole discretion. The following are, therefore, offered solely as examples of factors which you might consider to be mitigating. Number one, Mr. Smith never developed a father-son relationship with his natural father.... Number five, Jerry Jerome Smith is borderline mentally retarded. Number six, Jerry Jerome Smith has a learning capacity of a third-grader. Number seven, Jerry Jerome Smith was on drugs and alcohol when this crime was committed. ... Number nine, Jerry Jerome Smith acted under duress when this crime was committed inasmuch as he believed his mother would be injured or killed. Number ten, his mother was an alcoholic. Number eleven, he first consumed alcohol at age eight. Number twelve, [Smith] was sniffing gas and lacquer thinner at age nine or ten. Number thirteen, at age ten or eleven, Mr. Smith was sexually abused by his cousin. Number fourteen, Mr. Smith was in special education classes all his life and only finished the eighth grade. Next, that Mr. Smith has a history of excessive alcohol and drug abuse. Mr. Smith sniffed gas, lacquer thinner, and used marijuana, heroine [sic], angel dust, acid, LSD, cocaine, Valium, Quaaludes, crack, rush, hash, alcohol, homebrew, and wine. Next, as a mitigating circumstance for you to consider, Mr. Smith can’t read or write. ... Next, any other circumstance or circumstances arising from the evidence *153 that you as jurors have noted and consider mitigating.”
(R. 2132-86; emphasis added.) After receiving objections from counsel outside the jury’s presence, the trial court instructed the jury as follows: “I was reading a charge here ... and ... I just put the wrong word in. Instead of, “You may consider all the evidence of mitigation,’ the correct charge is, You must consider all the evidence of mitigation.’” (R. 2142.) These instructions did not foreclose the jury’s consideration of any mitigating evidence; instead, they directed the jury to base its decision on all of the evidence presented, including the evidence relevant to the appellant’s allegedly substantially impaired capacity.
We further note that, although the trial court did not instruct the jury specifically on § 13A-5-51(6), the prosecutor noted in his opening statement to the jury-sentencing phase, as follows:
“I expect they will attempt to prove some mitigating circumstances to you.... And they can follow the Code, what is mitigating, plus what other things that are relevant, whatever is relevant for you to consider....”
“I expect ... they will try to show you mitigating circumstances, the defendant, listen to this now, the defendant had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. [Y]ou heard testimony from Dr. D’Enrico he wasn’t impaired in any manner or fashion.”
(R.1960-61; 1965-66.) In addition, defense counsel, in his closing argument in the sentencing phase, argued the appellant’s alleged mental deficiency, the fact that “[h]is mind is fried on drugs and alcohol” (R.2077); and the alleged duress exerted upon him.
After reviewing the entire record, we conclude that the trial court’s failure to instruct the jury on the substantially-impaired-capacity statutory mitigating circumstance, under the facts and circumstances of this case, was not plain error: it did not adversely affect a substantial right of the appellant, nor did it prejudice the fairness, integrity, or outcome of the proceedings. The lack of an instruction on § 13A-5-51(6) did not preclude the jury from giving effect to the evidence relevant to that mitigating circumstance. Rather, considering the trial court’s instructions in their entirety, the jury was required to give effect to all of the evidence presented. Cf. Gaddy v. State, 698 So.2d 1100, 1142-44 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.1997) (the trial court’s refusal to give the defendant’s requested charge proposing specific nonstatutory mitigating circumstances was harmless, in light of the entire instructions, including instructions on the jury’s role in weighing the evidence and on what areas of the evidence were proper for finding mitigating circumstances).
Under the facts and jury instructions here, a specific instruction on § 13A-5-51(6) would have had no meaningful effect. An instruction would merely have related any relevant evidence to that specific statutory mitigating circumstance. However, many of the mitigating factors enumerated in fact touched on the one omitted, so the jury, following the trial court’s instructions, considered the evidence relevant to the appellant’s impaired capacity. Because the jury included this evidence in considering the enumerated circumstances and the “catchall” instruction and because the weighing process in § 13A-5-48 is not a “tallying of aggravating and mitigating circumstances for the purpose of numerical *154 comparison,” it did not matter that the jury did not numerically include one more mitigating circumstance (if in fact it would have found such a circumstance to exist): it considered the evidence and was provided reliable means, by the instructions, of giving mitigating effect to that evidence.
Moreover, there is an additional reason that a specific instruction on § 13A-5-51(6) would have had no meaningful effect: given all the evidence, it is highly unlikely that the jury would have found the existence of this mitigating circumstance had it been instructed specifically on § 13A-5-51(6). The appellant’s actions preceding and following the offense indicate that he appreciated the criminality of his conduct and that he had the ability to conform his conduct to the law. Even if the jury had been so instructed and had found the circumstance to exist, it is highly unlikely that it would have given § 13A-5-51(6) much weight in determining which sentence to recommend. We conclude that the failure to instruct on this circumstance did not prejudice the appellant and had no effect on the outcome of the case. Thus, we find no plain error here.
XL
The appellant contends that the trial court erroneously charged the jury on, and subsequently found the existence of, the aggravating circumstance that he knowingly created a great risk of death to many persons, § 13A-5-49(3). He argues that this aggravating circumstance “contemplates actions in which lives are threatened other than those that form the basis of the capital offense” (appellant’s brief, p. 38) and that its application to these facts is unconstitutionally overbroad and vague.
The attorney general requests that we hold in abeyance our review of the trial court’s finding of this circumstance until the trial court submits an amended sentencing order. He admits that the trial court’s explanation of its finding of this circumstance is subject to the interpretation that its finding was based solely on the jury’s verdict of guilty, which, the attorney general agrees, would have been improper. Thus, at this time, we address only the appellant’s contention that this aggravating circumstance should not have been submitted to the jury for its consideration. We review this contention for plain error, because the appellant made no objection to the jury’s consideration of this aggravating circumstance. In fact, defense counsel, in his opening remarks in the sentencing phase, stated that the defense assumed that it was true that the appellant “created a great risk of deadly harm to many people” (R.1972) and, in his closing, again admitted that “[you] pose the weight of injuring a lot of people ... [a]nytime you go into some place with a gun and start shooting around” (R.2076).
We find that this aggravating circumstance was properly submitted to the jury. Alabama courts have approved of including the capital murder victims and intended, but surviving, victims in determining whether the facts support the finding of the aggravating circumstance of § 13A-5-49(3). See Ex parte Giles, 632 So.2d 577, 583 (Ala.1993) (“It would be anomalous to hold that [§ 13A-5-49(3),] § 13-11-6(3) allows sentence enhancement where the defendant unintentionally endangers persons other than the homicide victims, but disallows enhancement where the defendant intentionally threatens the lives of others.”) (emphasis in original); Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999) (Part XV). Thus, the prosecution presented some evidence that the appellant knowingly created a great risk of death to at least six people: in addition to the three victims killed, the appellant attempted to kill Gross; he put his girl *155 friend’s life in danger as he struggled with Gross over a gun and attempted to obtain a knife from her, this struggle occurring in a backyard in a residential area; he discontinued his deadly rampage only when the driver of a car pulled up to the residence; and this crime occurred in a “crack house,” which was visited frequently.
Thus, § 13A-5-49(3) was not vague and overbroad as applied to the facts of this case. See Wilson v. State, 777 So.2d at 922 (application not arbitrary or inconsistent with prior law where the appellant’s conduct created a risk to seven people who were in one room and for one other person who was in another part of the residence); Wesley v. State, 575 So.2d 108, 121 (Ala.Crim.App.1989) (agreement with the trial court’s finding that “ ‘[t]he number of victims who were murdered, shot, and shot at by the defendant—seven—is undeniable proof that the defendant created a great risk of death to many persons’ ”), rev’d on other grounds, 575 So.2d 127 (Ala.1990). See also Wilson v. State, 777 So.2d at 922 (§ 13A-5-49(3) is not vague); Giles v. State, 632 So.2d 568, 573 (Ala.Crim.App.1992) (the evidence of the appellant’s attack on six members of a family in the family’s residence clearly established the existence of § 13A-5-49(3)), aff'd, 632 So.2d 577, 583 (Ala.1993).
XII.
The appellant contends that the trial court erred in allowing the prosecution, in its presentation of evidence supporting the aggravating circumstance that the appellant had previously been convicted of a violent felony, § 13A-5-49(2), to elicit from Probation Officer Robert McCullough the details of that prior felony. McCullough testified that the appellant had been previously convicted of first-degree assault and that his report was based on what the victim or the appellant had told him. He further testified that he had stated in his report that the appellant and the victim had argued over money the victim allegedly owed the appellant; that, during the altercation, the appellant stated that he was tired of people using him; that the appellant pointed a shotgun at the victim and said, “I’m going to kill the son of a bitch; I’m going to go to the penitentiary” (R.1981); that, although his mother asked him not to shoot, he shot the victim in the arm and “almost blew his arm off’ (R.1981); and that the victim is not able to use his arm.
The appellant contends that McCullough’s detailed description of the facts leading to his prior conviction was based on unreliable, prejudicial, and irrebuttable hearsay from McCullough’s report. The appellant did not object on this basis at the sentencing hearing. Thus, we review this claim for plain error.
While the relevancy of a few of the details is questionable, we agree with the attorney general that this claim does not present plain error under Dill v. State, 600 So.2d 343, 364 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992). In Dill, the court, in addressing the appellant’s contention that the prosecution had improperly elicited details about a prior conviction for a violent felony, by relying on hearsay evidence, explained:
“ ‘Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements.’ Ala.Code 1975, § 13A-5-45(d). See also Stephens v. State, 580 So.2d 11 (Ala.Crim.App.1990). Thus, the appellant’s hearsay claim has no merit. [T]he testimony concerning the violence sur *156 rounding the robbery conviction was properly admitted to show the violent nature of the offense under Ala.Code 1975, § 13A-6-45(c). Siebert v. State, 562 So.2d 586 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963, 111 S.Ct. 398, 112 L.Ed.2d 408 (1990).”
600 So.2d at 364. See also Smith v. State, 698 So.2d 189, 212-13 (Ala.Crim.App.1996) (testimony of the circuit clerk regarding the appellant’s testimony at a prior proceeding wherein the appellant described his violent behavior during his commission of a burglary was properly admitted pursuant to §§ 13A-5-45(c) and (d) and was relevant and of probative value), aff'd, 698 So.2d 219 (Ala.1997).
XIII.
The appellant argues that evidence of his prior conviction for first-degree assault was improperly admitted at trial over his objection. During the prosecution’s case-in-chief, the prosecutor, on redirect examination, asked a hostile witness whether she had heard “rumors and reports” concerning the appellant’s conviction and 10-year sentence for assault in the first degree. Subsequently, the appellant took the stand and testified in his own defense. Upon questioning by his counsel, the appellant admitted that he had four prior felony convictions, including the one for first-degree assault.
Arguably, the defense opened the door to the prosecutor’s inquiry into the appellant’s prior convictions by attempting to show that Smith had a non-violent character; however, we need not reach the issue of the propriety of the admission of evidence of his prior assault conviction:
“Once the defendant took the witness stand, those prior convictions were admissible for purposes of impeachment. [Charles W. Gamble, McElroy’s Alabama Evidence] at § 45.01 [(3d ed.1977)]. Any error in the admission of the prior convictions as part of the State’s case in chief was reduced to harmless error when the defendant testified, without objection, on his own behalf and admitted those prior convictions. Ex parte Williams, 484 So.2d 503 (Ala.1986). ‘A defendant cannot complain of the admission of improper evidence when he himself has testified to the same facts.’ Lewis v. State ex rel. Evans, 387 So.2d 795, 807 (Ala.1980). It is of no ‘consequence that this testimony may have been incompetent at the time it was offered, if it was subsequently rendered [competent].’ Hanners v. State, 147 Ala. 27, 41 So. 973, 975 (1906). ‘[W]hile, ordinarily, in the introduction of evidence, it should be competent at the time when offered, still, if rendered competent by the subsequent introduction of other evidence, this is sufficient to correct and cure any error that might otherwise have existed in the admission of the evidence first offered.’ Collins v. State, 138 Ala. 57, 34 So. 993, 994 (1903).”
Rowe v. State, 522 So.2d 328, 329-30 (Ala.Crim.App.1988).
Perhaps in anticipation of this response, the appellant asserts the following:
“Had [the defense] felt that the state had not proved its case, or had they determined that appellant’s mental capacity could be proved adequately through the expert Dr. Crook, [he] might have decided to exercise his right to silence, and the evidence that he had been arrested, convicted, and jailed before would not have come before the jury.”
(Appellant’s brief, p. 44.) When considering this assertion in the context of the evidence presented to the jury, it is based on contingencies that are highly improba *157 ble. Thus, we give this assertion no persuasive effect.
Moreover, the trial court properly instructed the jury on the purpose for which it could consider the evidence of the appellant’s prior convictions, i.e., the jury was instructed that the prior convictions could be considered only for impeachment and not as substantive evidence that the appellant committed the crime charged.
XIV.
The appellant contends that the prosecutor should not have attempted to impeach the prosecution’s witness Miranda Felder, Felder testified that, on the night of the murder, the appellant, whom she had not known long and was not friends with, and Lekina Smith arrived at her mother’s house. She further testified that the appellant asked her to “hold” a rifle for him; that she took the rifle into the house and put it in her brother’s room under his bed; that sometime later, detectives arrived and asked her about the rifle; that she told them it was in the house; and that the detectives found the rifle wrapped in a towel in the attic ceiling. On redirect examination, the following occurred:
“Q. [Prosecutor]: ... [W]ere you arrested when the police came and asked about the rifle, and you said that you told them it was under your brother’s bed, didn’t you get arrested?
“MR. MEREDITH: Objection, your Honor, it’s irrelevant.
“THE COURT: Overruled.
“Q. You were arrested, weren’t you, ma’am?
“A. [Felder]: Yes, sir.
“Q. And your brother or your mama or anybody else in the house wasn’t arrested, were they?
“A. No, sir.”
(R. 1106-07.) Felder was prosecuted as a juvenile for hindering prosecution of the appellant. At the time of trial, she had completed her sentence.
Initially, we note that, although the appellant argues on appeal that eliciting evidence of Felder’s arrest was error because juvenile proceedings may not be used to impeach a witness, Ala.R.Evid. 609(d), his objection at trial was based only on a relevancy ground. He argues this issue on appeal in terms of using a juvenile proceedings to impeach a prosecution witness.
We seriously doubt that the prosecutor was attempting to impeach Felder generally by showing her juvenile record; however, if his question did rise to the level of impeachment, it is arguable that the error, if any, would have benefited the appellant.
Moreover, considering Felder’s inculpa-tory testimony concerning her part in hiding the murder weapon and the facts concerning the discovery of it by the police, any testimony concerning her arrest arising from her participation would be insignificant. The testimony complained of here did not prejudice the appellant. We find no merit in this contention.
XV.
The appellant raises a number of issues involving prosecutorial misconduct. He contends that the prosecutor wrongfully injected facts into the case, led witnesses, misstated the law, and made improper comments and arguments to the jury. He did not object to many of the instances he now alleges were misconduct. In these instances, we will consider whether the prosecutor’s conduct constituted plain error. The prosecutor’s duty in a criminal prosecution is to seek justice, and although the prosecutor should prosecute with vigor, he or she should not use improper methods calculated to produce a wrongful conviction. Berger v. United *158 States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). The use of such methods is a ground for reversal of a conviction if it results in an unfair trial in violation of the Due Process Clause. Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); Melson v. State, 775 So.2d 857 (Ala.Crim.App.1999); Henderson v. State, 583 So.2d 276 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991); Fifth and Fourteenth Amendments, U.S. Const.
A.
The appellant contends that the prosecutor wrongfully injected facts into the case by the questions he asked certain witnesses.
First, the appellant contends that it was improper for the prosecutor to allude to the fact that Lekina Smith had offered to plea-bargain with the prosecution. Lekina Smith was the appellant’s girlfriend, was involved in the commission of the crime, and had been indicted along with the appellant for the same capital offense. Her attorney had approached the prosecutor in an attempt to plea-bargain for his client; however, the prosecutor had refused. Before tidal, Lavoiis Smith, Lekina’s mother, made two statements in the presence of the prosecutor, one with Chief Assistant District Attorney Maxwell also present and the other with Investigator Robert Jenkins present, that the appellant had contacted her by telephone from the county jail, and that he had told her that Lekina had nothing to do with what happened, that he did the shooting, that it was over a drug deal, and that he shot Flour-noy and shot the other persons in the residence so that there would be no witnesses to the crime. The prosecution called Lavoris Smith as a witness, and she testified that she told the prosecutor that she had received the telephone call from the appellant, that the appellant had told her that her daughter had had nothing to do with the shootings, and that he had done the shootings. However, she denied that she told the prosecuting attorney that the appellant had told her that he shot Flournoy over a drug deal and shot the others to eliminate the witnesses. She testified that it was not the appellant who told her that, but that it was her daughter, Lekina. Lekina was not called as a witness and had made it known that if she were called she would invoke the Fifth Amendment. The prosecutor claimed that he was surprised by Lavoris’s testimony, and the trial court permitted him to cross-examine her as a hostile witness. She continued to deny that she had made such a statement, and the prosecution called the assistant prosecutor, Maxwell, and the investigator, Jenkins, as impeachment witnesses; each testified that he was present when Lavoris had stated to the prosecutor about a week before trial that the appellant had told her that the shooting occurred over money owed from a drug deal and that he had shot the other persons, who were not involved in the drug deal, so that there would be no witnesses to the crime.
The credibility of a witness may be attacked by any party, including the party calling the witness. Rule 607, Ala.R.Evid. “With the adoption of Rule 607, Ala.R.Evid., in 1996, a calling party can now impeach its own witness, using ‘all weapons from the arsenal of impeachment that historically were reserved generally for opposing witnesses.’ C. Gamble, McElroy’s Alabama Evidence, § 165.01(6)(a) (5th ed.1996).” Burgin v. State, 747 So.2d 916, 918 (Ala.Crim.App.1999). A right to impeach one’s own witness is not absolute, and may be checked if it is abused. “Impeachment is improper *159 when employed as a guise to present substantive evidence to the jury that would be otherwise inadmissible.” Id. From the facts before us, we find no error in the trial court’s allowing the prosecution to treat Lavoris Smith as a hostile witness and allowing it to impeach her testimony by use of prior inconsistent statements. The record does not support a conclusion that the prosecutor cross-examined and impeached the witness for the purpose of placing before the jury inadmissible substantive evidence. Under the circumstances here, the prosecutor was entitled to cross-examine the witness for the purpose of probing her recollection, recalling to her mind the statements she had previously made, and drawing out an explanation of her apparent inconsistency. It was also proper for the purpose of showing the circumstances that induced the prosecution to call her as a witness.
A witness may be impeached by showing that he or she entertains bias toward the adverse party. Generally, an impeaching party can ask a witness about any feeling or act that would show bias. McElroy’s, § 149.01(1). Anything that tends to show bias, unfriendliness, an enmity, or that would incline a witness to swear against a party is admissible. Nichols v. State, 276 Ala. 209, 160 So.2d 619 (1964); Griffin v. State, 591 So.2d 547 (Ala.Crim.App.1991). Cross-examining counsel is given wide latitude to reveal any bias on the part of a witness, and details may be shown insofar as necessary to determine the extent and nature of the bias or enmity. McElroy’s, § 149.02.
In the instant case, it was reasonable for the prosecutor to believe that the witness entertained a bias or enmity toward him for refusing to plea bargain with her daughter’s attorney, and under the circumstances, it was proper for him to cross-examine the witness on that subject. In reviewing this matter, we should keep in mind that the witness’s daughter was being prosecuted for the same capital offense as the appellant, that the witness did not want to testify, that she had called the prosecutor and told him that she was not coming to court but was going to Florida, and that the trial judge had to issue an order to make her come to court. There is no merit in the appellant’s contention that the prosecutor wrongfully injected by his questions the fact that he had refused to plea bargain with the codefendant, Lekina Smith. Under the circumstances his questions were proper.
Second, the appellant contends that the prosecutor improperly injected facts into the trial by eliciting information from Sgt. Jay about what the prosecutor had told him during the preparations for trial and matters pertaining to Jay’s investigation of the case. This contention is based on the testimony of Kevin Bridges, an inmate in the county jail, who claimed to have heard the appellant make incriminating statements when he was incarcerated in the county jail awaiting trial. Bridges sent a letter to- Dennis Atkins of the Alabama Bureau of Investigation, reporting what he had heard, and Atkins forwarded the letter to Jay. Jay received the letter six to eight months before trial and inadvertently filed it in the file of another subject under investigation. In preparing the case for trial, the prosecutor had Jay take a statement from Bridges concerning the incriminating statements he allegedly heard the appellant make in the county jail. A copy of this statement was delivered to the appellant’s counsel before trial. After searching further, Jay found the letter he had received from Atkins; however, a page of the letter was apparently missing. The prosecutor promptly delivered a copy of this letter to defense counsel during the trial. The incomplete letter and the state *160 ment were admitted into evidence. The letter was admitted without objection.
Bridges testified for the prosecution during the trial. He stated that he heard the appellant discussing the instant case. He testified, among other things, that he heard the appellant say that Flournoy owed him money for “crack”; that he went to collect the money and Flournoy did not have it; that he shot Flournoy on the back porch, went into the house and shot a man and a girl in a back room, and tried to shoot another man, but his gun jammed and the man got away; that he laughed and bragged that he would “get off on some mental plea,” and that they would not believe that he would do such a thing in his right mind.
After reviewing the record in reference to the questions asked by the prosecutor and the answers given by Jay, we find that they in no way prejudiced the appellant or rendered the trial fundamentally unfair. This line of questioning was obviously an effort by the prosecutor to explain the circumstances surrounding the misplaced letter and the necessity of taking a statement from Bridges before trial. The prosecution was justified in responding in this manner because the appellant had suggested that the prosecution had deliberately withheld the letter in violation of the discovery orders. The appellant was not surprised by Bridges’s testimony because he had a copy of Bridges’s statement prior to trial. There was no evidence of bad faith on the part of the prosecution, and it obviously made every effort to comply with open-file discovery. There is no merit in this contention.
Third, the appellant contends that the prosecutor argued to the jury in closing argument a fact not in evidence by telling the jury that Derrick Gross, who did not testify, summoned the police to the scene on the night the crime was committed. He argues that the purpose of the comment was to inform the jurors that it was Gross who called for police assistance, in case the jury thought that the appellant had done so. There is no merit in this contention. Officer Scott Heath of the Dothan Police Department testified that Derrick Gross made the initial call to the police. (R. 765.) Thus, the prosecutor’s argument in this regard was a fair comment on and within the scope of the evidence.
Fourth, the appellant contends that the prosecutor improperly commented in open court and before the jury that the appellant had “muttered” something or made a remark directed toward him just as he concluded his cross-examination of the appellant. It does appear that the appellant made a comment, but the court reporter apparently did not hear it or understand it because it is not in the record. We do not know what he said, and he did not respond when the prosecutor asked him to repeat the comment. The prosecutor briefly referred to this in his argument to the jury in the sentencing phase. It appears from the record that this was a comment by the prosecutor on the appellant’s conduct in open court. No objections were made at the time of these occurrences; thus, we review this issue under the plain-error rule. We find no error in the prosecutor’s actions in bringing the appellant’s conduct to the attention of the court and making the incident a part of the record. Nor do we find error in his argument in this regard to the jury. The appellant’s manner of testifying and his appearance on the stand were proper subjects of comment in argument. In this case, the comments were fair and within the fair scope of the evidence. The prosecutor’s conduct in this instance clearly did not rise to the level of plain error.
*161 Fifth, the appellant contends that the prosecutor improperly injected into evidence the fact that one of the members of the victim’s family was not present in court because of illness; that one was not present because she was elderly; that one of the State’s witnesses, Lavoris Smith, had had a death in her family; and that he personally knew certain members of the venire. No objections were made to any of these comments. We conclude, after reviewing the record, that these comments did not prejudice the appellant or render his trial fundamentally unfair. It would be unreasonable to conclude that these comments affected the outcome of the trial. We find no error here, much less plain error.
Sixth, the appellant contends that in closing argument before the jury the prosecutor improperly stated that people were afraid of the appellant, and misrepresented those who were allegedly involved in the commission of the crime. Again, no objection having been made to these arguments, we review these contentions under the plain-error rule. We conclude, after reviewing the record, that the comments were reasonable inferences to be drawn from the evidence, and that they did not constitute error, and certainly not plain error.
Seventh, the appellant contends that in his arguments to the jury the prosecutor improperly minimized the appellant’s attempted suicide by injecting facts not in evidence. Again, no objection was made at trial to this argument; thus, we review the contention under the plain-error rule. Contrary to the appellant’s assertion, there was evidence introduced through the medical experts relating to the appellant’s attempted suicides, including testimony by Dr. D’Enrico that the appellant told him that he had eaten rat poison and had his stomach pumped on one occasion and that he had attempted to hang himself on another. These comments were obviously intended to disparage the appellant’s defense that because of his mental condition he could not entertain the requisite intent to commit the crime and were a fair comment on the evidence. We find no plain error here.
B.
The appellant further contends that the prosecutor “engaged in name-calling” throughout the proceedings. (Appellant’s brief, p. 56.) He cites, as examples, the prosecutor’s references to him as “this animal over here” (R. 673); “a capital murderer and ... a liar” (R. 1684); “wicked” (R.2095); and “evil” (R.2096). Defense counsel’s objection made in response to the reference to the appellant as an animal was overruled. (R. 673, 692-93.)
Pursuant to the following discussion, we find that the specific instances of the prosecutor’s “name-calling” cited by the appellant do not present reversible error:
“The digest abounds with instances where the prosecutor has commented on the defendant’s character or appearance .... Wright v. State, 279 Ala. 543, 188 So.2d 272 (1966) (‘Judas’); ... Weaver v. State, 142 Ala. 33, 39 So. 341 (1905) (‘beast’); Liner v. State, 350 So.2d 760 (Ala.Cr.App.1977) (‘a rattlesnake’ and ‘a viper’); ... Cassady v. State, 51 Ala.App. 544, 545, 287 So.2d 254 (1973) (‘a demon’); Reed v. State, 32 Ala.App. 338, 27 So.2d 22, cert. denied, 248 Ala. 196, 27 So.2d 25 (1946) (‘lied like a dog running on hot sand’); ... Thomas v. State, 19 Ala.App. 187, 96 So. 182, cert.denied, ... 209 Ala. 289, 96 So. 184 (1923) (‘a moral pervert’)....
“The controlling principles are found in 23A C.J.S. Criminal Law, Section 1102 (1961).
*162 “ ‘Comments by the prosecuting attorney which refer to, and make unfavorable inferences from, the conduct of accused in the course of the transaction for which he is on trial, or his conduct at any other time or place, or which refer to his character as shown by such conduct, or to his background, breeding, or associations, or to other details of his personal history or characteristics are proper, where the purported facts referred to by counsel are supported by competent evidence in the case, and where the inferences and deductions sought to be made from such facts are within the bounds of proper argument. On the other hand, remarks or argument of the prosecuting attorney concerning the character or conduct of accused, which is not supported by the record or which exceeds the limits of fair argument or inference is improper.
“ ‘In a proper case, the prosecuting attorney may characterize accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence in the case, and, where the evidence warrants the belief that accused is guilty, the prosecutor may employ terms appropriate to the nature or degree of turpitude involved in the crime charged; but characterizations not justified by the evidence or the charge which the evidence tends to prove, and hence merely abusive, or which are couched in intemperate and inflammatory language are, ... improper.’
“See also 6 Am.Jur. Trials, Prosecution Summations 873, 917 (1967).
“ ‘The prosecutor is at liberty to strike hard blows, but he must not strike foul ones; that is, while comment may be made about the defendant or his witnesses, it must be based on the testimony that the defendant or his witnesses gave from the stand or on rational conclusions concerning the defendant or witness that flow from the evidence in the case.’
“... ‘The prosecutor, as does defense counsel, has a right to present his impressions from the evidence.’ McQueen v. State, 355 So.2d 407, 411 (Ala.Cr.App.1978).”
Barbee v. State, 395 So.2d 1128, 1134-35 (Ala.Crim.App.1981). In regard to the prosecutor’s reference to the appellant as an animal, see Melson v. State, 775 So.2d 857, 885 (Ala.Crim.App.1999) (“the prosecutor’s reference to Melson as an ‘animal’ accorded with the evidence presented at trial concerning the brutal and cold-blooded nature of the murders”), aff'd, 775 So.2d 904 (Ala.2000). In regard to the prosecutor’s reference to the appellant as a capital murderer, see Maples v. State, 758 So.2d 1, 58 (Ala.Crim.App.) (the prosecutor’s reference to the defendant as a capital murderer was not an improper expression of his personal opinion of the appellant’s guilt because it was an expression of his opinion based on the evidence), aff'd, 758 So.2d 81 (Ala.1999); Hunt v. State, 659 So.2d 933, 940-42 (Ala.Crim.App.1994) (quoting Galloway v. State, 484 So.2d 1199, 1201 (Ala.Crim.App.1986), recognizing the general rule that the prosecutor’s expression of his opinion that the accused is guilty is not improper where he states, or it is apparent, that such opinion is based solely on the evidence), aff'd, 659 So.2d 960 (Ala.1995). In regard to the prosecutor’s comment on the appellant’s credibility, see Smith v. State, 795 So.2d 788, 816 (Ala.Crim.App.2000) (characterization of the appellant as a liar was supported by the evidence); Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980) (reference in closing argument to the de *163 fendant as a “bald face liar” was “a hard blow but it was not foul”). In reference to the prosecutor’s description of the appellant as evil, see also Pierce v. State, 576 So.2d 236, 249-250 (Ala.Crim.App.1990) (the repeated characterization of the appellant as an “evil person” was proper, because it was supported by the evidence). The prosecutor’s characterizations of the appellant raised in his brief were justified under the evidence before the jury.
C.
The appellant contends that the prosecutor repeatedly misstated the law to the jury. No objections were made to the alleged misstatements; thus we review them under the plain-error rule.
First, he contends that, during jury selection, the prosecution made certain references to the standard of proof for a conviction that he says lessened the State’s burden. He does not point to a specific instance of this in his brief, and only refers us to a page in the record. We not only have reviewed the page of the record referred to, but we have reviewed the entire record, and we do not find any instance where the prosecutor misstated the State’s burden of proof. We find no merit in this contention, and no plain error.
Second, the appellant contends that the prosecutor erred during voir dire examination of the jury panel by telling the venire “that cases did not get the death penalty because the law did not allow it—and not that the sentencer declined to impose it” and by giving the members of the venire “the impression that cases in which two or more people are killed always involve the death penalty.” (Appellant’s brief, p. 60.) He further contends that the prosecutor erred in his argument to the jury in the sentencing phase by invoking the Alabama Supreme Court and the United States Supreme Court “in contending that the death penalty was warranted here.” (Appellant’s brief, p. 62.) No objections were made at trial to these contentions. We have examined the record and find that these contentions are without merit. The comments and argument of the prosecutor complained of were not improper. We find no error, and certainly no plain error.
Third, the appellant contends that the prosecutor’s and the trial court’s references to the jury’s sentence verdict as a recommendation undermined the jury’s sense of responsibility in sentencing him to death and thereby violated Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).
It is constitutionally impermissible to rest a death sentence on a determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the accused’s death rests elsewhere. Caldwell. However, comments that accurately explain the respective functions of the judge and jury are permissible under Caldwell as long as the significance of the jury’s recommendation is adequately stressed. Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir.1987); Martin v. State, 548 So.2d 488 (Ala.Crim.App.1988), aff'd, 548 So.2d 496 (Ala.1989). In the instant case, neither the prosecutor nor the trial court misrepresented the effect of the jury’s sentencing recommendation. Their remarks clearly defined the jury’s role, were not misleading or confusing, and were correct statements of the law.
After reviewing the entire record, we conclude that the comments of the prosecutor and the remarks and instructions of the trial court to the jury did not undermine or tend to diminish the jury’s sense of responsibility in the sentencing process.
*164 Fourth, the appellant contends that the prosecutor improperly argued to the jury that it could infer intent from the use of a deadly weapon. No objection was made at trial to this argument. The prosecutor’s argument in this regard, under the facts of this case, was a correct statement of the law. See Terry v. State, 540 So.2d 782 (Ala.Crim.App.1988), overruled, on other ground, J.D.S. v. State, 587 So.2d 1249 (Ala.Crim.App.1991). Thus, we find no plain error.
Fifth, the appellant contends that the prosecutor’s closing argument before the jury in the sentencing phase “distorted the meaning and relevance of mitigating circumstances.” (Appellant’s brief, p. 61.) He specifically takes issue with the prosecutor’s argument to the jury that the evidence did not support a finding of the existence of the statutory mitigating circumstance that the appellant lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Again, no objection was raised at trial. The prosecutor’s argument was a fair comment on the evidence offered in mitigation. Thus, we find no plain error.
D.
The appellant contends that the prosecutor made several improper comments during his trial.
First, he argues that the prosecutor improperly informed the jury that it did not need to worry about the circumstances surrounding the appellant’s confession because the trial court had held a suppression hearing and, if the appellant’s rights had been violated, the jury would never have heard the statement. We address this assertion in Part XXI, infra.
Second, the appellant contends that the prosecutor wrongfully “bolstered his own standing” and “continually placed his own expertise on the record.” (Appellant’s brief, p. 54 n. 13.) He specifically asserts that the prosecutor improperly argued to the jury, in the guilt phase, his position on paroles. No objection was made at trial to this argument. The record shows that the prosecutor’s argument, expressing his general opposition to releasing criminals on parole, was in rebuttal to defense counsel’s argument; that argument implied that the state’s witness, Bridges, had received a deal in exchange for his testimony. We find no plain error here. The argument complained of was proper; it was a legitimate comment on the argument of opposing counsel.
The appellant also contends that the prosecutor improperly commented on his expertise. The conduct referred to occurred during the voir dire examination when the prosecutor told the venire that he had prosecuted many criminal cases. No objection was made at trial. When the comment is considered in the context of the entire voir dire, it is clear that it was preliminary to asking the members of the venire if he had ever prosecuted any members of the venire, members of their families, or friends. This comment was not improper, it did not prejudice the appellant in any way, and it did not constitute plain error.
Third, the appellant contends that the prosecutor improperly “spoke throughout voir dire as if there were no question but that this case would reach a penalty phase, even telling them what he planned to do at sentencing.” (Appellant’s brief, p. 60.) We do not agree with the appellant’s characterization of the voir dire questions by the prosecutor in this regard. Reading the voir dire in its entirety, we conclude that the prosecutor’s questions did not assume that the trial would reach the penalty phase, but only that it might. The jury *165 was certainly not misled by the questions, as the appellant suggests. We find no merit in this contention.
Fourth, the appellant contends that the prosecutor engaged in improper argument by referring to the appellant’s prior convictions in his argument to the jury during the guilt phase. We do not agree. The prosecutor’s argument was in rebuttal to Lavoris Smith’s testimony that the appellant had a reputation for nonviolence. This was legitimate argument in response to character evidence brought out by the appellant. We note that the trial court properly instructed the jury that it could consider the evidence of prior felony convictions only for impeachment purposes, and not as substantive evidence that the appellant committed the crime charged.
Fifth, the appellant contends that the prosecutor erred in cross-examining him about a postconviction petition he had apparently filed pro se, seeking review of his prior convictions. We find no error. Examined in proper context, the questions were directed toward the appellant’s claim that he could not read or write, and they were proper cross-examination.
The appellant’s claim that the prosecutor improperly referred to parole during closing argument is without merit. When considered in context, it is clear that the remark was a legitimate comment in response to the appellant’s attacks on the credibility of the State’s witness, Bridges.
Sixth, the appellant contends that it was error for the prosecutor, in closing argument in the guilt phase to refer to an adverse ruling by the trial court on an objection by the appellant as being “wholeheartedly” overruled. No objection was made to this characterization of the trial court’s ruling, and nothing appears in the record to support such a characterization. We view this comment as one made in the heat of debate, and one of such minor consequence that it could not have had any bearing on the outcome of the case. We find no plain error in this comment.
Seventh, the appellant contends that the prosecutor improperly made comments about the victim’s families. No objections were raised to these comments. The appellant does not specifically point out in his brief the comments he refers to, but only cites us to pages in the record. One of the comments was made in the prosecutor’s opening statement (he stated that he represented the victims as well as the State), and another involved questioning a witness to establish the fact of the death of one of the victims. We have examined the portions of the record referred to, and find no error in the comments, and certainly no plain error.
Eighth, the appellant further contends that the prosecutor erred in the emphasized portion of the following comment, “I submit to you, listen real carefully, take the sword of justice in this case and run it right through his guilty little heart because he deserves the death penalty based on the law and the evidence.” (R.2094; emphasis added.) Defense counsel did not object to this statement, which the prosecutor made in his opening statement in the sentencing phase.
“It is not enough that a prosecutor’s comment in closing arguments was undesirable or even universally condemned; the question instead is whether the comment ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ Burton[ v. State], 651 So.2d [641,] 651 [(Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994)], quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
*166 "... [A]s we have previously stated, a prosecutor’s comment must be viewed as delivered in the heat of debate, and, as such, is usually valued by the jury at its true worth. ‘ “[W]e must not lose sight of the fact that a trial is a legal battle, a combat in a sense, and not a parlor social affair. The solicitor is yet under duty to prosecute with earnestness and vigor—to strike hard blows, but not foul ones.” Berger v. United States, [295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)].’ Taylor[v. State], 666 So.2d [36,] 64 [(Ala.Cr.App.1994)], quoting Arant v. State, 232 Ala. 275, 280, 167 So. 540, 544 (1936).”
Melson v. State, 775 So.2d 857, 885 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000).
The prosecutor’s comment was not plain error. Retribution is a proper subject of prosecutorial argument. Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999); McWilliams v. State, 640 So.2d 982, 1001 (Ala.Crim.App.1991), aff'd in pertinent part, rem’d, 640 So.2d 1015 (Ala.1993). See also Price v. State, 725 So.2d 1003, 1033 (Ala.Crim.App.1997) (there is no impropriety in a prosecutor’s appeal to the jury for justice); Kuenzel v. State, 577 So.2d 474, 498 (Ala.Crim.App.1990) (retribution is a valid consideration in sentencing) (quoting Johnson v. Wainwright, 778 F.2d 623, 630 (11th Cir.1985)), aff'd, 577 So.2d 531 (Ala.1991). Viewing this comment as delivered in the heat of debate, we conclude that it was valued by the jury at its true worth and that it was not an improper factor in the formation of its sentencing recommendation verdict.
E.
The appellant contends that the trial court allowed the prosecutor to ask so many leading questions that he received an unfair trial. He calls our attention to only one such leading question, and cites us to several pages in the record where he contends leading questions were asked. We have examined the entire record, paying particular attention to the pages of the record cited. Objections were made to some of the questions as being leading, but in most instances no objections were made, and in some instances, if objections were made, no adverse rulings were obtained.
“Whether to allow or disallow leading questions is discretionary with the trial court and except for a flagrant violation will there be reversible error.” Rufffin v. State, 582 So.2d 1159, 1162 (Ala.Crim.App.1991), quoting Jones v. State, 292 Ala. 126, 128, 290 So.2d 165, 166 (1974). See also, C. Gamble, McElroy’s Alabama Evidence § 121.05 (4th ed.1991).
After reviewing the record in reference to the leading questions asked by the prosecutor, we find no flagrant violations, and thus no reversible error. We find no reversible error in the trial court’s rulings, and in all instances where no objections were made or no adverse rulings obtained, we And no plain error.
F.
The appellant contends that the cumulative effect of all the errors or instances of prosecutorial misconduct allegedly committed in the trial of his case violated his right to due process and his right to a fundamentally fair trial. We do not agree. We have reviewed each and every allegation of error or misconduct, as well as the cumulative effect of these alleged errors or misconduct, and find that the cumulative effect of these alleged errors does not call for a reversal.
XVI.
The appellant contends that it was reversible error for Gary Maxwell, the *167 chief assistant district attorney who offered limited assistance in the prosecution of the appellant, to testify on behalf of the prosecution. His testimony corroborated the testimony of Robert Jenkins, an investigator for the district attorney’s office, to the effect that Lavoris Smith (the mother of the appellant’s girlfriend), contrary to her testimony as the prosecution’s witness, had stated in his and District Attorney Valeska’s presence that the appellant had told her in a telephone conversation that he had killed “the other people to do away with the witnesses, and it was over a drug deal.” (R. 998.) Defense counsel tried to impeach Jenkins by suggesting through questioning that he was biased toward the prosecutor and that he therefore recollected the interview as the prosecutor wanted him to recollect it. Maxwell testified to another interview with Lavoris Smith wherein, in his and Valeska’s presence, she gave the same rendition of her conversation with the appellant as she had given to Jenkins and Valeska.
Defense counsel explicitly stated that he had no objection to Maxwell’s testifying only to the issue of the impeachment of Lavoris Smith. (R. 1013.) Thus, we review this issue for plain error.
Clearly, the prosecution was surprised when Lavoris Smith changed her testimony to the prosecution’s detriment, as we discuss in Part XVA, supra. It called Maxwell only after the defense tried to impeach Jenkins’s testimony. Under the principles stated in Waldrop v. State, 424 So.2d 1345, 1346-47 (Ala.Crim.App.1982), Maxwell’s testimony was proper.
“The rule was clearly stated in Maund v. State, 254 Ala. 452, 48 So.2d 553[, 561] (1950).
“ ‘The rule governing such procedure is well stated in 70 Corpus Juris page 183, as follows: “Although a prosecuting attorney is competent to testify, his testifying is not approved by the courts except where it is made necessary by the circumstances of the case, and, if he knows before the trial that he will be a necessary witness, he should withdraw and have other counsel prosecute the case. The propriety of allowing the prosecutor to testify is a matter largely within the trial court’s discretion. The testimony of a prosecuting attorney has been admitted where, unknown to the attorney before the trial, his testimony became valuable for the purpose of corroborating other witnesses in impeaching a defendant witness; [and] to explain the surprise occasioned by the testimony of a witness called by the prosecuting attorney when such witness contradicts statements made to him previously.
424 So.2d at 1346-47 (emphasis omitted). Clearly, the necessity for Maxwell’s testimony was not foreseeable; the assistant did not know until Lavoris Smith’s repudiation and the defense’s attempted impeachment of Jenkins that his testimony would be necessary. It appears that he had not anticipated the need to testify, nor had he formed the intent to testify. Compare Tarver v. State, 492 So.2d 328 (Ala.Crim.App.1986) (the sole prosecutor committed plain error by failing to withdraw when it became evident before trial that he would testify and instead conducted the entire trial); Waldrop v. State. Moreover, it appears that no one else was present during either of the two interviews to testify in Maxwell’s place. Compare Waldrop v. State. Measuring the trial court’s discretion against the necessity of Maxwell’s testimony, given the circumstances of this case, as we are required to do, Ex parte Gilchrist, 466 So.2d 991, 992 (Ala.1985), we find that the trial court did not abuse its *168 discretion and, thus, did not commit plain error by allowing Maxwell to testify.
Although not explicitly raised by the appellant, the attorney general indirectly acknowledges the related issue whether Maxwell should have withdrawn from the prosecution after he testified. The defense did not object to Maxwell’s very limited continued participation following his testimony. Thus, we review this issue for plain error. The attorney general asserts that Maxwell’s withdrawal was unnecessary because, he says, Maxwell gave no jury argument and was neither the sole nor the lead prosecutor.
In regard to a prosecutor-witness’s duty to withdraw from prosecution of a case once he learns it will be necessary for him to testify in the case, the court in Waldrop v. State, 424 So.2d at 1347, quoted with approval the following holding in State v. Hayes, 473 S.W.2d 688, 691-92 (Mo.1971):
“ * “Even [in the narrow circumstances where a prosecuting attorney is permitted to testify], his functions as a prosecuting attorney and as a witness should be disassociated. If he is aware, prior to trial, that he will be a necessary witness, or, if he discovers this fact in the course of the trial, he should withdraw and have other counsel prosecute the case.” Tomlin v. State, 81 Nev. 620, 407 P.2d 1020[, 1022 (1966)].’ ”
The court in Waldrop v. State continued:
“Under the circumstances, allowing the district attorney to continue to prosecute this case and argue to the jury had the effect of allowing him to violate the rule that it is not permissible for the solicitor to make an emphatic statement that the defendant is guilty of the crime charged. White v. State, 294 Ala. 266, 270, 314 So.2d 857 (1976). ‘[I]t has never been contemplated or allowed that an emphatic statement by a solicitor, of his own knowledge, could be made to the effect that the defendant is actually guilty of the crime charged in the indictment.’ Rowland v. State, 31 Ala.App. 605, 607, 20 So.2d 881[, 882] (1945).
[[Image here]]
“So sacred and fundamental is the principle that the jury not be improperly influenced that our Supreme Court has held that it constituted reversible error to allow the Sheriff, who had acted as the bailiff to the jury, to testify as a witness for the State even though there was no testimony of any conversation between the Sheriff and the members of the jury. There the mere ‘possibility of influence exerted on the jury’s verdict by the sheriff-bailiff was sufficient to deprive the defendant of his right to trial by an impartial jury.’ Chancellor v. State, 291 Ala. 413, 282 So.2d 242 (1973).
“We fully recognize that the matter of allowing a prosecutor to become a witness is largely within the discretion of the trial judge. However, once the district attorney testifies he should withdraw from the prosecution of that particular trial unless there is some sound and compelling reason which would require his continued service. See State v. Donahue, 315 So.2d 329[, 329] (La.1975), where the district attorney was ordered recused because he ‘was the sole witness of the content of an oral confession which it is acknowledged he will testify to at the trial.’
“Our decision is reached only because of the high respect we have for the office of the district attorney and because of our recognition of the power and influence he exerts in the prosecution of a criminal case. Any decision other than the present one seriously jeopardizes *169 and imperils the fact finding process of a trial by jury.”
424 So.2d at 1348-49.
The circumstances before us do not present circumstances as compelling as those in Waldrop v. State and Tarver v. State, where the prosecutor-witness, who was the sole or primary prosecutor, prosecuted the case after it became evident that he would testify. Here, Maxwell’s participation in the prosecution of the appellant was very limited. Although Maxwell was recognized as representing the prosecution as Valeska’s assistant, Valeska made all arguments to the jury and conducted all examinations (direct and cross) of the witnesses. Maxwell’s participation consisted primarily of aiding Valeska in presenting legal argument to the trial court in bench conferences outside the jury’s hearing and in hearings outside the jury’s presence. After his testimony, Maxwell made very limited comments during hearings outside the jury’s presence; during bench conferences outside the jury’s hearing, he made three comments during the guilt phase (R. 1198-99, 1884) and interjected himself twice during the sentencing phase (R.2026, 2050); one comment (four words) made before the jury was attributed to him, but there is some ambiguity as to whether he or defense counsel made that remark. (R. 1784.) Compare Ex parte Gilchrist, supra (the district attorney’s acting as the prosecutor after his testimony—examining witnesses, arguing in opposition to the defense’s motion to exclude, and delivering closing argument, thereby arguing to the jury his own credibility—was improper).
There is authority for the proposition that, “following withdrawal from a case by a prosecutor in order that he may testify for the prosecution, the prosecutor may, consistent with the rule that he withdraw, sit at the counsel table and converse with counsel who is actually conducting the trial.” Erwin S. Barbre, Annotation, Prosecuting Attorney as a Witness in Criminal Case, 54 A.L.R.3d 100, 121 (1974) (discussing eases supporting such proposition). This kind of limited participation—sitting at counsel table and conversing with counsel—falls within the limited activity described in the following:
“As a matter of course, an attorney participates in a trial when he in some manner actively takes part in and conducts the same as an attorney. [I]t is improper in a criminal prosecution to allow one who testifies as a witness to the principal facts in the case to also as attorney ... conduct himself in any manner inconsistent with his position as a witness or his interest as an officer of the state. In other words, although a competent witness, his function as a prosecuting attorney and as a witness must be disassociated....
“... Therefore, [the prosecutor-witness] should ... so conduct himself as to foster and demonstrate the fact that he is not actively participating as a prosecutor, but only as a witness, truthfully and impartially giving competent testimony.”
Frank v. State, 150 Neb. 745, 35 N.W.2d 816 (1949). For examples of permitted activity, see Newman v. Sigler, 421 F.2d 1377 (8th Cir.1970) (where the prosecutor, who was an essential witness for the prosecution, did not question any witness or give any jury argument or make any oral statement that would create any confusion on the part of the jury as to whether he was speaking in the capacity of prosecutor or of witness, his activity in sitting at counsel table with a special prosecutor during the trial and consulting with him with respect to the selection of the jury, examination of witnesses, and closing argument did not deprive the appellant of a fair trial); People v. Hauschel, 37 Colo. App. 114, 550 P.2d 876 (1975) (the district *170 attorney’s limited participation in the prosecution before he testified when it was known he would be a witness for the prosecution did not deny the defendant a fair trial where nearly all trial procedures were carried out by the deputy and pretrial participation of the district attorney was limited to taking part in voir dire of two prospective jurors and direct examination of one and redirect of another of 37 witnesses and where his testimony was limited to evidence he discovered during a search of defendant’s home; his remaining at counsel table after he testified, but taking no further part in the trial, was not reversible error, though the better practice was not to have done so); State v. Fackrell, 44 Wash.2d 874, 271 P.2d 679, 680 (1964) (no reversal required where the prosecutor-witness, after testifying, merely continued to sit at the counsel table through the remainder of the trial, but left the trial of the case to other counsel and took no further part in the trial except at one point to state that a particular question merely called for a “yes” or “no” answer; that did not constitute “assistance in the trial of the case”). See also Frank v. State (the most that could be said from the record was that the prosecutor-witness sat at the counsel table with the special prosecutor and assisted him in the preparation and details of the trial, as any other witness or interested officer of the state would have a right to do; this mere action would not alone require a reversal if, in doing so, the county attorney conducted himself in a manner consistent with his position as a witness or his interest as an officer of the state).
Applying this rationale to this issue whether Maxwell should have withdrawn from the prosecution of the case after he testified, which we are reviewing under the plain-error standard, we find that Maxwell’s activity after the necessity for his testimony became evident was so minimal that it complied with the spirit of the proposition that the prosecutor-witness may sit at counsel table and converse with the prosecutor actually conducting the trial. We find this conclusion bolstered by the fact that at no time did defense counsel object or argue that Maxwell’s limited participation violated the rule that he must withdraw. Accordingly, we find Maxwell’s functions as assistant prosecuting attorney and as a witness were, for the most part, disassociated.[7]
Moreover, we note that Maxwell took the stand to corroborate Jenkins’s impeachment testimony that Lavoris Smith had made a prior statement inconsistent with her testimony. Compare State v. Miller, 391 So.2d 1159, 1161-64 (La.1980) (in finding harmless the assistant district attorney’s resumption of his role as co-prosecutor after having testified, the court considered, among other factors, that he was an impeachment witness), with Wal *171 drop v. State, 424 So.2d at 1346, 1351 (reversal warranted where the prosecutor was the prosecution’s principal witness, testifying as to the defendant’s confession and written statement, the latter of which, the court noted, intensified and magnified the oral statement, leaving no doubt of the defendant’s guilt); State v. Hayes, 473 S.W.2d 688 (Mo.1971) (reversal warranted because of the prejudicial effect of the prosecuting attorney’s active prosecution of the case while serving as the prosecution’s principal witness to the only real factual issue). See also State v. Washington, 229 Kan. 47, 61, 622 P.2d 986, 996 (1981) (“[rjeversible prejudice results from the attorney’s testimony when the attorney actively participates in the criminal prosecution”), modified on other ground, State v. Hayes, 239 Kan. 443, 720 P.2d 1049 (1986). The purpose of Maxwell’s testimony was to bolster Jenkins’s testimony after the defense had attempted to impeach him. In fact, unlike the circumstances in Waldrop and Tarver, Maxwell’s testimony that was elicited by Valeska was, in essence, cumulative of Jenkins’s testimony. The only additional facts presented by Maxwell were elicited by defense counsel.[8] Moreover, the impeaching nature of Maxwell’s testimony was cumulative of Lavoris Smith’s testimony in which she impeached herself: she testified that she had indicated to Valeska that she did not want to testify; that she had informed him the day before her testimony that she was going to Florida; that her daughter was, at that time, being prosecuted for capital murder; and that she was concerned for her daughter’s safety because she was testifying against the appellant.
The circumstances here do not present plain error. “While the ‘better practice’ is not to permit a material witness to function as an officer of the court, ... nevertheless, for such conduct to constitute reversible error there must be a showing that the witness-attorney’s testimony is of sufficient consequence to have prevented a fair trial.” People v. Hauschel, 37 Colo.App. at 117, 550 P.2d at 879. Because his testimony was cumulative of other testimony, we do not consider Maxwell to have been a material, principal witness for the prosecution. We find Maxwell’s testimony not “of sufficient consequence to have prevented a fair trial.”
While we find Maxwell’s continued presence and very limited participation in sidebar conferences or hearings outside the jury’s presence do not present plain error, we emphasize that a prosecutor’s conduct in risking a reversal by adopting a dual role in a trial can only be characterized as reckless. See People v. Hauschel, 37 Colo. App. at 118, 550 P.2d at 880.
“No hard and fast rule can be laid down as to when it is permissible for a prosecuting attorney to become a witness against a defendant and remain as prosecutor. Circumstances might arise in the trial of a case making it necessary that the prosecuting attorney or his as *172 sistant become a witness, but these cases are few and exceptional. The function of a prosecuting attorney and a witness should be disassociated.... The tendency of a situation where a prosecutor in a criminal case becomes a witness for the government is to prevent somewhat that fair trial to which a defendant is entitled.”
Robinson v. United States, 32 F.2d 505, 510 (8th Cir.1928). Thus, it is best that, unless extraordinary circumstances are present, the trial court require the prosecutor-witness to relinquish his position as an assistant to the lead prosecutor. See also Newman v. Sigler, 421 F.2d at 1379 (“[i]n our view, a safer course for the prosecutor to follow in situations such as this would be to limit his function to that of being a witness”).
The appellant further asserts that, by the following comment in the prosecutor’s initial guilt-phase closing argument, the prosecutor “sought to capitalize on the status of [the prosecution’s] witnesses and to thoroughly blur the line between prosecutor and evidence-giver” (appellant’s brief, p. 50): “If you believe your District Attorney and your Chief Assistant District Attorney and our investigator lied to you, then I encourage you to find him not guilty and let him go scot-free, if you believe that.” (R. 1688.) The prosecutor made this statement in the context of the conflict between the testimony of Lavoris Smith and the testimony of Maxwell and of Jenkins. The appellant made no objection to this comment.
The credibility of witnesses is a proper subject for arguments to the jury. Price v. State, 725 So.2d 1003, 1029 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998). The prosecutor’s comment regarding the chief deputy was within the scope and limit of argument (although the better practice would have been to avoid referring to Maxwell as “your Chief Assistant District Attorney”). See, e.g., Stevens v. State, 506 So.2d 373 (Ala.Crim.App.1986) (the comment that the jury should find the defendant not guilty if the undercover agent, who had been employed with the State in this capacity and had “gone” to court for over nine years, lied in his testimony was a legitimate and reasonable inference from the evidence). The prosecutor was legitimately arguing to the jury the effect of Maxwell’s testimony. Id.
However, the prosecutor did improperly comment on his own credibility and, in effect, give his personal opinion regarding the appellant’s guilt.
“In Adams v. State, 280 Ala. 678, [680,] 198 So.2d 255[, 257] (1967), our Supreme Court said:
“ ‘... [T]o place before the jury for consideration the lawyer’s own character and credibility ... is no part of any judicial proceeding. The office of district attorney and counsel for the accused does not demand that the former’s duty is to secure a conviction, and the latter’s duty to obtain an acquittal; but, rather, the primary duty is to see that justice is done. See Canons 5 and 15 of American Canons of Professional Ethics....’”
Moseley v. State, 448 So.2d 450, 456 (Ala.Crim.App.1984). “When the prosecutor throws his own credibility onto the scales of decision, he tips the scales and changes the balance in an unlawful way.” King v. State, 518 So.2d 191, 196 (Ala.Crim.App.1987). In Davis v. State, 494 So.2d 851, 856-57 (Ala.Crim.App.1986), the court reversed a conviction, in part, because of the following comment by the prosecutor:
“If you find this man not guilty, you’re saying three things to me. [0]ne, Amanda Trammell is a liar. She’s either a robber or thief or she doesn’t *173 know what she’s talking about. Two, ... Steve Robertson is a liar because he testified that this man told him that he robbed that Tenneco station, and this man says he did not tell him that. Three, which really comes home, you’re saying that I’m a liar.”
In finding that the trial court erred in overruling the defendant’s objection to this comment, the court explained:
“The prosecutor’s statement was. tantamount to stating his personal opinion or belief regarding the accused guilt. It was also an argument which put the prosecutor’s own credibility in issue. It is never proper for the prosecutor to state his belief in the guilt or innocence of the accused. Adams v. State, 280 Ala. 678, 198 So.2d 256 (1967). Similarly, the prosecutor must not argue his own credibility to the jury; that is a condemned practice, Waldrop v. State, 424 So.2d 1345 (Ala.Cr.App.1982), and is unconscionable. This is just such ‘an insinuation, suggestion, or assertion of personal knowledge’ as was addressed in Berger [v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)]. To tell the jury that they cannot find the accused not guilty without calling the district attorney a liar is a bullying tactic which will result in reversal.”
494 So.2d at 857. See also Moseley v. State, 448 So.2d at 456 (“we must emphasize the line of cases decided by this court in which we have held that it is highly improper for attorneys, particularly prosecutors, to state their personal opinions in closing argument”).
“ ‘ “While counsel may properly argue as to the weight and sufficiency of the evidence and the credibility of -witnesses from the evidence if he neither says nor insinuates that the statement is based on his own personal knowledge or anything else besides the witnesses’ testimony at the trial, it is not proper for him to take the position of an unsworn witness as to credibility. Thus, statements by counsel arguing the witness’ credibility from his official position or occupation, or counsel’s personal acquaintance with the witness, usually for some stated duration of time, are quite regularly construed as reversible error, usually on the ground that such comment constitutes unsworn testimony by counsel.” 75 Am.Jur.2d, Trial § 306 (1974).’ ”
Arthur v. State, 575 So.2d 1165, 1181 (Ala.Crim.App.1990) (quoting Clark v. State, 462 So.2d 743, 747 (Ala.Crim.App.1984) (Bowen, P.J., concurring)). See also Woods v. State, 19 Ala.App. 299, 301, 97 So. 179, 180 (1923) (quoting with approval the following: “ ‘The right to a fair and impartial trial is violated by the misconduct of counsel in stating to the jury facts not in evidence because by so doing he fraudulently testifies without having been sworn as a witness.’ ”).[9]
The following summarizes the rationale for finding that the prosecutor’s remark was highly improper:
“The unsworn witness rule poses more subtle problems in our efforts to preserve the right to a fair trial. This rule had no definitive contours, but generally stands for the proposition that the prosecutor may not inject his own credibility into the trial. Thus, we have reversed convictions where the prosecutor, to the prejudice of the defendant, has expressed his personal belief on matters which may influence the jury, has ar *174 gued his own credibility on summation, has vouched for the credibility of the People’s witnesses, or has, by cross-examination, suggested the existence of facts not in evidence. The primary rationale for so limiting the prosecutor’s conduct is rooted in a concern that the criminal process be fair. Such conduct on the part of the prosecutor amounts to a subtle form of testimony against the defendant, as to which the defendant may have no effective means of cross-examination. Hence, the rule is founded upon the possible danger that the jury, impressed by the prestige of the office of the District Attorney, will accord great weight to the beliefs and opinions of the prosecutor.”
People v. Paperno, 54 N.Y.2d 294, 445 N.Y.S.2d 119, 429 N.E.2d 797, 800-01 (N.Y.1981).
Here, however, we are reviewing the prosecutor’s partially objectionable remark for plain error. We will correct an error not raised at trial only if several conditions are satisfied: there must be (1) “error,” (2) that is “plain,” (3) that “af-feet[s] substantial rights,” and (4) that “ ‘seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.’ ” United States v. Olano, 507 U.S. 725, 732-35, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)). In most cases, a defendant’s substantial rights are affected when there is a reasonable probability that, but for the comments, the outcome would be different. See Olano, 507 U.S. at 734-35.
In assessing the prejudicial nature of this remark, we look at the remark in the light of the entire record, considering the following five factors—a test applied by the court in United States v. Cornett, 232 F.3d 570 (7th Cir.2000)—
“(1) the nature and seriousness of the comments; (2) whether the defense counsel invited the prosecutor’s remarks; (3) whether the trial court’s instructions to the jury were adequate to cure any prejudice that might otherwise result from the improper comments; (4) whether the defense was able to counter the improper arguments through rebuttal; and (5) the weight of the evidence against the defendant.”
232 F.3d at 574. “Of these factors, [the court] placets] considerable emphasis on the curative effect of jury instructions and the weight of the evidence.” Id. at 574.
Here, in its final charge to the jury, shortly after this remark was made, the trial court instructed the jury:
“You should base your decisions only on the evidence admitted in this courtroom. And not everything you heard and saw in this courtroom is evidence. The testimony, the writings, the objects and the other things presented during the trial and allowed by the Court into evidence are evidence in the case. The statements made by the attorneys are not evidence and should not be used by you as evidence in this case.
“However, once evidence is admitted, only the jury can decide two essential things about it: First, whether or not it should be believed; and, second, how important it is. And you should make these decisions about each part of the evidence by using your own common sense as reasonable men and women. You should not imagine things that can’t be proven by the evidence admitted in this trial.
“Of course, you must consider all of the evidence admitted in this trial without bias, prejudice, or sympathy to either side, and you must be equally just to both sides. And your verdict must *175 not be based on suspicion, speculation, or conjecture.
“You are the sole judges of the evidence in this case and of the credibility of the witnesses. You may accept or reject any part of the testimony you consider worthy of belief. In determining the weight to be given the testimony of any witness, you may consider the demeanor of that witness while on the witness stand, and his or her apparent candor or evasion, or the existence or nonexistence of any bias or interest in the case. And you may take into consideration any matter which you would consider in your own every day affairs in passing upon the truthfulness and the accuracy of the testimony. And you should weigh the testimony in the light of your own common sense and observations and reach a verdict that will be based upon the truth as you determine it from all the evidence in the case.”
(R. 1836—39.)[10]
In regard to the weight of the evidence against the appellant, we find the following applicable:
“While the prosecutor’s infraction of the rule is obvious, [it does not warrant] a reversal of the conviction. Considering the weight of the evidence against this appellant, it is unlikely that the possible prejudice was instrumental in the jury’s finding.”
Clark v. State, 462 So.2d at 747 (Bowen, P.J., concurring).
In regard to whether the defense had the opportunity to counter this isolated remark in the prosecutor’s initial closing argument at the guilt phase, we note that defense counsel began his closing remarks by stating:
“You’ve heard Mr. Valeska’s—and I stress this—you’ve heard Mr. Valeska’s testimony about what happened here. I would just ask you simply when you go back into the deliberation room to remember what you heard on the stand, and not what Mr. Valeska testified to. Okay. Try to make that distinction, okay?”
(R. 1705). Then, he subsequently stated:
“[Valeska] doesn’t want to win this case or lose this case based on the facts. He doesn’t. He just wants to win....”
“[Valeska] said, if you don’t believe your district attorney, if you don’t believe your assistant district attorney, you don’t believe the investigator, let him go. Mr. Valeska didn’t testify, so I don’t know what he was referring to or what you believe. He didn’t get on the stand and testify, so I don’t even know what he was talking about.
“What are you supposed to believe? The Judge told you comments by the lawyers and all are not evidence. You *176 can’t consider that. Witnesses are what we are looking at. And I said it would be improper for Valeska to have testified. He didn’t know. Mr. Maxwell testified. Mr. Jenkins testified.”
(R. 1714,1717-18.)
In regard to whether defense counsel invited the prosecutor’s remark, we find that he did not.
In reviewing the nature and seriousness of the remark, we note that the remark, although highly improper, was brief. However, we find that the prosecutor made a similar highly improper comment during his rebuttal closing argument in the guilt phase, as follows:
“You look me straight in the face, and I challenge you, each one of you.... If you think I made [Bridges] a deal to testify, put Jerry Jerome Smith back on the street, because I’ve got a reputation, too. And if I lied or did something, I’d get disbarred and go to jail. He got nothing from us.”
(R. 1810-11.) This argument was made in rebuttal to defense counsel’s closing argument in which he suggested that Bridges’s sentence was shortened in exchange for his testimony regarding the appellant’s in-culpatory statement. (R. 1720-27.) During this argument, defense counsel implied that the prosecution had disposed of evidence of a deal with Bridges by arguing:
“Why didn’t [Valeska’s] great investigative team ... find this letter that supposedly was put in the hands of an Alabama Bureau of Investigation officer. Things just don’t disappear like that.... And things don’t sit on somebody’s desk for six months that involves a capital murder case.... What is on that first page of that letter? Somebody didn’t want us to see it. Was it ‘Dear sir, I have some information, and if you’ll come talk to me and make a deal, I’ll tell you about it.’ ”
(R. 1721-22.)
After reviewing the five factors as to both improper remarks by the prosecutor, we conclude that the comments did not constitute plain error in the context of the trial as a whole. They were not so prejudicial as to undermine the appellant’s substantial rights: they created no reasonable probability that, but for these comments, the outcome would have been different.
XVII.
The appellant contends that the trial court erred in permitting the prosecutor to cross-examine him regarding his testimony on direct examination that he was under the influence of illegal drugs at that time and that he had obtained the drugs in the county jail where he was incarcerated. He further contends that the trial court erred in allowing the prosecutor to investigate his claim that he was under the influence of drugs, and in allowing the probation and parole officer to test him for drugs and to testify to the findings. He argues that his use of drugs in jail and during the trial was irrelevant to the issues in the case, and that the prosecutor’s actions distracted the jury.
This issue arose during the direct examination of the appellant when he was testifying in his own behalf in the guilt phase of the trial. After defense counsel questioned him extensively on direct examination about his addiction to and use of drugs in the past and on the date of the commission of the crime, he asked the appellant, “Are you on drugs today?” The appellant replied affirmatively, stating that he was under the influence of marijuana. (R. 1385-86.) During a recess, the probation and parole officer tested the appellant for drugs and subsequently testified that the appellant tested positive for marijuana and *177 that traces of marijuana would remain in a person’s system for approximately 28 days after use.
We find no merit in the appellant’s contention. An accused in a criminal prosecution cannot be required to take the stand as a witness, but if he elects to do so, which was the case here, he is subject to cross-examination—just like any other witness. Hutchins v. State, 568 So.2d 395 (Ala.Crim.App.1990); Hunter v. State, 57 Ala.App. 651, 331 So.2d 406 (1976); C. Gamble, McElroy’s Alabama Evidence § 185.01(2) (4th ed.1991). An accused who takes the stand in his own defense may be fully cross-examined as to any inconsistency or implausibility of his testimony-in-chief, and as to matters directed to testing his recollection, motive, and credibility.
Here the actions of the prosecutor in cross-examining the appellant in reference to his being under the influence of drugs while he was testifying and his access to and use of drugs in the county jail were proper and relevant subjects of inquiry, as they bore directly on his credibility as a witness.
XVIII.
The appellant contends that “the record is peppered with references to [his] alleged acts against [Derrick] Gross, and the prosecutor referred to them in closing argument.” The appellant cites us to the following pages in the record: R. 667-78, 768, 1441, 1442-44, 1675, 1678, 1679, 1681, 1688-89. He argues that this testimony and the prosecutor’s remarks constitute evidence of uncharged crimes and was presumptively prejudicial.
However, the evidence in question clearly falls within a well-recognized exception to the general rule that excludes evidence of prior and subsequent crimes, when the only probative value of that evidence is to show in the defendant a tendency or disposition to commit the now-charged, crime: “ ‘[I]t is generally within the res gestae to prove that other persons were killed or injured by the accused at the same time and place as the victim of the now-charged crime.’ [C. Gamble,] McElroy’s [Alabama Evidence] at § 70.01(12)(b) [(4th ed.1991)].” Leonard v. State, 551 So.2d 1143, 1146 (Ala.Crim.App.1989).
“ ‘Evidence of the accused’s commission of another crime is admissible if such other crime is inseparably connected with or is a part of the res gestae of •the now-charged crime. This rule is often expressed in terms of the other crime and the now-charged crime being parts of one continuous transaction or one continuous criminal occurrence.’ C. Gamble, McElroy’s Alabama Evidence (3d ed.1977), § 69.01(3). See also Orr v. State, 462 So.2d 1013, 1015 (Ala.Cr.App.1984). ‘Evidence of other crimes is properly admissible as part of the res gestae if all of the criminal acts are part of one continuous criminal adventure by the same party occurring within a matter of hours. Miller v. State, 405 So.2d 41 (Ala.Crim.App.1981). See also Moseley v. State, 357 So.2d 390 (Ala.Crim. App.1978); Summers v. State, 348 So.2d 1126 (Ala.Crim.App.), cert. denied, 348 So.2d 1136 (Ala.1977).’ Pettaway v. State, 494 So.2d 884, 886 (Ala.Cr.App.1986). In the present case, this evidence ‘was intimately connected with the same transaction which is the basis of the State’s case.... The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State’s case-in-chief rests within the sound .discretion of the trial judge.’ Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App.1987), and cases cited therein. ‘The trial court did not err in overruling appellant’s objection to the admission of such evidence. No matter how many *178 distinct crimes may be involved, all the details of one continuous criminal occurrence or adventure may be given as part of the offense with which the defendant is charged.’ Coleman v. State, 487 So.2d 1380, 1385 (Ala.Cr.App.1986) and cases cited therein.”
Rowell v. State, 570 So.2d 848, 852 (Ala.Crim.App.1990).
We find no plain error in admitting the evidence of the appellant’s assault on Derrick Gross.
The appellant also asserts that it was error to allow a Dothan police officer to testify that he had stopped the appellant two nights before the murders and that the appellant gave him a false name. We find that any error in this regard would have been harmless. This evidence could not have unduly prejudiced the jury, particularly in light of the overwhelming evidence, including the appellant’s incriminating statement, of his guilt.
XIX.
The appellant contends that by having him demonstrate how he used the murder weapon, the prosecutor “created” evidence, presumably to give the jury a mental image of the murders. He argues that there was no purpose to the demonstration except to arouse the passion or prejudice of the jury.
“An accused on trial for a criminal offense cannot be required to give or furnish testimony against himself either by way of spoken words or by act. Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968); Dean v. State, 240 Ala. 8, 197 So. 53 (1940); Article I, § 6, Constitution of Alabama of 1901. However where an accused elects to testify for himself, he waives his constitutional right not to be compelled to give evidence against himself. Brown v. United States, 356 U.S. 148, 154, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); Lipscomb v. State, 32 Ala.App. 623, 29 So.2d 145 (1947); Green v. State, 218 Ala. 363, 118 So. 506 (1928); Carpenter v. State, 193 Ala. 51, 69 So. 531 (1915); Kelly v. State, 160 Ala. 48, 49 So. 535 (1909); Cotton v. State, 87 Ala. 103, 6 So. 372 (1889). A defendant who has introduced himself as a witness may be cross-examined and compelled to do what would be material and competent of any other witness. Coats v. State, 253 Ala. 290, 45 So.2d 35 (1950); Smith v. State, 247 Ala. 354, 24 So.2d 546 (1946). ‘An accused who has testified in his own behalf may be cross-examined as to any facts or matters, even though collateral, which are inconsistent with the testimony given by him on direct examination, and tend to qualify or contradict such testimony, or to show its improbability.’ 98 C.J.S. Criminal Law § 401(3) (1957). See also Nicholson v. State, 150 Ala. 80, 43 So. 365 (1907); Stevens v. State, 133 Ala. 28, 32 So. 270 (1902); Eaton v. State, 8 Ala. App. 136, 63 So. 41 (1913).
“The general rule on requiring the accused to demonstrate an encounter, action, or position on cross-examination is stated at 171 A.L.R. 1144,1190.
“ ‘The right of the prosecution, upon cross-examination of a defendant, to require him to give some physical demonstration of matters such as his actions or position at the time of the alleged offense, where he has voluntarily testified concerning those matters on his direct examination, has been sustained as proper cross-examination in quite a variety of circumstances, as shown by the following cases. While not all of them mention the question of constitutional privilege, the general import of these cases appears to be that by voluntarily testifying to and opening up the matter on *179 his direct examination, or perhaps merely by voluntarily becoming a witness in the case, the defendant had waived such privilege as he may have originally had against giving the particular demonstration.’
“In Lumpkin v. State, 19 Ala.App. 272, 97 So. 171 (1923), it was held not error to require, upon cross-examination, a defendant in a homicide case, who had become a witness in his own behalf, to illustrate before the jury how the fatal fight occurred by showing the motions and actions of the parties to the encounter, with the State’s attorney taking the part of the deceased. Also in Coats v. State, 253 Ala. 290, 45 So.2d 35 (1950), it was held not error to permit the appellant, at the request of the State during its cross-examination and over the objection of defense counsel, to leave the witness stand and sit in a chair, in view of the jury, so as to better demonstrate the manner in which the appellant contended he was holding the gun at the time of its discharge.
“The scope and extent of cross-examination rest in the sound discretion of the trial court, Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969), as do the scope and extent of experiments and demonstrations. Campbell [v. State, 55 Ala. 80 (1876)], supra; McElroy, §§ 81.01(3), 81.02(1). As a general rule experiments and demonstrations should be permitted to be made in the courtroom in the jury’s presence where it reasonably appears that the experiment will aid the jury in ascertaining the truth, where there exists a substantial similarity of conditions and where the experiment will not unfairly prejudice the defendant.”
Ivey v. State, 369 So.2d 1276, 1279-80 (Ala.Crim.App.1979).
On direct examination, the appellant testified to the events surrounding the killings. Specifically, he testified that he “just kept shooting” Flournoy, but that he did not remember pulling the trigger or how many times he shot him; that he “just pointed the gun and shot” Helms, but, likewise, did not remember how many times he shot her; and that he “just shot” Bennett, but again did not remember how many times. The appellant’s testimony was clearly aimed at impressing upon the jury that he did not intend to commit the murders, but rather that he just “snapped.” Cross-examination upon these matters, including calling for the appellant to demonstrate the manner in which he held the rifle when he shot the victims, was proper. The trial court did not abuse its discretion in allowing the demonstration.
XX.
The appellant contends that the trial court’s jury charge was improper because it did not clearly require the jury to unanimously find that the appellant intended the death of two or more people. He bases his argument on a portion of the following instruction. We have put the contested instruction in the context of the court’s entire charge.
“[T]he indictment ... says, the Grand Jury of said county charged that before the finding of the indictment, ... Smith ... did intentionally cause the death of David Lee Bennett by shooting him with a .22 caliber rifle during the course of intentionally causing the deaths of Willie James Flournoy and Theresa Ann Helms by shooting them with a .22 caliber rifle.... ”
“The law states that the intentional murder of two or more persons is capital *180 murder. A person commits an intentional murder of two or more persons, if pursuant to one scheme or course of conduct, he causes the death of two or more people. And in performing the acts which caused the death of those people, he intends to kill each of those people.
[[Image here]]
“[T]o convict, the State must prove beyond a reasonable doubt each of the following elements of an intentional murder of two or more persons: Number One, that ... Bennett is dead; Number Two, that ... Smith caused the death of ... Bennett by shooting him; Number Three, that in committing the acts which caused the death of ... Bennett, the defendant intended to kill the deceased or another person. A person acts intentionally when it is his purpose to cause the death of another person. The intent to kill must be real and specific; Element Number Four, that ... Flournoy is dead; Number Five, that the defendant caused the death of ... Flournoy by shooting him; Number Six, that in committing the acts which caused the death of..., Flournoy, the defendant intended to kill the deceased or another person; And, Number Seven, that the murder of ... Bennett and the murder of ... Flournoy were pursuant to one scheme or course of conduct.
“If you find from the evidence ... that the State has proved beyond a reasonable doubt each of the above elements of the offense[ ] of the intentional murder of two or more persons as charged, then you should find the defendant guilty of capital murder. If you find that the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of intentional murder of two or more persons, then you cannot find the defendant guilty of capital murder.
“If there are more than two deceased that are named in the indictment, the State must only prove that at least two of the named deceased, as opposed to all of the named deceased, were murdered during the defendant’s scheme or course of conduct.
“With respect to the offense of capital murder, if you find the State has proved beyond a reasonable doubt all the elements I have just given to you, then your verdict must be guilty, as I said. And that verdict must be unanimous, which means all twelve of you must reach that decision.”
(R. 1829-30, 1847-51; emphasis added.) (The above, with the exception of the reading of the indictment, the fifth paragraph, and the last sentence, are the instructions recommended in Alabama Pattern Jury Instructions: Criminal 5-121 (3d ed.1994). The fifth paragraph is from the “Use Notes” accompanying those specific pattern jury instructions.)
The trial court continued:
“Intent must be specific and real in a capital murder case. Intent to kill may be inferred from the use of a deadly weapon or instrument. The defendant must act intentionally as opposed to negligently, accidentally or recklessly cause the death of the deceased in order to convict the defendant guilty of capital murder....
“You act intentionally with respect to a result or conduct when you have the purpose to cause that result or to engage in that conduct. Intent is to be determined by the surrounding circumstances and by the actions, if any, of the defendant. That is what intent is under the capital murder statute.”
“[I]f you find that ... Smith killed the victims, but ... Smith didn’t intend to *181 kill the victims, then you cannot convict ... Smith of capital murder.
“[I]f you find that Mr, Smith didn’t have the capacity to form an intent, then you must acquit him of capital murder, because capital murder requires an intentional killing.”
(R. 1857-59,1875-76.)
The following verdict form, approved by the appellant’s counsel, was read to the jury at the end of the trial court’s charge:
“[W]e, the jury, find the defendant ... guilty of capital murder, in that, he did intentionally cause the death of David Lee Bennett by shooting him with a .22 caliber rifle during the course of intentionally causing the deaths of Willie James Flournoy and Theresa Ann Helms by shooting them with a .22 caliber rifle in violation of § 13A-5-40(10) of the Code of Alabama.”
(R. 1876-77.) The jury was then instructed: “[Y]our verdict must be unanimous, which means all twelve of you have to agree on a verdict either of guilty or not guilty.” After deliberations, the jury foreperson signed the verdict form above. When the jury returned that verdict, each juror acknowledged that that verdict was his or her verdict in the case.
The appellant contends that the court’s instructions allowed the jury to convict him of having committed the capital offense without finding intent as to two victims. He argues:
“[T]he jurors were told that as to each victim, an intent to kill had to be found as to him ‘or another person.’ This charge does not work in a case like this. It meant that if the jurors believed there was an intent to kill Mr. Bennett but-not Mr. Flournoy, they could still convict because Mr. Bennett could serve as the ‘other person’ with regard to the second victim.”
(Appellant’s brief, p. 65.)
Section 13A-5-40(b) specifies that murder, as a component of the capital offense, means “murder” as defined in § 13A-6-2(a)(1): “A person commits the crime of murder if ... [w]ith intent to cause the death of another person, he causes the death of that person or another person ....” (Emphasis added.)
“By its language, § 13A-6-2(a)(l) clearly invokes the doctrine of transferred intent in defining the crime of murder. For example, if Defendant fires a gun with the intent to kill Smith but instead kills Jones, then Defendant is guilty of the intentional murder of Jones.
Section 13A-5-40(b) refers to § 13A-6-2(a)(l) for the definition of ‘murder’; and § 13A-6-2(a)(l) codifies the doctrine of transferred intent in that definition.”
Ex parte Jackson, 614 So.2d 405, 407 (Ala.1993).[11]
Thus, depending on the facts of a case, it is conceivable that the offense of murder wherein two or more persons are murdered by one act or pursuant to one scheme or course of conduct could arise *182 from the intent to kill one person. The court in Living v. State, 796 So.2d 1121 (Ala.Crim.App.2000), reckoned with such possibility. In Living the court stated:
“On appeal, ... Living argues that the jury could have found that he intentionally killed Jennifer, but that he did not intend to kill Melissa. Therefore, according to Living, the jury could have found him guilty of murder with regard to Jennifer and guilty of reckless manslaughter with regard to Melissa.
“Under the doctrine of transferred intent, however, if Living intended to kill Jennifer he would be criminally culpable for murder with regard to the unintended death of Melissa. See Harvey v. State, 111 Md.App. 401, 681 A.2d 628 (1996) (the doctrine of transferred intent operates with full force whenever the unintended victim is hit and killed; it makes no difference whether the intended victim is missed; hit and killed; or hit and only wounded). Several jurisdictions have held that the doctrine of transferred intent is applicable when a defendant kills an intended victim as well as an unintended victim. See, e.g., State v. Fennell, 340 S.C. 266, 531 S.E.2d 512 (2000); Ochoa v. State, 115 Nev. 194, 981 P.2d 1201, 1205 (1999); Mordica v. State, 618 So.2d 301, 303 (Fla.Dist.Ct.App.1993); and State v. Worlock, 117 N.J. 596, 569 A.2d 1314, 1325 (1990),
“.... If Living intended to kill Jennifer, his specific intent would transfer to the killing of Melissa.”
796 So.2d at 1131.
Accordingly, the appellant’s contention is based on the incorrect assumption that the prosecution is required to prove subjective intent to kill as to each victim: that is not required by law. Moreover, the pertinent instructions in this case follow the pattern jury instructions, which, in turn, reflect the statutory scheme. See also Dobyne v. State, 672 So.2d 1319, 1341-42 (Ala.Crim.App.1994) (approving similar instructions against the claim that the trial court’s instructions permitted a capital conviction even if the appellant had no specific intent to kill one of the two victims), aff'd, 672 So.2d 1354 (Ala.1995). In addition, we note that the appellant’s theory at trial was that he did not have the intent to kill as to any of the victims. In fact, he characterized his defense in his brief: “His defense, stated from the witness stand and articulated by counsel in argument, was that he did not intend their deaths.” (Appellant’s brief, p. 64.) His argument that he may have had the intent to kill as to one victim and no intent for any additional victim is presented for the first time on appeal. We further note that the only reasonable theory supported by the evidence, indeed supported by overwhelming evidence, was that the appellant intended to kill each victim. Finally, the jury’s verdict erases any ambiguity: each juror determined that the appellant intentionally killed each of the three victims. Based on these considerations, we find no plain error.
The appellant also argues that because three persons were killed, the trial court’s instructions that the prosecution must prove that at least two, as opposed to all, were murdered during one scheme or course of conduct allowed for a verdict that was not unanimous. He argues that all 12 jurors should have been required to determine whether the element of intent was present as to the same two victims.
The court was confronted with a similar issue in Wilson v. State, 777 So.2d 856, 885 (Ala.Crim.App.1999), aff'd, 111 So.2d 935 (Ala.2000):
“[T]he appellant contends that the trial court did not instruct the jury that it had to unanimously find that he committed the capital offense. He argues that, *183 to find him guilty of the capital offense charged, the jury had to find that he intentionally killed two of the decedents .... [H]e contends that the trial court should have instructed the jurors that they had to unanimously find that he intentionally killed the same two decedents to support a capital conviction. Because the appellant did not present this argument to the trial court, we review it for plain error. See Rule 45A, Ala.R.App.P.
“The trial court’s instruction on the capital offense was almost identical to the pattern jury instruction on the capital murder of two or more people pursuant to a single scheme or course of conduct. ‘A trial court’s following of an accepted jury instruction weighs heavily against any finding of plain error.’ Price v. State, 725 So.2d 1003, 1058 (Ala.Cr.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).[12] Finally, from the verdict forms, it is clear that the jurors unanimously agreed that the appellant was responsible for the murders of all four of the decedents. Accordingly, we do not find any plain error in this instance.”
Based on this rationale and the considerations noted above, especially the fact that each juror acknowledged that he or she had concluded that the appellant intended to kill each of his three victims, clearly, the jury unanimously found the appellant guilty of intentionally killing the three victims.[13]
*184 XXI.
The appellant also contends that the trial court’s failure to instruct the jury on how to consider his extrajudicial statement or on the weight or credibility, if any, it should accord the statement violated his rights guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments and Alabama law. We review this contention under the standard of plain error: the appellant neither requested an instruction on voluntariness, nor did he object to the trial court’s failure to instruct the jury on the issue.
The appellant, in making this argument, relies solely on Ex parte Singleton, 465 So.2d 443, 446 (Ala.1985), and Bush v. State, 523 So.2d 538, 560 (Ala.Crim.App.1988). In Ex parte Singleton, the Alabama Supreme Court recognized that the trial court cannot lawfully prevent the jury from making the determination of volun-tariness as affecting the weight and credibility to be given a defendant’s statement. See Ex parte Trawick, 698 So.2d 162, 174 (Ala.1997). In Bush v. State, this court held that the trial court committed plain error by taking the issue of voluntariness of a confession away from the jury; it did so when it specifically instructed the jury that it was “not entitled to disregard the Court’s admitting [the confession].” 523 So.2d at 558. These cases, however, include a critical circumstance that the facts before us do not: the trial court in those cases specifically informed the jury that the court had already made a preliminary determination that the defendant’s statement was voluntary.
Because the trial court in this case gave no such instruction, we are guided by the following rule: where the trial court does not instruct the jury that the court has made a preliminary determination that the defendant’s confession was voluntary, no inference concerning the weight or credibility of the statement has been created; thus, the trial court’s failure to specifically charge the jury that the jury is to make the ultimate decision regarding the voluntariness of the statement is not plain error. Ex parte Trawick, 698 So.2d 162 (Ala.1997); Woods v. State, 789 So.2d 896 (Ala.Crim.App.1999); Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999). Here, the trial court did not create any inference as to the weight or credibility the jury should give the appellant’s statement. See Minor v. State. Moreover, the trial court’s instructions throughout the trial stressed the jury’s responsibility as the sole judge of the truth of the evidence.[14] “Such instruction implicitly in- *185 eluded [the appellant’s] statement.” Minor v. State, 780 So.2d at 784. See also Ex parte Trawick, 698 So.2d at 174 (no plain error in the trial court’s failure to instruct the jury that the jury, and not the trial court, has the ultimate decision on the voluntariness of a confession where the trial court had not disclosed that it had already determined the confession to be voluntary and thus admissible; “[t]he trial court properly instructed the jury that the court would rule only as to whether evidence could be admitted into the case and that the jury would be the sole and exclusive judge of the truth of the evidence that was admitted”); Woods v. State, 789 So.2d at 932 (in finding no plain error in the trial court’s failure to so instruct where the trial court did not instruct the jury that it had made a preliminary finding that the confession was voluntary, the court noted that, “on several occasions, the trial court instructed the jury that it was the sole judge of the credibility of the evidence presented”); Minor v. State, 780 So.2d at *186 784 (where the trial court did not instruct and did not tell the jury of its preliminary determination of voluntariness, the court found, “Because the trial court’s oral charge adequately explained the jury’s duty to evaluate the evidence, no plain error occurred.... ”). Thus, on the basis of Ex parte Tramok, we find no plain error in the trial court’s failure to give the jury a specific instruction that the ultimate decision on the voluntariness of the appellant’s statement was for the jury to make.
In arguing the necessity of such an instruction, the appellant asserts that the prosecutor, in effect, told the jury that it did not need to be concerned about the circumstances surrounding the appellant’s confession because the trial court had held a legal suppression hearing and, if the appellant’s rights had been violated, his confession would not have been allowed into evidence. In construing the meaning of this alleged statement in context, we start with defense counsel’s cross-examination of Sgt. Jay. During this cross-examination, defense counsel mentioned “the suppression hearing tape” and referred to testimony by Jay “[i]n the suppression hearing.” (R. 1056, 1063.) In the latter portion of defense counsel’s examination of Jay the following occurred:
“Q. Do you think Mr. Smith should be convicted of capital murder?
“A. Yes, Ido.”
“Q. One of the elements the State must prove beyond a reasonable doubt is that the defendant ... intended to cause those deaths.
“A. Yes, sir.
[[Image here]]
“Q. Do you know that there are some things that negate intent?
“A. You are going to have to explain.
[[Image here]]
“Q. If the person is so intoxicated to the point that he can’t form that intent, that would negate that intent. Do you understand that concept?
“A. Yes, Ido.
“Q. So, if you thought ... Smith had some alcohol on him or smelled of alcohol slightly, if any, why didn’t you ascertain the degree of intoxication that ... Smith was on?
“A. ‘Cause in my opinion, he was not intoxicated. He was able to give a complete statement, a description of everything. He was able to work a straight disposal of the weapon. He was able to give an accurate account of everything I could prove. I’ve dealt with intoxicated people in the past, and you can’t do that.
[[Image here]]
“Q. Have you ever made a [driving-under-the-influence] arrest?
“A. Yes, sir, many.
“Q. When you stop the car, and there is alcohol on their breath, what do you do?
“A. You test them and make sure they are, if they are driving, if they’re impaired.”
(R. 1081, 1087-89.) Immediately thereafter, the prosecutor asked only two questions on redirect:
“Q. Sgt. Jay, ... do you have any personal knowledge in any way, Mr. Meredith said Jerry Jerome Smith can’t read, that that’s true?
“A. I don’t have any knowledge of that, no, sir.
“Q. I want to ask you—He was asking you about intoxication. He didn’t tell you that voluntary intoxication that you can be drinking, under the influence of drugs, and there’s a legal suppression hearing held by a trial judge; and if his *187 rights were violated, a jury will never hear that, is that not true?
“A. That is true.”
(R. 1090.) This last question, the appellant argues, informed the jury, in effect, that the trial court had held a legal suppression hearing and had determined that the appellant’s statement was admissible. (Appellant’s brief, pp. 54, 67-68.) Defense counsel did not object to this question.
We find that this statement is too ambiguous to conclude that it informed the jury that the trial court had held a suppression hearing on the appellant’s confession and had determined that the confession was voluntary and thus admissible. For the jury to have assumed, from the prosecutor’s statement, that the trial court had determined the voluntariness of the appellant’s confession is too far a leap to constitute plain error. Because any error here is not obvious, we are not presented with plain error. “Plain error is error which, when examined in the context of the entire case, is so obvious that failure to notice it would seriously affect the fairness, integrity, and public reputation of the judicial proceedings.” Slaton v. State, 680 So.2d 879, 887 (Ala.Crim.App.1995) (quoting United States v. Butler, 792 F.2d 1528, 1535 (11th Cir.1986)), aff'd, 680 So.2d 909 (Ala.1996). Moreover, we note that it was defense counsel who first referred to a suppression hearing in questioning of Jay.
The trial court’s failure to specifically instruct that the jury determines the volun-tariness of the defendant’s confession did not rise to the level of plain error in this case, even when one considers the prosecutor’s reference in his redirect of Sgt. Jay to a suppression hearing.
XXII.
The appellant contends that the order in which the trial court gave its instructions prevented the jury from considering his defenses of intoxication (§ 13A-3-2)[15] and duress (§ 13A-3-30) until after it had resolved the question of guilt of the capital offense. He argues that, by the order of the trial court’s instruction and by the court’s instruction that the jury consider the lesser included offenses of murder and manslaughter only after it rejected the capital murder charge, the jurors could have thought that they were precluded from considering his entire defense (intoxication and duress) until after they had ruled on the capital charge. He argues that “[t]he court never told them that intoxication and duress were defenses to the capital charge and thus therefore had to be considered when that charge was considered.” (Appellant’s brief, p. 69; emphasis in original.) He asserts that, by so instructing, the trial court relieved the prosecution of its burden of proof and denied him the right to have the jury consider and give effect to his defense. The appellant failed to object at trial on any basis pertinent to the issue he now raises.
The trial court followed the order recognized as the order that many judges prefer: introduction, crimes charged, possible defenses, and conclusion. See “Introduction to the Instructions,” Alabama Pattern Jury Instructions: Criminal (3d ed.1994) (hereinafter “APJI ”). After instructing the jury on the elements of the capital offense, the trial court instructed on the elements of the lesser offenses of murder and reckless *188 manslaughter. This was proper. See APJI 5-122 (following the pattern jury instruction for the capital offense of murder of two or more persons is the notation: “(If lesser-included offenses are included, the Court should instruct on those offenses at this point.)”); 6-1 (same notation after pattern instruction for intentional murder), The court then instructed the jury on voluntary intoxication and duress.[16]
*189 “ ‘A trial court has broad discretion in formulating its jury instructions, pro-vid[ed] those instructions accurately reflect the law and the facts of the ease. Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999) (citing Raper v. State, 584 So.2d 544 (Ala.Crim.App.1991)). Moreover, this Court does not review jury instructions in isolation, instead we consider the instruction as a whole. Stewart v. State, 601 So.2d 491 (Ala.Crim.App.1992).”
Living v. State, 796 So.2d 1121, 1130-31 (Ala.Crim.App.2000). Further, a trial court’s oral charge must be construed as a whole and must be given a reasonable— not a strained—construction. Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999). See also Maples v. State, 758 So.2d 1, 63 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999). Finally, it is always presumed that the jury followed the court’s instructions, Ex parte Steiuart, 659 So.2d 122, 128 (Ala.1993), aff'd on remand, 730 So.2d 1203 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.1999), and that the jury considered the entire charge.
We disagree with the appellant’s argument that “[b]ecause the jury was told that it had to already have decided whether to convict or acquit on the capital charge, it very likely thought intoxication relevant only to the crimes of murder and manslaughter.” (Appellant’s brief, p. 69.) It was logical and efficient for the trial court to instruct on voluntary intoxication after the elements of the manslaughter charge. See Fletcher v. State, 621 So.2d 1010, 1019 (Ala.Crim.App.1993) (“Voluntary intoxication and manslaughter as a lesser included offense of intentional murder are interrelated and often overlapping subjects.”). Viewing the appellant’s claim in the context of the entire charge, as we must, we find that the jury was clearly informed that, in determining whether the element of intent of the capital offense was present, it could consider whether voluntary intoxication negated that required intent. See also Living v. State, 796 So.2d at 1132 (under instructions on intoxication similar to the instruction here, the trial court “clearly and unambiguously instructed the jury that it could consider intoxication when it considered the offenses of capital murder and murder”). This is the only reasonable construction of the court’s charge as a whole. “We think it a reasonable assumption that the jury took a common sense view of the instructions and gave them their plainly apparent meaning.” Harris v. State, 412 So.2d 1278, 1281 (Ala.Crim.App.1982).
We also reject the appellant’s conclusion that the jury was not allowed to properly consider the defense of duress. More specifically, in regard to his argument that the jurors may have thought that duress applied only to the lesser offenses of murder and manslaughter, the appellant makes the erroneous assumption that the defense of duress is applicable to capital murder and, for that matter, to murder. Section 13A-3—30(d) provides that this defense is unavailable in a prosecution for murder or for any killing of another under aggravat *190 ed circumstances, as provided by § 13A-5-39 et seq. See also Boyd v. State, 715 So.2d 825, 837 (Ala.Crim.App.1997) (the defense of duress is inapplicable to a charge of capital murder), aff'd, 715 So.2d 852 (Ala.1998); Commentary, § 13A-3-31 (“This section retains the view that duress will not be extended to cases where an innocent third person is intentionally kñled.”); 2 Paul H. Robinson, Criminal Law Defenses, § 177(g)(1) (1984). Thus, again, the order of the trial court’s instructions made perfect sense and was optimally efficient.
XXIII.
The appellant contends that it was error for the trial court to refuse the jury’s request to be permitted to listen to a portion of the appellant’s testimony. After the jury was excused to begin deliberations, the following occurred:
“THE COURT: Let the record reflect that Gwen Cooper, my court reporter, was carrying the exhibits back to the jury room, and a juror requested to know something that the defendant had said on the stand while he was testifying. And, of course, Gwen came and relayed that message to me.
“My ruling is that I’m not going to allow that, because, first of all, [the jurors are] supposed to rely on their memories. They heard the evidence. They are supposed to determine what the facts are. Second of all, if you were to read a small portion of what the defendant said, then that only highlights a certain portion. If, in fact, that is to be done, then the whole transcript should be made available to the jury for their consideration. And because of that reason, that it’s an impossibility to make a whole transcript available to the jury at this point in time, I think that is the reason that you don’t allow the jury to hear any portion thereof. The defense has entered an objection to that stating that they should be allowed to read any portion of the transcript, because it’s, in fact, evidence. And do y’all have any comments before I bring the jury in?”
After denying the request, the trial court instructed the jurors that they must rely on what they heard from the witness stand and any notes that they may have made.
The attorney general correctly points out that whether to allow testimony to be reread to the jury is within the sound discretion of the trial court.
“‘The rule governing additional instructions to a jury is Rule 22.2, Ala. R.Crim.P., which provides:
“ ‘ “After the jurors have retired to consider their verdict, if they request to have any testimony repeated, or if they or any party requests additional instructions, the court may recall the jurors to the courtroom and order the testimony read or give appropriate additional instructions. The court may also order other testimony read or give other instructions, so as not to give undue prominence to the particular testimony or instructions requested. Such testimony may be read or such instructions given only after notice to the parties.”
“ ‘ “This rule is permissive, rather than mandatoryf,] as evidenced by the use of the word ‘may.’ ” Jackson v. State, 581 So.2d 553, 559 (Ala.Crim.App.1991).’
“Grayson v. State, 675 So.2d 516, 523 (Ala.Cr.App.1995) (emphasis added). Furthermore, ‘[t]he decision to allow the jury to rehear testimony rests with the trial judge.’ Collins v. State, 611 So.2d 498, 502 (Ala.Cr.App.1992) (citing Fitchard v. State, 424 So.2d 674 (Ala.Cr.App. *191 1982); Hammes v. State, 417 So.2d 594 (Ala.Cr.App.1982); Martin v. State, 504 So.2d 335 (Ala.Cr.App.1986), and United States v. Sims, 719 F.2d 375 (11th Cir. 1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703 (1984)).”
Scott v. State, 728 So.2d 172, 184 (Ala.1999) (emphasis omitted).
The record does not indicate that the jury made the request because it was confused about a legal issue in the case, see Deutcsh v. State, 610 So.2d 1212, 1218 (Ala.Crim.App.1992); in fact, it does not reveal the reason behind the jury’s request. Therefore, under the circumstances, we find no abuse of the trial court’s discretion in refusing the jury’s request.
XXIV.
A.
The appellant contends that the trial court erred in failing to charge on the offenses of murder with extreme indifference to human life, § 13A-6-2(a)(2),[17] and of heat-of-passion manslaughter, § 13A-6-3(a)(2).[18] “A person accused of the greater offense is entitled to have the trial court charge on lesser offenses included within that offense when there is a reasonable theory from the evidence supporting the lesser offenses.” Living v. State, 796 So.2d 1121, 1129 (Ala.Crim.App.2000). See also § 13A-l-9(b) (“The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense.”). The appellant argues that these proposed lesser offenses were supported by the evidence that he was “pumped up on drugs” at the time of the offense and that he “snapped” when Flour-noy allegedly made profane and vulgar comments to the appellant’s girlfriend. (Appellant’s brief, p. 72.)
The evidence presented here offered no reasonable theory to support either offense. “A charge on reckless murder[, murder with extreme indifference to human life,] is not appropriate where the acts resulting in death are directed toward one or more particular people, ... rather than toward human life in general.” Dunaway v. State, 746 So.2d 1021, 1034-35 (Ala.CrimApp.1998). See also Ex parte Simmons, 649 So.2d 1282, 1284 (Ala.1994) (“The purpose of § 13A-6-2(a)(2) is to embrace those homicides caused by such acts as shooting a firearm into a crowd, throwing a timber from a roof onto a crowded street, or driving an automobile in a grossly wanton manner.”); Haney v. State, 603 So.2d 368, 398 (Ala.Crim.App.1991) (reckless murder “is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual”). The evidence here did not allow for a charge under § 13A-6-2(a)(2): the appellant’s acts were directed toward the three victims, with the intent to kill them. See McLaughlin v. State, 586 So.2d 267, 270-71 (Ala.Crim.App.1991) (“Because it was undisputed that the appellant pursued and *192 pointed a gun at a particular victim, the evidence did not support the reckless murder charge.”). The evidence offered no inference that the appellant’s acts were the result of indifference to human life in general.
In regard to heat-of-passion manslaughter, the evidence presented no legal provocation, such as is required to reduce a killing from murder to heat-of-passion manslaughter. The well-established rule in Alabama is that mere words, no matter how insulting or abusive, cannot reduce a homicide from murder to manslaughter. Biggs v. State, 441 So.2d 989, 992 (Ala.Crim.App.1983). See also Smith v. State, 727 So.2d 147, 161 (Ala.Crim.App. 1998) (in rejecting manslaughter as a lesser offense on the evidence that the killing was triggered by the victim’s comment that the appellant’s wife was “good,” the court stated, “There was no evidence presented from which any inference that [the victim] assaulted or threatened Smith could be drawn, and this court has held that mere words or gestures, however offensive or insulting, will not reduce a homicide from murder to manslaughter.”), aff'd, 727 So.2d 173 (Ala.1999), disagreed with on other ground, Ex parte Borden, 769 So.2d 950 (Ala.2000); Bone v. State, 706 So.2d 1291, 1297 (Ala.Crim.App.1997); MacEwan v. State, 701 So.2d 66, 69 (Ala. Crim.App.1997); Speake v. State, 610 So.2d 1238, 1240—41 (Ala.Crim.App.1992). Because no evidence of adequate legal provocation was presented at trial, the trial court did not err in failing to instruct the jury on heat-of-passion manslaughter.
B.
The appellant further contends that the trial court’s jury instruction on reasonable doubt violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because it stated, “[T]he doubt which would justify an acquittal in this case must be a doubt for which you have a reason arising from all the evidence or lack of evidence.... ” (R. 1835-36.)[19]
*193 The appellant is correct in his assertion that other jurisdictions have condemned such an instruction. See both state and federal cases cited in Adams v. South Carolina, 464 U.S. 1023, 1025-26, 104 S.Ct. 558, 78 L.Ed.2d 730 & nn. 3-4 (1983) (Marshall and Brennan, JJ., dissenting from denial of certiorari review), wherein Justice Marshall stated:
“I continue to believe that trial courts err when they instruct juries that a reasonable doubt means ‘a substantial doubt’ or ‘a strong and well-founded doubt’ or ‘a doubt for which you give a reason.’ The Fourteenth Amendment requires prosecutors to prove beyond a reasonable doubt every element of a crime. In re Winship, 397 U.S. 358 (1970).... [Wjhen a jury is told that a reasonable doubt is a doubt that can be articulated, the prosecutor’s burden of proof is unconstitutionally eased.”
Id. at 1025. See also Butler v. South Carolina, 459 U.S. 932, 935 n. 3, 103 S.Ct. 242, 74 L.Ed.2d 191 (1982) (Marshall, J., dissenting from denial of certiorari review) (“Many courts have disapproved the requirement that a juror be able to articulate a reason for his doubt.”).
We first point out that defense counsel included language to which he now *194 objects in his requested charge no. 10.[20] Thus, assuming the giving of the contested instruction was error, any error was invited by the appellant’s specific request for the charge and therefore would not constitute ground for reversal. See McLaughlin v. State, 586 So.2d 267, 271 (Ala.Crim.App.1991) (quoting Leverett v. State, 462 So.2d 972, 977 (Ala.Crim.App.1984) (“ ‘The doctrine of invited error has been specifically applied to possible error resulting from the defendant’s request for a particular jury instruction.’ ”)), overruled, on other ground, Quinlivan v. State, 627 So.2d 1082, 1088-89 (Ala.Crim.App.1992).
We further find this issue to be without merit under Alabama caselaw. The appellant argues this instruction met the standard expressed in Cage v. Louisiana for unconstitutionality: whether “a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause.” 498 U.S. at 41. However, this standard of review for jury instructions on reasonable doubt has been supplanted by the following: “ “whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. Boyde v. California, 494 U.S. 370, 380 (1990).” Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), We now follow this standard. Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999). “The constitutional question in the present case[], therefore, is whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the [In re] Winship [, 397 U.S. 358 (1970)] standard.” Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994).
Alabama courts have held that the statement that a reasonable doubt is a doubt for which a reason can be given does not violate Cage and does not improperly lessen the prosecution’s burden of proof. Jackson v. State, 836 So.2d 915, 949 (Ala.Crim.App.1999), citing Ex parte McWilliams, 640 So.2d 1015, 1023-24 (Ala.1993); Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2000). See also Ex parte Taylor, 666 So.2d 73, 82-85 (Ala.1995), disagreed with on other ground, Ex parte Borden, 769 So.2d 950 (Ala.2000); Stewart v. State, 730 So.2d 1203, 1232 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.1999); Bush v. State, 695 So.2d 70, 114-15 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997). The court in Burgess, reviewing for plain error the instruction “[a] reasonable doubt is one for which a good reason can be given,” explained:
“The instruction, taken as a whole, was used to explain to the jury the principle that a doubt cannot arise from speculation, surmise, or conjecture, but must be based on the evidence or a lack thereof. The trial court’s instruction did not require that a juror be able to articulate a specific reason for its doubt, but rather that it be a doubt for which a reason could be recognized. The instruction to the jury made it clear that it was to render a verdict based upon a careful consideration of the evidence. ... [T]he use of the term ‘good reason’ [did not mislead] the jury into believing that a higher or different burden of proof than *195 ‘beyond a reasonable doubt’ was require for its deliberations.”
827 So.2d at 180. For cases specifically finding, under the new standard, that instructions containing the “a doubt for which you have a reason” language did not present plain error, see Boyd v. State, 715 So.2d 825, 848-44 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.1998); Williams v. State, 710 So.2d 1276, 1334-85 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997).
Taking the trial court’s instructions in their entirety, as we are required to do, we find that there is no reasonable likelihood that the jury applied the instructions concerning reasonable doubt in such a way as to violate the appellant’s constitutional rights. As a whole, the instructions—including those on the presumption of innocence, burden of proof, and weighing of the evidence—correctly conveyed to the jury the proper concept of reasonable doubt. We find no plain error.
C.
The appellant contends that the following emphasized instruction violated his right to a fair trial:
“[T]he defendant, as you recall, took the stand and testified. And the law gives him that right and that privilege. And when he does so testify, you wouldn’t be justified in rejecting his testimony and setting it aside and saying that you will not believe it just because he is the defendant and interested in the result of your verdict.

“But ivhen you weigh and consider his testimony, you may take into consideration the fact that he is interested in the result of your verdict, but you should give to his testimony such weight and such aredit as you deem it entitled to”

(R. 1841-42.) The appellant failed to object to this instruction at trial. He cites as authority Mosley v. State, 241 Ala. 132, 1 So.2d 593 (1941), and Miller v. State, 20 Ala.App. 562, 103 So. 916 (1925). We find both cases distinguishable.
In Mosley, the trial court instructed that the defendant “has got more interest in the result of the findings of this jury than anyone else, because on the verdict of this jury depends his freedom, his liberty, or on it depends his incarceration, or it may be his death.” 241 Ala. at 136, 1 So.2d at 595. The instruction in Mosley was held to be unconstitutional because it did not instruct in general terms, but unduly emphasized the defendant’s interest in the outcome of the trial. The court expressed concern for “a likelihood that [the instruction] will impress the jury with the thought that in the mind of the trial judge defendant’s evidence is to be very lightly regarded.” Id. at 136, 1 So.2d at 595. The instruction under review in this case does not raise that concern; it did not unduly emphasize the appellant’s interest.
The court in Miller reviewed a mandatory instruction that the jurors “are to consider” the testimony of the defendant “in the light of the fact he is the defendant and interested in the result of your verdict.” 20 Ala.App. at 563-64, 103 So. at 917. Such mandatory instruction is an incorrect statement of the law and infringes on the jury’s role as the ultimate fact-finder in the case. Phillips v. State, 606 So.2d 170, 170 (Ala.Crim.App.1991). However, the instruction in the present case instructs that the jury may take the fact of the defendant’s interest in the outcome of the trial into consideration. “ ‘[T]he rule is that the jury may consider defendant’s testimony in the light of his interest, etc., not that they must.’ ” Phillips, 606 So.2d at 170, quoting Miller v. *196 State, 21 Ala.App. 283, 107 So. 721, 722 (1926).
Alabama courts have approved similar instructions. See, e.g., Smith v. State, 756 So.2d 892, 925 (Ala.Crim.App.1997); Hart v. State, 612 So.2d 520, 529-30 (Ala.Crim.App.), aff'd, 612 So.2d 536 (Ala.1992). In fact, the court in Banks v. State, 448 So.2d 973, 977 (Ala.Crim.App.1984), stated that such a charge correctly states the law and the duty of the jury and should be given in every case in which the defendant testifies. (The court in Banks accordingly rejected the appellant’s claims that “this jury charge singles out the appellant; that it gives his testimony prominence or special attention; and that it tends to disparage his testimony.” Id.)
D.
The appellant contends that the following are examples of instructions given by the trial court that “were skewed in such a way as to distort or even invert their intended meaning” (appellant’s brief, p. 75) and, thus, lessened the prosecution’s burden of proof and deprived him of a fair and reliable verdict. In reviewing these isolated instructions, we are mindful of the following principles:
“ “When reviewing a judge’s oral charge, “each statement made by a judge to the jury should be examined in light of the entire charge and ... isolated statements which appear prejudicial when taken out of context may be innocuous when viewed in light of the entire trial.” United States v. McCoy, 539 F.2d 1050, 1063 (5th Cir.1976), cert. denied, 431 U.S 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977). “‘The language of a charge must be given a reasonable construction, and not a strained and unreasonable one.’ ” Harris v. State, 394 So.2d 96, 100 (Ala.Cr.App.1981). “(F)anciful theories based on vagaries of the imagination” should not be indulged in construing the court’s charge. Addington v. State, 16 Ala.App. 10, 19, 74 So. 846 (1916).’
“Kennedy v. State, 472 So.2d 1092, 1103 (Ala.Cr.App.1984), affirmed, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
“ ‘Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.’
“Boyde v. California, 494 U.S. [370,] 380-81 [(1990)].”
Kuenzel v. State, 577 So.2d 474, 517 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).
First, the appellant asserts that, by the following, the trial court instructed the jury that, before it could acquit the appellant of the capital offense, it had to find beyond a reasonable doubt that the prosecution had not met its burden: “[I]f you find from the evidence in this case the State has failed to meet their burden of proof beyond a reasonable doubt, and then you find the defendant ... is not guilty of capital murder, you have the option of deciding some lesser-included offenses.” (R. 1854r-55.) Clearly, the trial court was merely reminding the jury that the prosecution’s burden was to establish the appellant’s guilt beyond a reasonable doubt. The trial court repeatedly told the jury that it was the prosecution’s burden to prove the appellant guilty beyond a reasonable doubt. Viewing this comment in *197 the context of the entire charge, the appellant’s construction is strained and unreasonable. This contention presents no error, much less plain error.
Second, the appellant contends that the trial court, by instructing the jury that if it acquitted the appellant of capital murder it could consider the lesser offenses if it “wanted” to, gave the jury the impression that the lesser offenses were not serious, viable options. Before instructing the jury on the elements of capital murder, the trial court instructed,
“[My instruction informing you] what the elements are of the indictment ... [i]s going to get somewhat complicated, because not only do you have to decide the guilt or innocence of the defendant on the capital murder case, you have other lesser-included offenses you can consider, if you want to. So we are going to try to logically go down those step-by-step.”
(R. 1846.) Before instructing on the elements of the lesser offenses, the trial court instructed:
“[I]f you find from the evidence in this case the State has failed to meet their burden of proof beyond a reasonable doubt, and then you find the defendant ... is not guilty of capital murder, you have the option of deciding some lesser-included offenses.
“Now, lesser-included offenses ... are going to be ... murder and manslaughter .... [Y]ou need to understand this is a logical progression. You first have to consider capital murder. And, then, if you feel like the defendant is not guilty of that, then you drop down, and you can consider the offense of murder. And, then, if you feel like the defendant is not guilty of that particular crime, then you can drop down and find the defendant guilty or not guilty of manslaughter.”
(R, 1864-56.) While some of this language may not be the most artful, it certainly does not constitute any error, much less plain error. Taking these excerpts in the context of the overall charge, the less than desirable phraseology is innocuous. Again, the appellant’s interpretation of isolated portions of the trial court’s charge is strained and unreasonable.
Third, the appellant argues that, by the emphasized instruction below, the court commented on “the state of the evidence”:
“With respect to the offense of capital murder, if you find the State has proved beyond a reasonable doubt all the elements I have just given to you, then your verdict must be guilty, as I said.
[[Image here]]
“However, if you find from the evidence then that the State has failed to prove one or more of the elements- of capital murder as I just gave to you, then you must find the defendant not guilty.”
(R. 1861-52; emphasis added.) The trial court gave this instruction immediately after stating that, if the jury found that the prosecution had proven beyond a reasonable doubt each of the elements of capital murder, it should find the appellant guilty. By the emphasized comment, the court was merely repeating an instruction it had just given, i.e., “as [it had] said”; it was not commenting that it had said that the jury’s verdict must be guilty. Again, we are presented with a frivolous, strained, and unreasonable interpretation. The trial court properly overruled the appellant’s motion for a mistrial on this ground.
XXV.
The appellant contends that the following “flaws” in the trial court’s sentencing instructions violated his rights under the Fifth, Sixth, Eighth, and Fourteenth *198 Amendments as well Alabama law (although he cites none):
A.
The appellant contends that the trial court’s repeated reference to the jurors’ sentencing verdict as a “recommendation” reduced the jurors’ sense of responsibility. It is well established that an instruction of the trial court accurately informing the jury that its sentence verdict is advisory and a recommendation and that the trial court would make the final decision as to the sentence do not violate Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2638, 86 L.Ed.2d 231 (1985). Ex parte Taylor, 666 So.2d 73, 88 (Ala.1995). Moreover, instructions regarding the jury’s role in sentencing as that of offering only a recommended or advisory verdict do not conflict with Alabama law. Id. at 87.
By the following instruction, the appellant also argues, the trial court informed the jurors that it might not follow their recommendation and that life imprisonment without the possibility of parole means life imprisonment without parole only if the court follows their verdict:
“The law provides that the punishment for the capital offense for which you have convicted the defendant is either death by electrocution or life imprisonment without the eligibility of parole. Life imprisonment without parole means life imprisonment without parole. If you recommend life without parole, and I follow your recommendation, Alabama law will never allow the defendant to be paroled.”
(R.2098.) The appellant argues that this instruction was prejudicial because “it gave the impression that if the panel voted against death Mr. Smith could actually be paroled.” (Appellant’s brief, p. 76.) The court’s instruction is straightforward in conveying that only two sentences are permissible; it does not imply that a third sentence—one with eligibility for parole— is possible. We find no error, much less plain error, in this instruction.
B.
The appellant again raises the alleged impropriety of the reasonable doubt instruction that “a reasonable doubt is one which you have a reason for.” (R. 2105.) As we rejected the appellant’s argument attacking the guilt-phase instruction on this ground, we likewise reject this argument. See Part XXIV.B., supra.
C.
The appellant contends that the trial court erred in instructing the jury on the “great risk of death” aggravating circumstance. This issue is without merit. See Part XI, supra.
D.
The appellant argues that the trial court, by differentiating between its oral charge and the charges submitted by the attorneys, signaled the jury that there was some distinction between the charges. The court instructed:
“[A]s in the guilt phase of the trial, the attorneys have requested certain written requested charges. I will read these at this time. Again, they are correct propositions of law, and you are to consider them as correctly stating the law of Alabama, and you are to take these along with the Court’s oral charge.”
(R. 2122.) Ala.R.Crim.Proc. 21.1 requires only that the trial court read the charges “without reference as to which party filed the request.” See also Smith v. State, 727 So.2d 147, 169 (Ala.Crim.App.1998) (approving an instruction like the one in this case in all important aspects). We find no error.
*199 XXVI.
The appellant contends that throughout the trial, the trial court “made offhand remarks which may have left the jury with a distorted view of the evidence, the case, or the appellant.” (Appellant’s brief, p. 77.) He calls our attention to only two instances during the trial where he contends the court acted improperly. No objections were made at trial to these alleged improper comments. He first argues that the trial court erred in telling the venire during voir dire that there would be a second or penalty phase in the trial; and, second, that error occurred when the trial court made comments that suggested to the jury that there existed incriminating evidence against the appellant that it would not get to hear. We do not agree with the appellant’s conclusion.
A fair reading of the trial court’s comments clearly shows that the trial court did not tell the members of the venire that there definitely would be a penalty phase, but on the contrary, told them that there would be a penalty phase only if the appellant was found guilty. The trial court’s comments outlining the trial procedure to be followed were correct.
Likewise, the record does not support the appellant’s conclusion that the trial court led the jury to believe there was incriminating evidence that it would not get to hear. The comments referred to were simply the court telling the jurors that during their service on the jury they should avoid all media coverage of the trial, that information in the media was not evidence to be considered, and that they must base their decision solely on the evidence presented and admitted in the courtroom during the trial. The instructions complained of were not misleading and were proper.
After reviewing the entire record, we find no merit in the appellant’s contentions concerning the trial court’s comments, and certainly no plain error.
XXVII.
The appellant contends that Alabama’s method of execution constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.
“The use of the electric chair, as a means of satisfying a capital punishment, has repeatedly withstood constitutional challenge. See Woods v. State, 789 So.2d 896 (Ala.Cr.App.1999); Jackson v. State, 836 So.2d 915 (Ala.Cr.App.1999); Scott v. State, 728 So.2d 164 (Ala.Cr.App.1997), aff'd, 728 So.2d 172 (Ala.), cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999); Williams v. State, 556 So.2d 737 (Ala.Cr.App.1986), aff'd in part, rev’d in part on other grounds, 556 So.2d 744 (Ala.1987), on remand, 556 So.2d 746 (Ala.Cr.App.1988), after remand, 571 So.2d 336 (Ala.Cr.App.1989), aff'd, 571 So.2d 338 (Ala.1990), cert. denied, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991).”
Smith v. State, 795 So.2d 788, 832 (Ala.Crim.App.2000). We find no merit in this contention.
XXVIIL
The appellant contends that Alabama’s system of limiting the compensation for attorneys appointed on capital cases to $1,000 for out-of-court work for each phase of the trial violates the separation-of-powers doctrine, constitutes a taking without just compensation, violates the Due Process Clause, deprives indigent capital defendants of the effective assistance of counsel, and violates the Equal Protection Clause.
*200 “These claims have repeatedly been rejected. See Ex parte Smith, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997); May v. State, 672 So.2d 1310 (Ala.1995); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Smith v. State, 581 So.2d 497 (Ala.Cr.App.1990), rev’d on other grounds, 581 So.2d 531 (Ala.1991), on remand, 581 So.2d 536 (Ala.Cr.App.1991), after remand, 698 So.2d 189 (Ala.Cr.App.1996), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997).
“ ‘It should be noted that the Alabama Legislature recently passed the “Investment in Justice Act of 1999,” and, in pertinent part, that Act amended § 15-12-21. Under the new Act, the rate of compensation for attorneys representing indigent criminal defendants is increased to $50 per hour for in-court time and $30 per hour for out-of-court time, with no limit on compensation for an attorney in a case involving a capital offense. Moreover, effective October 1, 2000, the hourly rate increases to $40 per hour for out-of-court time and $60 per hour for in-court time.’ McWhorter v. State, 781 So.2d 257, 306 (Ala.Cr.App.1999).”
Smith v. State, 795 So.2d 788, 832-33 (Ala.Crim.App.2000).
In regard to the appellant’s contentions that the statutory limitation on attorney fees constitutes a taking without just compensation and violates the separation of powers,
“these issues have been previously addressed and rejected by this Court and by the Alabama Supreme Court. See, e.g., Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Hyde v. State, [cite]; Barbour v. State, 673 So.2d 461 (Ala.Cr.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); May v. State, 672 So.2d 1307 (Ala.Cr.App.1993), writ quashed, 672 So.2d 1310 (Ala.1995); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993); and Smith v. State, 581 So.2d 497 (Ala.Cr.App.1990).”
Broadnax v. State, 825 So.2d 134, 206 (Aa.Crim.App.2000).
For these reasons, we find no merit in the appellant’s contentions regarding the limit on compensation for attorneys in capital cases.
XXIX.
The appellant contends that the cumulative effect of all the errors he alleges on appeal entitles him to a new trial and/or a new jury-sentencing hearing. We disagree.
In accordance with Ala.R.App.P, 46A, we have examined the record in this case for any plain error, whether or not brought to our attention or to the attention of the trial court. We have found no “plain error or defect in the proceedings” in the guilt phase of the trial or in the jury-sentencing phase. Thus, we have determined that each alleged error is without merit or is harmless. We further find, upon considering these alleged errors cumulatively, that their cumulative effect, likewise, does not require reversal. Jackson v. State, 791 So.2d 979 (Ala.Crim.App.2000).
In its sentencing order, the trial court stated the following in reference to the statutory mitigating circumstances: “I have considered all of the statutory miti *201 gating circumstances and find that some of them exist.” (Emphasis added.) However, the trial court addressed only one: § 13A-5-51(6). (The court addressed this one even though it had not submitted this circumstance to the jury for its consideration, yet did not address the two it did submit to the jury, § 13A-5-51(2) and (3).) In sentencing a defendant in a capital case, the trial court is required, among other things, to enter specific written findings concerning the existence or non-existence of each mitigating circumstance enumerated in § 13A-5-51. Jones v. State, 520 So.2d 543 (Ala.Crim.App.1984), aff'd, 520 So.2d 553 (Ala.1988); Hubbard v. State, 382 So.2d 577 (Ala.Crim.App.1979), aff'd, 382 So.2d 597 (Ala.1980), rev’d on reh’g on other grounds, 405 So.2d 695 (Ala.1981); § 13A-5-47. Clearly, a finding by the trial court that “some” of the statutory mitigating circumstances exist, without identifying them, is insufficient. Moreover, the trial court lists 16 proposed nonstatutory mitigating circumstances with the preface: “I have made the following findings of fact with regard to some of the mitigating circumstances.” However, most are listed without any findings, including whether the trial court found each proposed mitigating circumstance to, in fact, mitigate the offense.
“In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in a particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances and the mitigating circumstances as found by the trial court.”
Roberts v. State, 735 So.2d 1244, 1269 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala. 1999). Without a proper sentencing order, whereby we can discern the trial court’s finding on each statutory mitigating circumstance and without a listing of each nonstatutory mitigating circumstance the trial court found to exist, we cannot perform our function of reviewing the judgment of the trial court sentencing the appellant to death.
In accordance with the above, we affirm the judgment of conviction, and we remand this case to the trial court for that court’s review and/or reconsideration of its sentence in light of our discussions in Parts IX, X, and XI, supra, and for it to enter a new sentencing order that fully complies with § 13A-5-47(d).
The trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time within 42 days of the release of this opinion. The return to remand shall include a transcript of the sentencing proceedings conducted by the court.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.
LONG, P.J., and McMILLAN, BASCHAB, and FRY, JJ., concur; COBB, J., concurs in part and dissents in part.

. The grand jury initially returned four indictments against Jerry Jerome Smith charging capital murder: cases CC-97-268, CC-97-269, CC-97-270, and CC-97-271. Each in- . dictment alleged the commission of a capital offense arising out of the same facts and circumstances, i.e., “[mjurder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct,” Alabama Code 1975, § 13A-5-40(a)(10). Pursuant to the appellant’s motion, the prosecution elected to proceed to trial on the indictment in case CC-97-270. The trial court and the appellant agreed to the State’s election. The indictment upon which the appellant was tried reads, in pertinent part, as follows:
“The grand jury of said county charge that, before the finding of the indictment, Jerry Jerome Smith ... did intentionally cause the death of David Lee Bennett by shooting him with a .22 calibre rifle during the course of intentionally causing the deaths of Willie James Flournoy and Theresa Ann Helms by shooting them with a .22 calibre rifle, in violation of § 13A-5-40(10) of the Code of Alabama.... ”

. The waiver contained a statement that the appellant understood his rights, that he was willing to make a statement, that he understood what he was doing, that he did not want a lawyer, and that no promises had been made and he had not been pressured in any way in order to induce him to make the statement.

. On October 21, 1999, the day following his statement to Officer Jay and Officer Beeson, the appellant asked a jailer to arrange for him to speak to the officers again. He was taken to the office of Officer Beeson where he told Beeson that his girlfriend had been charged with the crime, but that she did not do it, and that he had killed the men. This statement was clearly volunteered, was not subject to Miranda warnings, and was admissible in evidence. While it was taken up in the suppression hearing, the appellant raised no objection to it, and does not now raise any issue relating to it on appeal.

. The records consisted of police records concerning an assault on the appellant's sister by the appellant's father when the appellant was 12 years old; a police report on the arrest of the appellant's father for a second assault on the appellant’s sister five months later; hospital records for treatment of the appellant's sister for injuries allegedly resulting from the two assaults; Salvation Army group home records concerning the appellant's sister and their family during her five-week stay in the home after the second assault; a mental health, facility's records regarding psychological counseling provided the family during a one-year period after the assaults; and Alabama Department of Human Resources records pertaining to the appellant’s sister and the family during the year the assaults occurred.

. After the appellant testified that his oldest brother was mentally retarded and that one of his siblings had been in prison, the prosecutor objected. In response, the trial court instructed the jury to disregard the testimony regarding the appellant’s sister being retarded *146 and his brother having been in jail. There was no evidence before the jury, at the time of the ruling, that a sister was retarded: the evidence was that the oldest brother was retarded. There was also no specific evidence that a brother had been imprisoned: the evidence was that a sibling, gender unspecified, had been in prison. Thus, the evidence of the brother's mental retardation and a sibling’s incarceration remained before the jury.

. The appellant did list the following as a proposed nonstatutory mitigating circumstances he wanted included in the trial court’s jury charge at the conclusion of the sentencing phase: “Mr. Smith's cousin, [A.J.T.] is in a mental institution.” (C.R.232.) Although the appellant does not argue that evidence of this allegedly mitigating circumstance was erroneously excluded, we note that, absent evidence of some extraordinary link of this alleged fact to the appellant, evidence of the commitment of a cousin would be irrelevant.

. We did not arrive at this conclusion effortlessly. Although Maxwell’s participation after his testimony was so minimal that he was, in essence, not actively participating before the jury, Valeska twice included Maxwell in his arguments to the jury as a prosecutor in the case. In his initial closing argument in the guilt phase, Valeska commented, "I have the burden of proof, myself, and Mr. Maxwell.” (R. 1703.) In his opening argument in the sentencing phase, he stated: “On behalf of [the victims], the law in Alabama says that this part of the trial the State of Alabama, myself, as the District Attorney and my Assistant District Attorney seek the death penalty, not you, this jury.” (R. 1946-47.) However, we find that when these two isolated comments are considered in the context of Vales-ka’s extensive arguments to the jury, where all other references were in regard to him as being the representative of the State, not to him and Maxwell as prosecutors, we find that the two isolated comments above do not so undermine Maxwell’s limited participation before the jury after his testimony as to confuse the jury.

. The prosecutor’s direct examination of Maxwell was basically to the point: he asked Maxwell to reiterate the statement Lavoris Smith had made in his presence concerning her telephone conversation with the appellant. Although Valeska elicited from Maxwell only his reiteration of Lavoris Smith’s out-of-court statement, defense counsel elicited from Maxwell his version and opinion of the entire interview of Lavoris Smith by Valeska. For example, defense counsel elicited Maxwell’s opinion that her out-of-court statement helped the prosecution's case tremendously; he also elicited Maxwell’s opinion that Lavoris Smith changed her testimony because she was trying to protect herself and her daughter; he evoked Maxwell’s "many years of experience”; and he elicited the testimony that Va-leska told her at the beginning of the interview that he wanted the truth, whether it benefited the prosecution or not.

. The case to which this quote is attributed in Woods—People v. McGuire, 89 Mich. 64, 50 N.W. 786—does not contain this sentence. A search in an extensive database discloses that this sentence is found only in the Alabama cases attributing it to McGuire, Still, we consider it to be an accurate statement of the law.

. We note that the trial court gave other pertinent instructions at various times during the proceedings. For example, after the jury was sworn, the trial court instructed: "Only you are the deciders of facts in this case, and the only facts you need to consider are those from the witness stand. You are the sole judges of the facts in this case and that's your job.” (R. 475-76.) It further instructed, just before presentation of the evidence, as follows:
"[T]he facts of the case .., are solely for you to determine. I have no opinion and can’t give an opinion as to the facts. That is for you to decide. And once the Court instructs you on the law, you take the law and apply the facts to that.... Now, the statements made by the attorneys in this case are not evidence. You are not to deem those as evidence. The only evidence in this case is what comes from the witness stand.”
(R. 655-56.)

. The court in Jackson held that this analysis could not be applied to the aggravating component of the capital offense—in that case, the victim was in a motor vehicle when killed and the deadly weapon causing his death was fired from outside the vehicle—to elevate the crime of murder to capital murder. The court explained:
"Under the facts alleged in the indictment, Jackson’s intent to kill Prickett [the intended victim] can certainly be ‘transferred’ to the conduct that actually resulted in the death of Roberts. However, Prickett’s location (in a motor vehicle) cannot be 'transferred' to Roberts so as to elevate the crime to capital murder.”
614 So.2d at 407. This holding has no application to this case.

. See also Hagood v. State, 777 So.2d 214 (Ala.1999) (it is the preferred practice to use the pattern jury instructions). However, we are cognizant of the following qualification:
"While most pattern jury instructions may be properly used in the majority of criminal and civil cases, there may be some instances when using those pattern charges would be misleading or erroneous. In those situations, trial courts should deviate from the pattern instructions and give a jury charge that correctly reflects the law to be applied to the circumstances of the case. Similarly, while there will likely be few instances in which the giving of a pattern instruction would be plainly erroneous in a capital case, we do not foreclose that possibility. For that reason, a trial court must diligently scrutinize the jury charges it gives—even pattern charges—on a case-by-case basis to ensure that they properly instruct the jury in accordance with applicable statutes and caselaw."
Ex parte Wood, 715 So.2d 819, 824 (Ala.1998).

. Although the appellant does not make this argument, the indictment charged the appellant with three deaths, but the trial court’s jury charge put the determination of the appellant’s guilt in the context of two deaths. In this regard, we note the following:
"The appellant’s sixth argument is that there was a critical and material variance between the indictment and the State’s proof at trial that denied him a fair trial and an accurate penalty determination. Specifically, he contends that, by stating that he caused the deaths of '[A., B., C., and D.],' the State was required to prove that he killed all four of the decedents. Based on that contention, he further argues that the trial court erred in instructing the jury that, to convict him of the capital offense, it had to find only that he killed two or more of the decedents.
"Initially, we note that the indictment substantially tracks the language of the capital murder statute. See § 13A-5-40(a)(10), Ala.Code 1975. Also, the trial court substantially followed the pattern jury instruction when charging the jury on the capital offense of murder of two or more people pursuant to one scheme or course of conduct.... Finally, ... the jury concluded that the appellant was responsible ... for the murders of all four victims, and the evidence supported that conclusion. Therefore, we conclude that the appellant had sufficient notice of the charges against him and that there was not a material variance between the indictment and the proof at trial.”
Wilson v. State, 777 So.2d 856, 887 (Ala.Crim.App.1999), aff’d, 777 So.2d 935 (Ala.2000).

. For example, after the jury was sworn, the trial court instructed:
"Only you are the deciders of facts in this case, and the only facts you need to consider are those from the witness stand. You are the sole judges of the facts in this case and that's your job. I have no opinion or no comment about the facts. My job is basically to conduct the proceedings in this trial and instruct you as to the law at a later time.”
(R. 475-76.)
It further instructed, just before presentation of the evidence, as follows:
"[T]he facts of the case ... are solely for you to determine. I have no opinion and can’t give an opinion as to the facts. That is for you to decide. And once the Court instructs you on the law, you take the law and apply the facts to that.... Now, the statements made by the attorneys in this case are not evidence. You are not to deem those as evidence. The only evidence in this case is what comes from the witness stand.”
(R. 655-56.)
In its oral charge to the jury, the trial court instructed:
“Again, you are the triers of the facts in the case. It's totally up to you to decide the facts in the case. I have no opinion about the facts of this case one way or the other, nor should I have an opinion.”
*185 “You should base your decisions only on the evidence admitted in this courtroom. And not everything you heard and saw in this courtroom is evidence. The testimony, the writings, the objects and the other things presented during the trial and allowed by the Court into evidence are evidence in the case. The statements made by the attorneys are not evidence and should not be used by you as evidence in this case.
"However, once evidence is admitted, only the jury can decide two essential things about it: First, whether or not it should be believed; and, second, how important it is. And you should make these decisions about each part of the evidence by using your own common sense as reasonable men and women. You should not imagine things that can't be proven by the evidence admitted in this trial.
[[Image here]]
"You are the sole judges of the evidence in this case and of the credibility of the witnesses. You may accept or reject any part of the testimony you consider worthy of belief. In determining the weight to be given the testimony of any witness, you may consider the demeanor of that witness while on the witness stand, and his or her apparent candor or evasion, or the existence or nonexistence of any bias or interest in the case. And you may take into consideration any matter which you would consider in your own every day affairs in passing upon the truthfulness and the accuracy of the testimony. And you should weigh the testimony in the light of your own common sense and observations and reach a verdict that will be based upon the truth as you determine it from all the evidence in the case.”
“[T]he defendant, as you recall, took the stand and testified. And the law gives him that right and that privilege. And when he does so testify, you wouldn't be justified in rejecting his testimony and setting it aside and saying that you will not believe it just because he is the defendant and interested in the result of your verdict.
"But when you weigh and consider his testimony, you may take into consideration the fact that he is interested in the result of your verdict, but you should give to his testimony such weight and such credit as you deem it entitled to.
[[Image here]]
"I am not permitted by law to express my opinion or comment on the effect of the evidence presented to you on the credibility of any witnesses in this case. Therefore, any ruling, statement, or expressions which may have been made by me during the course of this trial is not to be considered by you as any effort on my part to convey to you any feeling or opinion about the facts of this case or the credibility of any witnesses in this particular case.”
"[D]o not come back and ask me an instruction on what the evidence was in the case, because you determine the evidence. I can’t clear up any part of the evidence. You were supposed to listen to the evidence and make your own minds up. And, again, like I told you before I have no opinion as to the evidence in this case or can’t express an opinion. That is for you. My job is to explain the law to you. You heard the facts. You apply the facts to the law as you see it in this case.”
(R. 1829, 1836-39, 1841-44, 1879-80.)

. Technically speaking, voluntary intoxication is never a defense to a criminal charge; however, it may negate the specific intent essential to an intentional murder and reduce it to manslaughter. See McConnico v. State, 551 So.2d 424 (Ala.Cr.App.1988); § 13A-3-2(a).

. After instructing the jury that intent to kill is a necessary element of capital murder, the trial court instructed:
“[I]f you find from the evidence in this case the State has failed to meet [its] burden of proof beyond a reasonable doubt, and then you find the defendant ... is not guilty of capital murder, you have the option of deciding some lesser-included offenses.
"Now, lesser-included offenses in this case are going to be murder, not capital murder, but murder and manslaughter.... [Y]ou need to understand this is a logical progression. You first have to consider capital murder. And, then, if you feel like the defendant is not guilty of that, then you drop down, and you can consider the offense of murder. And, then, if you feel like the defendant is not guilty of that particular crime, then you can drop down and find the defendant guilty or not guilty of manslaughter....
[[Image here]]
"Before I go on to the lesser-included offense of murder, let me give you just a few more definitions under the capital murder statute.... Intent must be specific and real in a capital murder case..... The defendant must act intentionally as opposed to negligently, accidentally, or recklessly [to] cause the death of the deceased in order to convict the defendant of capital murder...,
"You act intentionally with respect to a result or conduct when you have the purpose to cause that result or to engage in that conduct. Intent is to be determined by the surrounding circumstances and by the actions, if any, of the defendant.”
(R. 1854-59; emphasis added.) After the trial court listed the elements of murder, including intent, § 13A-6-2(a)(l), and after it instructed the jury on the elements of reckless manslaughter, including recklessness, § 13A-6-3(a)(1), the court continued:
“A person who creates a risk, but is unaware thereby solely by reason of voluntary intoxication acts recklessly with respect thereto, Voluntary intoxication means intoxication caused by substances that the actor knowingly introduced into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them under circumstances that would afford a defense to a charge of the crime.
“If you find from the evidence that the State has proved beyond a reasonable doubt each of the above elements of the offense of manslaughter as charged, or as in a lesser-included offense, then you should find the defendant guilty of manslaughter. If you find the State has failed to prove beyond a reasonable doubt any one or more of the elements of the offense of manslaughter, then you can't find the defendant guilty of manslaughter.
"Now, in this case, the defense has interjected two issues, or two defenses. One being the defense of intoxication, as regarding ... whether or not the defendant had the intent to commit the crimes in question.
“Intoxication of the defendant, whether voluntarily or involuntary, may be considered by you, the jury, whenever it is relevant to negate an element of the offense charged, such as intent. However, being unaware of a risk because of voluntary intoxication is not relevant in considering whether the defendant acted recklessly where recklessness is an element of the crime charged.
"Although voluntarily intoxication does not serve as an excuse, the intoxication may render the accused incapable of forming the essential mental elements of the crime charged.
"And, ... there has been some evidence of duress in this particular case.... To convict, the State, in addition to the elements of the crime charged, must prove beyond a reasonable doubt that at the time of the commission of the alleged crime the defendant did not engage in the alleged criminal conduct because he was compelled to do so either, Number One, by the threat of imminent death; or, Number Two, by the threat of serious physical injury to himself or to another.”
(R. 1864-68; emphasis added.) After completing its instruction on duress, the trial court completed its oral charge by reading charges submitted by the parties, including the following:
*189 "The Court charges the jury if you find from the evidence ... Smith recklessly caused the deaths of the victims, then you may find [him] guilty of manslaughter and not of capital murder.
"[I]f you find that ... Smith killed the victims, but [he] didn’t intend to kill the victims, then you cannot convict [him] of capital murder.

“[I]f you find that Mr. Smith didn’t have the capacity to form an intent, then you must acquit him of capital murder, because capital murder requires an intentional killing."

(R, 1874-76; emphasis added.)

. Section 13A-6-2(a)(2) provides, “A person commits the crime of murder if ... [u]nder circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person.”

. Section 13A-6-3(a)(2) provides, "A person commits the crime of manslaughter if ... [h]e causes the death of another person under circumstances that would constitute murder under Section 13A-6-2; except, that he causes the death due to a sudden heat of passion caused by provocation recognized by law, and before a reasonable time for the passion to cool and for reason to reassert itself.”

. The court’s charge on reasonable doubt was, as follows:
"Now, the defendant is presumed to be innocent until he is proven guilty beyond a reasonable doubt by the evidence in this case. And he comes into Court clothed with this presumption and this presumption follows him throughout the course and the proceedings of the trial until the evidence produced by the State of Alabama convinces each of you of his guilt beyond a reasonable doubt. And this presumption of innocence is to be regarded by you as a matter of evidence in the case to the benefit of which the accused is entitled. And as a matter of evidence, this presumption attends the accused until and unless his guilt is proved beyond a reasonable doubt by the evidence in this case.
"In the defendant's case, as in all criminal cases, where a defendant pleads not guilty, the burden of proof is upon the State of Alabama to convince each member of the jury as to the truth of the material allegations beyond a reasonable doubt contained in the indictment. The burden of proof in a criminal case never shifts to the defendant.
"Now, what is reasonable doubt. It’s a very simple term, in fact. [T]he doubt which would justify an acquittal in this case must be a doubt for which you have a reason arising from all the evidence or lack of evidence and remaining after careful consideration of the testimony, such as reasonable, fair-minded, and conscientious men and women would entertain under all the circumstances. The State is not required to prove guilt beyond all doubt, but beyond a reasonable doubt. Again, reasonable doubt is a doubt for which you have a reason.
"You should base your decisions only on the evidence admitted in this courtroom. ...
"... [O]nce evidence is admitted, only the jury can decide two essential things about it: First, whether or not it should be believed; and, second, how important it is. And you should make these decisions about each part of the evidence by using your own common sense as reasonable men and *193 women. You should not imagine things that can’t be proven by the evidence admitted in this trial.
"... [Y]our verdict must not be based on suspicion, speculation, or conjecture.
(R. 1833-38.)
In instructing the jury on the elements of the capital offense and of the two lesser included offenses, the court stated that, for the jury to convict, the prosecution “must prove beyond a reasonable doubt” each of the elements of the offense under the jury’s consideration. (R. 1847, 1848, 1860, 1863, 1865.) The court continued:
"I instruct you that in investigative matters of fact and weighing evidence, you may not assume that the defendant ... is guilty, and then attempt to reconcile the evidence with that theory of guilt. It is your sworn duty to presume Jerry Jerome Smith's innocence, to give him the benefit of that presumption all through the trial and in every stage of your investigation of the evidence in the jury room until it's overcome, if it shall be overcome, by proof beyond a reasonable doubt.
"The evidence in order to deprive the defendant of the benefit of this humane presumption of law must not only be consistent with the theory of guilty, but must be inconsistent with and exclude every reasonable theory of innocence. And as long as you are able to ... reconcile the evidence of any reasonable theory of Jerry Jerome's innocence, the law makes it your duty to do so.
"If upon a full consideration of all of the evidence in the case, you entertain a reasonable doubt as to whether the defendant, Jerry Jerome Smith, is guilty of the crime charged against him in the indictment, you cannot find him guilty.
"The Court charges the jury that a humane provision of the law is that upon the evidence there should not be a conviction unless it excludes every other reasonable hypothesis than that of the guilt of the accused. And no matter how strong may be the facts, if they can be reconciled with the theory that the defendant did not do the act, then the guilt of the accused is not shown by the full measure of proof the law requires.
"The Court charged the jury that the burden is never on the defendant to establish his innocence, or to disprove the facts necessary to establish a crime of which he is charged; but that in this case if any and all the evidence after consideration of all the same, raises in the minds of the jury a reasonable doubt as to the guilt of the defendant, you should acquit the defendant.
"The Court charges the jury that while reasonable inferences from the evidence may furnish a basis for proof beyond a reasonable doubt, mere possibilities, suspicion, or guess work, no matter how strong, will not overturn the presumption of innocence.”
(R. 1870-74.)

. Charge no. 10 states: “A reasonable doubt is sometimes said to be a doubt for which a reason can be given; it must spring from the evidence in the case, and the evidence only; if, after careful consideration of all the evidence you have a doubt arising from the evidence, or any part of the evidence, of the defendant’s guilt, and if such doubt seems to be reasonable to you, then the defendant should be acquitted. ’ ’ (C.R.203.)